[No. S008840. July 3, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
HERBERT JAMES CODDINGTON, Defendant and Appellant.

532

538

**COUNSEL**

Bruce Eric Cohen, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Appellant was convicted by a jury in the El Dorado County Superior Court of the May 16, 1987, first degree murders (Pen. Code,

§ 189)[1] of Mabs Martin, age 69, and Dorothy Walsh, age 73 (counts 1 and 2), with a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), and of the May 17, 1987, forcible rape (§ 261, former subd. (2), now subd. (a)(2)) of Alecia T. (count 3), oral copulation (§ 288a) of Monica B. (count 5), and forcible digital penetration (§ 289, subd. (a)) (counts 4 and 6) of Alecia T. and Monica B., ages 14 and 12, respectively. The jury also found true an allegation that the crimes in counts 3 through 6 fell within section 667.6, subdivision (c), which provides for full consecutive terms. On appellant's plea of not guilty by reason of insanity, the jury found him sane at the time the crimes were committed. After trial of the penalty phase the jury returned a verdict of death on both murder counts. On January 20, 1989, after denying appellant's motions for new trial and reduction of the penalty (§ 190.4, subd. (e)), the court imposed the death penalty for the two murders, denied probation, and imposed four consecutive terms of eight years each on the remaining counts.

This appeal is automatic. (§ 1239, subd. (b).)

We shall affirm the judgment in its entirety.

## I

### FACTS

A. *Prosecution Guilt Phase Evidence.*

Martin and Walsh were murdered on May 16, 1987, when they accompanied Alecia and Monica, as chaperones, to what all four believed was the filming of an antidrug video in which the girls were to appear.

The evidence established that Alecia and Monica were lured to a South Lake Tahoe mobilehome appellant occupied on May 16, 1987, for the ostensible purpose of acting in the antidrug video. Prior to May 16, 1987, appellant had contacted several modeling agencies in Reno in person and by telephone, sometimes using the name Mark Bloomfield, and stated that he was interested in finding teenage models for the video. The caller, in a May 14, 1987 call to the Barbizon Modeling School and Agency in Reno, used that name and said he was from Barrett or Parrot Communications in Georgia. The person who appeared at the Barbizon agency on May 15, identifying himself as Mark Bloomfield, had a business card bearing the word Parrot. He appeared nervous and in disguise. His hair was very black and was slicked back with a hair preparation, he wore a mustache, and had

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

horn-rimmed glasses. The owner of the agency decided that she would not supply any models for him. The person who contacted Aviance Modeling Agency on May 13, 1987, had dark brown hair, a mustache, and wore glasses. He asked if the agent there knew where Avalon Modeling Agency was located. A man who identified himself as Mark Bloomfield had called the Avalon Agency on May 13, 1987, inquiring about teenage models for an antidrug campaign he was filming at Lake Tahoe.

In May 1987 appellant had also contacted Candice Smith, a woman employed as a blackjack dealer in Stateline, Nevada, who knew him as Gary Sarno, a daily player at the blackjack table. Evidence was presented that before he called Smith, appellant told another blackjack dealer that he understood that Smith had a "pretty cute little daughter." Appellant telephoned Smith at 3:00 a.m. using the name John Parrot. He affected a Southern accent and said he was calling from Atlanta, Georgia. The caller said he had obtained her name from Avalon Modeling Agency and wanted to use her in a beer commercial. During the call he mentioned Smith's daughter. Smith said she was not interested and questioned the hour of the call. He said he had played at her table quite a bit. He knew quite a bit about her. She hung up. He called back at 9:00 a.m., again identifying himself as John Parrot, and explained that he just wanted her to know the call was legitimate. He offered to let her speak to his partner. A voice which she thought was the same person then said "hello." Using the prior voice, he said he wanted to meet her for lunch. She hung up.

On Thursday evening, May 14, 1987, Mabs Martin, the owner of Showcase Models, set up an audition for appellant at her agency in Reno. Appellant, using the name Mark Bloomfield, conducted the audition. Witnesses described him as having really dark black hair that appeared to be dyed. He wore glasses and a dark pinstripe suit. Alecia, Monica, and eight to 10 other girls auditioned. They read from cue cards about drug abuse and walked around the studio. Ostensibly this audition was for a commercial to be shot at Lake Tahoe the following Saturday.

On Friday afternoon appellant auditioned girls at the Barbizon Modeling School. That evening appellant auditioned Jennifer K., another student at Showcase Models. When Jennifer parked she noticed a large, expensive car with a license that she believed read "TVTEEN." After discussing the drug problem and looking at Jennifer's portfolio, appellant said they would be going to Regan Beach. He talked about the commercial and said he wanted her to bring very short shorts and a bathing suit. Jennifer knew that Martin planned to drive other girls to the site, but wanted to drive separately as she had to go to Sacramento on Saturday with her family. Martin and appellant

opposed this. He wanted everyone to drive to Tahoe together and to meet at the Nugget casino. Martin arranged for Jennifer to meet Martin on Saturday morning and drive with Martin to the meeting. Martin called Jennifer later that evening and told Jennifer that appellant did not need Jennifer. His photographer said she was too old. Martin called Alecia and Monica, and told them that they had won the parts and would be paid $50 per hour.

Other circumstantial evidence that appellant planned both the murders of the chaperones and sexual molestation of the girls was offered. David Hacker testified that, in 1983, appellant had read aloud to David and his brother Allen from a booklet about assassinations which described various methods of killing people. One of the methods was using a clear nylon baggage tie, pulling it tight and walking off. Appellant said at the time, "[O]nce you have it on, you can't get it off." Evidence was presented that in February 1987, at the time appellant became the sublessee of the trailer, a person using the name Gary Sarno advertised in a local newspaper for used carpeting or mattress material needed for soundproofing. The telephone number of one person who had responded to the ad was found among appellant's possessions. Also, early in 1987 a South Lake Tahoe lumber company delivered plywood and studs to the trailer. In May 1987 a repairman entered the trailer and saw plywood, drywall, and insulation laid flat in the living room. A neighbor and the manager of the trailer park observed old and end pieces of carpet outside the trailer. An invoice revealed that the FLEX-CUF[2] ligatures that could not be released once cinched up, which appellant knew could be used to strangle Martin and Walsh, had been ordered on March 13, 1987. The People also offered exhibits consisting of various scraps of writing by appellant found in his trailer. Exhibit No. 186 included writings taken from other exhibits which asked how to call "them," "how will they come," "where will they meet," how to get "them" to the trailer, and how to get "them" inside. To the last two, the response was "force."

Although most of the evidence of preplanning related to luring and confining teenage girls, these documents also bore words that could reflect appellant's concern that the chaperones would have to be killed. On one response appellant had added "tarp," which the prosecution argued was something in which a body could be wrapped. The prosecutor also argued to the jury that various disjointed words found on those papers reflected planning the murders and how to dispose of the bodies. Those words included "bag," "sacks," "case," "burn," "Rot," "shallow", "deep," "won't eat through," "chop," and "where store" followed by "trunk," "van," "M.D,"

---

[2]FLEX-CUF is a proprietary name for a self-locking plastic restraint to be used on human subjects. It must be cut to be removed.

"trailer," and "motel." Another series of words, which the prosecutor argued reflected preplanning of the murders, asked "what to do once inside" and responded "throat," "zap," "stomach," "straps," "cuffs," and "backup 45." Other notations suggested that appellant had also planned to leave distracting clues when he left and had planned what he would say if apprehended.

On Saturday, May 16, 1987, Martin told her son that she was going to drive to South Lake Tahoe with two girls to shoot an antidrug commercial and that her friend "Dottie" Walsh would accompany them. Martin owned a 1984 Chrysler Fifth Avenue automobile. Martin met Alecia and Monica and then picked up Dottie Walsh. They drove to the Nugget where Martin parked and the group waited in the restaurant. When appellant arrived, all five drove to appellant's trailer in Martin's car. The girls were told to go inside so they could change into shorts and freshen their makeup.

The two girls went in with Martin and Walsh. Appellant directed them to a room with wood walls on which were pictures of models. There was a bed in the room, but there were no mirrors. As the girls entered the room appellant rammed Martin and Walsh and threw them into the room, closing the door behind him. He ran to Alecia and hit her on the jaw with a rectangular black object about five inches wide and two inches thick. He then began hitting and pushing Martin and Walsh on the chest and face. He told all four to shut up and told Martin and Walsh to lie on the floor so he could tie them up. Before Martin got down, appellant threatened to kill one of the girls if she did not get down. He then used FLEX-CUFs to tie the women's hands behind their backs and to bind their feet. Walsh begged not to be killed. Martin told appellant, "[T]ake us. Don't hurt the girls." One of them told appellant she would give him all the money he wanted, to which appellant replied, "I know you will." Alecia gave appellant money she had in her pocket. Appellant put a pillowcase over Martin's head and a FLEX-CUF around her neck. She asked him to loosen it, saying she could not breathe. She started to gag, and fell over to the side from a sitting position.

Appellant then ordered Alecia and Monica to lie over the legs of the older women. He used FLEX-CUFs to tie their hands behind their backs and their feet together. He then put Alecia on the bed and Monica on the floor beside the bed. He put a jacket over Alecia's face and a pair of shorts over Monica's head. Alecia could see only the carpet. She heard a "throwing up" sound from Walsh. Monica heard gargling noises. Alecia then heard a dragging sound like bodies being dragged. About 15 minutes later she heard the sound of plastic bags. Monica also heard the noise of dragging of the plastic bags and thought Martin and Walsh were no longer in the room.

Appellant then returned to the room. He took the FLEX-CUFs off the girls and retied their hands in the front with belts. He put a ski mask over

Alecia's eyes and a pillowcase over her head, securing it with a rope around her neck. Alecia was able to see a red substance on the carpet to the right of the door, however. Asked about what he was doing at that spot, appellant replied that he had spilled Kool-Aid and was going to clean it up. Monica was able to see him scrubbing something dark brown on the carpet.[3] Appellant was wearing a plastic bag over his head. His hair was black and wet.

Appellant told Alecia and Monica that he did not want them, saying, "[W]e wanted Mabs, and I was paid to get her, and I'll have to be paid extra for Dottie." Appellant allowed the girls to take off the wrist restraints and blindfolds. He said he might hold the girls for ransom. When Monica asked him if he was going to kill them, he displayed a pistol with a silencer on it, and said that if he planned to kill them he could already have done it. Alecia saw that the door into the room had eyeholes in it. Appellant gave them water, and, after making them turn around and put the pillowcases over their heads, brought in some fruit. Later, appellant brought magazines. Alecia removed an address label for "Herb Coddington" from one and put it in her suitcase. She later gave it to the FBI.

The next morning when the girls awoke, appellant brought eggs and strawberries and made the girls take vitamins. He allowed them to go into the living room of the trailer. Appellant was wearing what Alecia thought was a turtleneck with the arms over his mouth and part of his ears and a ski hat over his hair. The hair that she could see was orange. Monica thought he was wearing a knit cap and ski mask. She also saw orange hair sticking out. After the girls watched television, appellant said he was going to work out. He put them back in the other room and told them to change clothes so they could work out also. They heard heavy breathing as if he were working out. He said he was going to shower and they heard a shower. He then let the girls come back into the living room and had them exercise to a videotape. They were returned to the other room. They refused appellant's offer of a shower, but when Alecia used the bathroom to brush her teeth she saw brown hair, about the size of a moustache, all over the sink.

Appellant told the girls that they were going to make a videotape to be sold in Europe, with an 18-year-old boy his friends had kidnapped. He told them they would have to take off their clothes. He blindfolded them, but Alecia could see out under the blindfold. She asked appellant if he was going to rape them. He replied "no," and added that if the boy hurt them he would hurt the boy. The girls were then put on the bed where they held hands. Appellant then climbed onto the bed and began whispering to Monica. In his

---

[3]Carpet pad from that location bore blood identified as coming from a person with the same PGM (phosphoglucomotase, an enzyme) classification as Dorothy Walsh.

normal voice, holding a microphone, appellant pretended to tell the nonexistent boy to be gentle and make the girls feel relaxed. Affecting the voice of a young boy he then whispered to Monica that he was also scared and that, while he did not think they were going to be killed, the people had guns. Appellant undressed Monica and kissed her all over her body including her private parts. Alecia could hear, but could not understand, the whispering. When she asked Monica if she was all right, Monica replied "yes." After about half an hour Monica said "stop" and asked to get dressed. Appellant agreed.

Appellant then took off Alecia's clothes and whispered in a young boy's voice that he was sorry, he did not want to do this, and he hoped they would not kill them. He massaged Alecia all over her body and kissed her on her lips, breasts, and upper vagina. After 20 minutes she said "stop." She heard appellant's voice coming from some distance, but there was still weight on the bed. It felt like a foot.

The girls were allowed to dress and go into the living room. Only appellant was there. Appellant said the video would have to be repeated as it was "not worth two cents" and no one would buy it. He promised to let the girls go home if they did another five or 10 minutes. He put them back in the room and again blindfolded them. Alecia was put on the floor, Monica on the bed, but they could still hold hands. Monica heard a voice with a European or British accent say the tape was no good, and heard appellant respond that he had tried. The other voice said he would have to do another one.

Appellant removed Monica's clothes and put a finger in her vagina. She felt pain and repeatedly asked him to stop. The voice pretending to be a boy called out to appellant and appellant said to stop. He asked Monica if she wanted her mouth on him and, when she said no, he told her that she would have to keep doing "it." Next, pretending to be the boy, he took her finger and sucked on it, saying that was how to do it. Appellant then put his penis in her mouth. She said she was going to throw up to which he replied: "Why did you say that? Now, you've ruined the whole thing." He told her she would have to do more. She said she could not and he allowed her to dress.

Appellant then put Alecia on the bed and told her that since Monica did not do very well she would have to do better. She repeatedly said "no," but he removed her clothes and put his finger in her vagina. She screamed to stop it. Appellant then said: "Well don't use the finger, you're going to have to fuck her." She screamed that he had promised he would not rape her, but appellant got back on the bed, put Alecia's legs over his shoulders and

inserted his penis into her vagina. It was very painful and she told him that "it doesn't fit," again asking him to stop. He got off and said: "Well it doesn't fit. You're going to have to use the finger again." Appellant then inserted his finger into her vagina, causing her great pain and some bleeding. Alecia could see a red light in the corner of the room and believed it was a camera that was videotaping.

The girls were allowed to watch television later. When they asked permission to call their parents, appellant told them they could tape their voices and he would play the tape over a pay phone. He let them go to bed where they eventually fell asleep. On Monday morning, May 18, appellant told the girls that he was going to release them someplace and call the police so they could be taken to Reno. He instructed them to say they had been kidnapped and taken to a blue two-story house in Sacramento, warning them that if they did not follow those instructions the girls' families would be in danger. He did not release them, however. They were rescued that night by FBI agents and South Lake Tahoe police who had identified appellant as the suspect from composite sketches based on witness descriptions of the man who had been interviewing teenage models.

The law enforcement agents had been alerted to Alecia's disappearance by her stepfather. Alecia's stepfather broke into Martin's studio and used her Rolodex phone directory to contact persons from whom he was able to identify Martin's automobile, which his brother-in-law then located on a parking lot at South Lake Tahoe. FBI agents determined that the "TVTEEN" license plate was connected to a Tveten automobile dealership in South Lake Tahoe,[4] and learned from Tveten that the composite sketch was of a person Tveten knew as Gary Sarno, whose address was supplied. That address was for the trailer park where appellant lived in a trailer next to Tveten's mother. The trailer park manager confirmed that appellant's car had a "TVETEN" license plate on it before he acquired a Nevada plate.

In March 1987, Tveten had seen old carpeting outside appellant's trailer. Appellant told Tveten he was making a soundproof room for playing the guitar. Appellant had purchased a Porsche from Tveten because appellant's BMW, purchased in Europe, could not be registered in California. Appellant then told Tveten he was going to have the BMW licensed in Nevada and would not need the Porsche. Tveten took the Porsche on consignment to sell for appellant. About two weeks before the crimes with which appellant was charged, Tveten had given appellant paper license plates from his dealership so appellant could drive the BMW to Nevada for registration.

---

[4]The "license plate" was actually the auto dealer's promotional card in the form of a license plate.

The trailer was placed under surveillance. The manager told agents that a paper dealer's license reading TVETEN formerly had been on appellant's car which now bore a Nevada license. Tveten telephoned appellant, told him that appellant's Porsche had been sold and Tveten had the money for him. Tveten also told appellant that the FBI was looking for him and that he should call them. When Tveten asked appellant if he was involved in the kidnapping that the newspapers had reported, appellant replied that he had done "much worse."

Alecia heard the telephone ring and appellant say: "What? My picture's in the post office?" They then heard a car leave. Shortly thereafter appellant telephoned David Hacker asking for directions to Allen Hacker's home in Happy Camp. Appellant said that "[t]hings were getting a little hot." FBI agents followed appellant when he left the trailer in the early evening and saw him enter the post office and look at the bulletin board. His hair was a glowing orange-yellow. Appellant returned to the trailer at 9:00 p.m. Three minutes later an FBI agent received a telephone call from a man who identified himself as Herb Coddington and said he understood the FBI was looking for him, that a friend had seen his photo in the post office and said that he was wanted. Asked for what, the caller replied: "The kidnapping in Reno." The agent told the caller that he was not sure whom they were looking for and would have one of the agents who had that information call. The caller gave the agent the phone number and address of the trailer occupied by appellant.

On Sunday whenever the two girls asked appellant if they could leave, he responded only, "[L]et me think." He once said he would drop them off and call the police so they could be taken to Reno, and that he would try to get a plane to Europe. Later, Alecia heard appellant ask someone on the telephone, "[M]y picture is on the wall?" Appellant then told Alecia and Monica that they did not have to worry because "they found me." He told them to give him their clothing so he could wash off his fingerprints. By then the trailer, which had been under surveillance, was surrounded by law enforcement personnel. Two FBI agents who had been assigned to interview appellant knocked, identified themselves as agents and asked to talk to appellant, who replied that he did not want to speak in person and would rather talk to them on the telephone. The lights had gone out and immediately an FBI agent made a call to the trailer. Appellant asked the agents outside what he was to do and was told the call was from the FBI and he was to answer the phone and do exactly as told. Appellant answered the phone and said there were people at the door. He was told the people were FBI agents and he should open the door. He told the agent on the telephone that the girls were there and said he needed to go to a hospital.

Law enforcement personnel then assaulted and broke into the trailer. As they did so another agent had broken a window in the trailer, looked in and saw appellant. He ordered appellant to "go down" and held him at gunpoint until the other agents who had by then entered the trailer took appellant into custody. While held at gunpoint, handcuffed and searched, appellant stated again that he was sick, and the girls were all right. He also said that the women were in a back bedroom and that he had placed them in plastic bags because he did not want any "messies." The FBI agents found Alecia and Monica in a room built within another room, its door secured by a two-by-four that was used as a bar. South Lake Tahoe officers, who then assumed control of the investigation, found the bodies of Martin and Walsh in plastic bags in a bedroom of the mobilehome.

Appellant was advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]) at the time he was placed in an automobile for transportation to jail. While being transported appellant admitted that he had killed Martin and Walsh. He said again that he was sick and needed help. Under questioning, appellant admitted that he had strangled the two women. He killed them almost immediately after they entered the mobilehome on Saturday morning because they had fought him and were too hard to control. He denied sexual molestation of the girls. He explained his conduct by saying there were too many bad things in the world, too much smoking in the casinos, and too many drunk drivers.

Appellant was then taken to, and interviewed at, the South Lake Tahoe Police Department after again being advised of and waiving his constitutional rights. When asked how he killed the two women, appellant told the officers that he had strangled Martin and Walsh and they could find the cord he used inside the residence. He said he had killed the women almost immediately on Saturday morning when he brought them into the trailer. When asked how he controlled the two girls he said that he had built a soundproof room that the agents would find inside. He denied any sexual contact with the girls. He again explained his conduct by saying that there was too much smoking in the casinos and too many drunk drivers. He told the agents that police officers had a difficult job and that was why he had bagged up the women the way they were bagged up so the police would not have to see the "messies."

During the time the girls were being held in the trailer appellant had called Michael Szeremeta, an acquaintance then living in Minnesota whom he had called several times before these incidents. Szeremeta testified that he and appellant met in Las Vegas in 1982. Appellant was then a gambler by

profession and had authored two books on gambling. Szeremeta, who had an advanced degree in mathematics, had discussed the mathematical possibilities related to gambling with appellant and thought appellant had a very sophisticated understanding of the subject. Appellant was accomplished at card counting, which improved the odds in his favor. In 1985 appellant had moved to South Lake Tahoe, but he still visited Szeremeta. Appellant once mentioned that he was practicing clairvoyance techniques and believed he could predict the outcome of the cards in baccarat.

Szeremeta moved to Minnesota in 1986. Appellant had called him on the telephone about five times after that. In either January or March 1987, appellant referred to "the man in Philadelphia" who had captured a woman and held her captive. Szeremeta received the fifth call from appellant during the time Alecia and Monica were being held captive. Appellant told Szeremeta that "I have something going here . . . something like the guy in Philadelphia." Asked if it was voluntary, appellant replied "no." Appellant was not worried that he might be discovered because, he said, the landlord never came around. Appellant also said that he was close to 30 years old, his life was going nowhere, and the man in Philadelphia had gotten away with it. He told Szeremeta that Szeremeta might want to stop by if he was in the area as "it" was "better than [he] could imagine."

When found, Martin's body, which had been inside a garbage bag, had a portion of a FLEX-CUF around her neck. Her hands were then tied with rope. Walsh, whose body was wrapped in clear plastic and placed inside three garbage bags, had a FLEX-CUF around her neck. Her hands were then tied in front of her body with rope. Autopsies confirmed that ligature neck compression was the cause of death of both Martin and Walsh. Each victim had suffered additional, very similar injuries, including lacerations and abrasions. There was bruising in Walsh's vaginal area outside the hymeneal ring, and a tear of Martin's vaginal area just outside the hymeneal ring. Walsh also suffered a hemorrhage inside her brain from a blow to the head. A FLEX-CUF container was found in the master bedroom of the mobile-home.

A physical examination revealed a recent bruise on Alecia's thigh and one on her cheek, erythema (redness), engorgement, and bluish bruising in the vaginal area, and torn necrotic tissue hanging from the hymen. The examining physician could not identify the instrumentality that caused the injuries, but they were consistent with insertion of a finger. Monica also had reddened tissue in the vaginal area.

B. *Defense Guilt Phase Evidence/Prosecution Rebuttal.*

During voir dire of the jurors the defense conceded that defendant was responsible for the deaths of Martin and Walsh, and that he had molested the

two girls. During closing argument counsel again conceded appellant's guilt of the sex offenses and that he had killed Martin and Walsh. He disputed only the degree of homicide of which appellant was guilty and argued that the killing was an unplanned reaction to the victims' screaming and resisting when forced into the plywood room, an attempt to quiet the victims. Although the FLEX-CUFs were on the women's necks, only when that failed to quiet them did appellant pull them tight and kill them.

Only one defense witness was called during the guilt phase of the trial. The prosecutor had said in his opening statement that a Mr. Hacker would testify that appellant had a fascination with FLEX-CUFs. In response to that statement, Allen Hacker testified that he had met appellant in 1981 or 1982 while working in Las Vegas casinos exploring the potential of card counting. Appellant was one of several persons he knew in Las Vegas who counted cards. He and appellant also shared an interest in target shooting.

Allen Hacker testified that he would not testify in accordance with the prosecutor's opening statement that appellant was obsessed with use of FLEX-CUFs as a method of killing. In 1982, in a Las Vegas gun shop, Allen Hacker and appellant had discussed "ziplocks," which he described as locking nylon strips like those used to tie garbage bags, when Allen read from a booklet, supposedly written by an ex-CIA agent, that described ways to kill people. He and appellant agreed that the methods were outrageous and unrealistic. Appellant expressed no particular interest in nylon ties then or in their subsequent contacts. Hacker denied telling FBI Agent McKevitt that appellant read The Anarchist Cookbook and seemed interested in ways of killing people, particularly women.

Allen Hacker also described appellant's inability to function under stress and "inappropriate" behavior while part of a gambling team of card counters. Appellant's behavior drew attention to himself when it appeared that the house was catching on. Allen Hacker denied telling FBI agents that appellant was cunning, sly, and expert at disguises. He believed he had told the agents that appellant was a bumbler who did unusual things. Appellant was extremely bright about mathematics, but did not act the way other people did and most people were uncomfortable around appellant. Socially, appellant was like a 12 or 13 year old.

In rebuttal, McKevitt, the FBI agent who had interviewed Allen Hacker, testified that when she interviewed Allen Hacker, he had described appellant as sly, cunning and an expert at disguises. On cross-examination she conceded she could not recall whether Hacker might have said appellant believed he was an expert at disguises. The agent testified that Hacker was

surprised that appellant was the subject of the investigation and thought appellant was too intelligent to get caught. Hacker had also told the agent that appellant was interested in methods of killing people, particularly women.

## C. *Sanity Phase Evidence.*

Three defense experts testified that, in their opinion, appellant was legally insane at the time of the offense.

Mark J. Mills, M.D., a psychiatrist and professor of psychiatry at the University of California at Los Angeles Medical School, was the director of the Program in Psychiatry and Law for the UCLA Neuropsychiatric Institute and Hospital, and director of the Forensic Science Medical Group. He was board certified in psychiatry, neurology, and forensic psychiatry. Prior to attending medical school, Dr. Mills had graduated from Harvard Law School. He had interviewed appellant on two occasions for a total of 10 or 11 hours and had discussed the case with appellant's counsel and reviewed some documents to understand what had happened.

Dr. Mills offered his opinion that appellant did not suffer from any organic brain damage or illness, although there was a "negativity" in the temporal lobe that would be consistent with a delusionary disease. Dr. Mills concluded that for several months before and continuing through several months after the crimes appellant suffered from a delusional or paranoid disorder of the grandiose type described in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev.) (DSM-III-R). Appellant believed he had a special relationship with a deity. A delusion is a systemic belief not shared by most other persons. Dr. Mills believed that appellant believed he was receiving messages from God in very unusual forms. Green traffic lights meant that whatever he was thinking he should do, red that whatever he was thinking or fantasizing about should be stopped. Yellow was a warning. Certain numbers heard on the radio or seen on clocks also communicated messages from God: 46 or 45 were "go" numbers. Twenty-six was a "stop" number. Indicative of his disorder, about a year and a half before the crimes appellant switched from rational thinking to "crazy" or "magical" thinking in his gambling. He believed at this time that if he did not obey the messages he received things would turn out very badly.

Dr. Mills was satisfied that appellant was not malingering. He found that many of the beliefs appellant described to him were also reflected in entries appellant made in his diary and on other papers contemporaneously with the

events he described. Appellant knew what he was doing when he killed Martin and Walsh. He knew they would die when he applied the ligatures and he knew that was against the law. However, appellant believed that since he was obeying personal messages from God who would punish him if he did not comply, appellant did not believe or understand that he was violating any moral law. On that basis, Dr. Mills opined that appellant was insane at the time of the criminal acts.

Tests given to appellant several months after the crimes did not indicate he was psychotic or crazy, possibly because of the delay in testing. The delusional disorder had gotten better in the structured setting of the jail, where appellant received support from his attorneys and understood the reality of the pending charges.

Fred Rosenthal, M.D., a psychiatrist with experience as a biologist and neurophysiologist, interviewed appellant for about 12 hours total and interviewed his mother, father and sister. He also reviewed extensive writings of appellant, a 60-page autobiography appellant prepared while in jail, police and FBI reports, psychiatric reports, and psychological testing reports. He concluded that appellant was psychotic and legally insane at the time he committed the crimes. He believed that appellant's illness might be schizophrenia, although not a typical textbook case of that illness, but he did not make that a firm diagnosis. Appellant did suffer a psychotic episode, but Dr. Rosenthal did not know if this was a psychotic episode superimposed on the borderline aspects of appellant's personality, or a brief reactive psychosis to stress, or if appellant was schizophrenic and had become psychotic at the time of the offenses. The delusional disorder diagnosis of Dr. Mills was not inconsistent with Dr. Rosenthal's diagnosis, as a delusional disorder is another, more specifically paranoid, form of psychosis.

Dr. Rosenthal believed appellant had severe obsessional problems as reflected in an endless production of notes and lists, voluminous written materials, the way he thought, his actions as described by others, and his very small and meticulous writing.

Dr. Rosenthal based his conclusion that appellant was psychotic and delusional on appellant's history, his magical thinking about numbers, and appellant's belief that he had extrasensory perception and belief that he was receiving messages from God who ordered appellant to do his bidding. Dr. Rosenthal testified that delusional thinking of this type was fairly common among schizophrenics and other persons who become psychotic. Although appellant was aware of the nature and quality of his actions and understood that what he did would cause the death of Martin and Walsh and knew that

his conduct was unlawful and condemned by society, he did not understand that it was morally wrong.

Joseph Satten, M.D., a psychiatrist, interviewed appellant three times for about eight to nine hours total, spoke with appellant's parents and sister, and reviewed the FBI reports and the reports of prior psychiatric examinations, and the documents prepared by appellant at different times in his life. He also concluded that at the time of the offenses defendant suffered from a mental disease or defect, and was legally insane. Appellant suffered from a long-term mixed personality disorder with elements of several personality disorders. He also had obsessive compulsive disorder, which caused him to have obsessions and feel driven to do certain things. The obsessive-compulsive disorder had been superseded briefly by a psychotic disorder, either a paranoid (delusional) disorder or an atypical psychosis. Like Drs. Mills and Rosenthal, Dr. Satten concluded that appellant was insane at the time of the offenses. While appellant understood he was killing two women, he was incapable of distinguishing right and wrong and did not understand that what he was doing was morally wrong.

Dr. Satten found no inconsistency between appellant's statement to him that he had received no messages on the day he lured the victims to his trailer and his statement to another expert that the traffic lights were all green on the way to the trailer. Appellant simply meant that there was no message that he should not go through with his plan. He did not receive a stop message. Telling one person that he received the go-ahead sign in January and another that he received it in February 1987, was not a major or meaningful inconsistency.

Drs. Mills, Rosenthal, and Satten were aware of the contrary views of court-appointed experts and other experts who had examined appellant. They were also aware of appellant's past use of deception and lies, his gambling practices, and other factors which might suggest that he was not being truthful and was motivated to lie when interviewed by them. That information did not change their view that appellant was psychotic and legally insane at the time he committed the crimes.

The prosecution witnesses offered contrary opinions.

Bruce T. Kaldor, M.D., had been appointed by the court to determine whether appellant was insane at the time of the commission of the crimes. He reviewed all available information and interviewed appellant for six hours over two days, interviewed his relatives, friends, jail personnel, arresting officers, and others. He asked Dr. Michael Erickson to undertake psychological testing to distinguish personality disorder, neurosis and psychosis, and possible malingering. Dr. Kaldor testified about the "practice effect"

in which intelligent persons interviewed by several mental health professionals are able to tailor their responses to indicate certain symptoms. He also observed that persons who suffer from mental illness can be excellent malingerers because they have experienced the symptoms they describe. Dr. Kaldor believed that the inconsistencies in statements appellant made to the various experts could be significant in determining if he was malingering.

Dr. Kaldor concluded that appellant had a severe personality disorder with many facets, a DSM-III-R mixed personality disorder. His diagnosis was "Mixed personality disorder with anti-social, paranoid, border-line obsessive/compulsive, passive/aggressive, and narcissistic features." Appellant knew what he was doing when he killed the two women and knew that the acts were unlawful. He had not conceptualized his own religion, but had a concept of morality that was very idiosyncratic to him. He had his own ideas of what was right and wrong. He had no well-systematized, organized religious moral conception. Dr. Kaldor believed that as an aspect of his obsessive-compulsive disorder appellant did engage in conduct based on his perception of the meaning of numbers and traffic lights, but when caught, appellant exaggerated and embellished this for his own self-serving purposes to avoid responsibility for what he had done. Dr. Kaldor conceded that if he believed appellant's version of God fit within the *People v. Skinner* concept,[5] he would have to conclude that appellant was legally insane at the time of the offenses.

Robert M. Bittle, M.D., a psychiatrist appointed by the court, reviewed similar material, requested psychological and neurological testing, and interviewed appellant and his relatives. He also concluded that appellant, who was very intelligent, with an IQ of 142 to 145, had a remarkable ability to rationalize his behavior and beliefs, and was able to manipulate the psychological testing. He did not believe appellant's use of numbers or stoplights

[5]In *People v. Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752] , this court construed the test of legal insanity adopted in June 1982, by initiative (Prop. 8) as Penal Code section 25, subdivision (b), which provides: "In any criminal proceeding, . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." We held, with regard to application of the second prong of the insanity definition: "If the mental illness is manifested in delusions which render the individual incapable . . . of understanding that [the act] is wrong, he is legally insane under the California formulation of the M'Naghten test." (*Skinner,* at p. 782.) The defendant must know that the act was "inherently, or morally wrong." (*Ibid.*) As applied when a defendant suffers from a delusional mental illness, a person who "because of mental illness believed that God commanded and expected him to kill another human being and that therefore the killing was morally justified and was not 'wrong' " would meet that prong of the insanity test. (*Id.* at p. 783.) A person "who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Ibid.*)

had a delusional quality that would amount to a major mental illness. Appellant had an obsessive-compulsive personality. Such people go through certain rituals as a natural part of their personality. They tend to be more superstitious and have more rigid behavior patterns which they try to rationalize. This behavior went back to appellant's adolescence. Appellant was not disturbed by these behaviors and they did not seriously interrupt his daily existence. At the time of the offenses appellant was not totally controlled by making every decision with this ritual and with his obsessive thoughts and compulsive behavior. He had some independence. This distinguished appellant who had an obsessive-compulsive personality from a person suffering from a major mental illness or obsessive-compulsive disorder. The signs from God defendant experienced were a means by which appellant rationalized or justified behavior in which he wanted to engage.

Dr. Bittle diagnosed appellant as having a severe borderline personality disorder with a multitude of features including passivism, hysteroid elements, pendent elements, passive/aggressive elements, and antisocial elements. This was his lifelong functioning since midadolescence, accounting for his behavior over the preceding several years that he best represented what would be referred to as a borderline personality disorder. With a borderline personality under special circumstances in a period of high stress, the individual may have an acute psychotic episode. Dr. Bittle considered, but concluded that appellant did not suffer from, schizophrenia, a delusional paranoid disorder, or a brief reactive psychosis. Dr. Bittle concluded appellant suffered from a mental defect, a personality disorder, borderline type, that was severe, but that disease did not impair appellant's ability to understand the nature and quality of his acts or his ability to know right from wrong. Appellant did not have an organized moral system or a delusion that originated in an external source.

The parties stipulated that all of the guilt phase evidence could be considered in the sanity phase.[6] They agreed that the hundreds of documents seized in appellant's trailer would be displayed to the jury to emphasize the sheer number of records and papers he retained, some of which went back to his school days, and on many of which his compulsive writing appeared. They further stipulated that appellant had over $10,000 in cash available when arrested. The jury also received evidence regarding appellant's gambling activity and investments, and heard very brief testimony by his parents about his childhood, his family, his upbringing, and his religious beliefs. It viewed two videotapes, the first a compilation of home movies and slides depicting appellant in his early years, the other being excerpts of films found

---

[6]The jury was not instructed to that effect, but counsel agreed that should the jury request any information about the guilt phase evidence, an instruction would be formulated.

in appellant's trailer, which included scenes of appellant with a former girlfriend and her children and the part of a pornographic film into which appellant had inserted a clip of himself wearing makeup.

The jury returned a verdict finding appellant sane at the time of the offenses.

D. *Defense Penalty Phase Evidence.*

Joanne Garner had known appellant well through grammar and high school, but had seen him only twice since graduation. Most of her knowledge of appellant came from his visits to the home of his grandparents who were her neighbors. She testified that appellant had been normal, clean-cut, neat and fastidious, and very serious. He got along well with teachers and played chess with his fourth grade teacher during recess. She described normal childhood activities and said that when appellant got involved in something he became very involved and really studied the matter to learn everything he could about it. He was not dishonest and was never violent, but was always the peacemaker. He would not harm anyone's property because he did not want that to happen to him. She and appellant were romantically involved for a brief period in high school, but when she told him she did not want to become more involved he accepted it and they remained friends. He had no sexually perverted or bizarre sexual ideas. He had a good relationship with his grandparents. Garner could not understand his murdering Martin and Walsh.

Vladimir Grigoriew had known appellant from kindergarten through high school. They lived three houses apart, played together, and were close friends. They saw each other infrequently after appellant joined the Marine Corps, but Grigoriew had visited appellant in California. As a child appellant was intellectual, cultured, and civilized compared with the other children. He read books and was not outdoorsy or physical. He was a master at any indoor board game. Appellant was obsessive about health and against smoking, drinking, taking drugs or eating junk food, frequently commenting about how bad those things were. He ordered a soft drink or water in bars or, if he ordered a drink, it would last for the evening. As an adult appellant had criticized Grigoriew's driving because he was not maximizing gasoline mileage. Appellant drove excessively slowly, to save gas.

Appellant was not violent or even physical. He was frustrated because he was not popular and some children thought he was a wise guy. Appellant spoke in a loud voice and spoke out of turn in class. He would sometimes become depressed and felt that he was a loser because he and his circle of

friends had not accomplished much in school and he did not have a girlfriend or a car. He had a very low image of himself.

Grigoriew described appellant's family as a typical average family, almost a model family. His father was a professional, and was a handyman around the house. He was quiet, but was available if someone had a question or wanted to know how something was done. Appellant's mother worked part-time, but spent most of her time taking care of the household, raising the children. The family had a nice house and two cars, and they socialized. Church was important to appellant's parents, but appellant had objected to having to attend religious education classes in grammar school. In high school appellant developed an interest in the Mormon Church, and joined the Methodist Youth Fund, which was made up of girls, in order to meet girls. He got Grigoriew to join with him for that purpose. The girls elected appellant president at the first meeting.

Appellant had discussed becoming an attorney with Grigoriew, but dropped out of college, saying high school had not prepared him to study for college. Grigoriew testified that after appellant dropped out of college, appellant did unusual things that caused Grigoriew to think appellant was having a nervous breakdown. Appellant shaved his head, hung around wearing white pajamas, and acted like a kung fu character. Then appellant took all his money and left for Las Vegas to gamble and win a lot of money, but found out only when he got there that you had to be 21 to gamble. Appellant then joined the Marine Corps even though they had agreed that a military career was not right for either of them.

Grigoriew was surprised that appellant did have some success as a gambler later, and believed appellant was successful and happy. In 1985, however, when Grigoriew visited him, appellant was dissatisfied with his life and with having accomplished little. On cross-examination Grigoriew testified that he had never given appellant permission to represent to the manager of the Tahoe Verde Mobile Home Park that Grigoriew would be appellant's roommate and had not authorized appellant to obtain a telephone calling card in Grigoriew's name.

Appellant's father, G. Herbert Coddington, testified that appellant seemed like a normal child, but was a little more intelligent than average. He had a good memory and learned to play games like chess at an early age. He had no problems with the law and was no more disobedient than other boys his age. He was respectful of other people and was never cruel or violent. Kindness was one of his strong attributes. He was very gentle and the younger children liked and looked up to him. Small children liked him, and

flocked around him. Appellant did have obsessive traits, however. He followed his parents around the house turning off the lights when they left the room. He chastised his mother for smoking. Raised as a Catholic because his mother was Catholic, appellant objected to having to attend services regularly while his father, a Protestant, did not do so. He annoyed his father by questioning him and asking "why" repeatedly. The family was close-knit and lived close to both sets of grandparents.

Appellant did not understand or accept the family rule that because a gentleman does not hit a girl he could not retaliate when hit by his sister or another girl. Appellant suffered from Osgood-Schatter's disease and was dissatisfied that he could not participate in physical activities as a result.

When appellant joined the Marine Corps he was promised he could sign up for the job he wanted and selected intelligence. He was made a clerk-typist, which fit within that category, but felt cheated and went AWOL. His father convinced him he should return. When he did he was given psychological tests, which led to an honorable discharge as unfit psychologically for service. When appellant last came home for Christmas in December 1986, his father noticed nothing unusual about his behavior other than that appellant played Santa Claus and ran back and forth handing out presents to the people there.

Appellant's father could not explain his son's conduct in committing the crimes.

Appellant's mother testified that she could recall nothing in appellant's upbringing to explain the crimes. They were a pretty close family, always together and supported each other. In Las Vegas appellant became more and more lonesome and wanted someone with whom to share his life, but he did not know how to go about it. He lived in a fantasy world. He liked science fiction and did not know what reality was anymore. At Christmas 1986 appellant seemed more nervous, but she thought it was from the stress of gambling.

Neither parent was aware that appellant had been discharged from the Marine Corps because of mental or emotional illness.

The parties stipulated that appellant had no prior criminal convictions.

E. *Prosecution Penalty Phase Evidence.*

The only evidence offered by the People at the penalty phase was rebuttal evidence in the form of a stipulation that appellant had represented to a

rental agent that Grigoriew would be a cotenant of the space at the Tahoe Verde Mobile Home Park and that appellant had secured phone service in Grigoriew's name, and had received an international telephone credit card in that name.

After argument and instructions, the jury returned a verdict of death.[7] The court denied appellant's automatic motion for modification of the penalty and his motion for new trial, after which judgment imposing the penalty of death was pronounced. Before imposing judgment the court found that appellant had been "well and fully represented by counsel" and ruled that the murder counts and special circumstances had been proved beyond a reasonable doubt, and that the aggravating factors outweighed the mitigating factors.[8]

## II

### APPELLATE CLAIMS

A. *Pretrial and Guilt Phase Issues.*

1. *Transfer to Placerville for trial.*

Appellant contends variously that the transfer of his trial from South Lake Tahoe to Placerville was unauthorized, denied him the right to trial in the vicinage in which the crime was committed, and denied him the right to a jury drawn from a representative cross-section of that area, both in violation of the Sixth Amendment to the United States Constitution. He also claims that the jury selection procedures denied him certain statutory rights.

Although the South Lake Tahoe area is only 50 to 60 miles from the county seat in Placerville, the El Dorado Superior Court has sessions in

---

[7]Only one verdict of death was returned and this was read in open court. It did not specify the count or counts for which the jury determined death was the appropriate penalty. We have held that this is not error or a defective verdict. (*People v. Hines* (1997) 15 Cal.4th 997, 1070-1071 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Crittenden* (1994) 9 Cal.4th 83, 159 [36 Cal.Rptr.2d 474, 885 P.2d 887].) However, in practice this rule could be troublesome in a case in which conviction on one of several murder counts is reversed as judgment is not pronounced on each count of which defendant is convicted. For this reason, the better practice is to provide the jury with verdict forms for each count on which the penalty must be imposed and to impose a penalty on each count.

[8]As to the noncapital counts, probation was denied, and full consecutive eight-year upper terms imposed for each count on the basis that each involved great violence, the offenses were premeditated, the victims were particularly vulnerable, and there were multiple victims. The court specified that should the death sentence be reduced or commuted, the 32-year term was to be served prior to any reduced or commuted murder terms. Credit for 650 days time served and conduct credits was awarded.

South Lake Tahoe for actions arising in the Tahoe area and in Placerville for actions arising in the "Western Slope" of the Sierra Nevada Mountains. The division facilitates a continuity of proceedings during the winter months when snow, ice, and related road closures make transportation from the Tahoe region to Placerville difficult. Code of Civil Procedure section 199 accommodates that division, providing that in El Dorado County, jury venires for the superior court "shall be drawn from residents of the supervisorial district, or a portion thereof, within which the court will sit for such trial and from residents of such other immediately adjacent supervisorial district or portion thereof, as may be specified by local superior court rules. Such veniremen shall serve the court sitting in the geographic portion of the county from which this section and such court rules specify trial jury venires shall be drawn, provided that such rules shall afford to each eligible resident of such county an opportunity for selection as a trial jury venireman. Such court may, in its discretion, order a countywide venire in the interest of justice."

Appellant was tried before Judge Finney, who regularly sat in the South Lake Tahoe session of the court. Pretrial proceedings were conducted in South Lake Tahoe. From the outset of those proceedings Judge Finney expressed concern that extensive publicity threatened appellant's right to a fair trial. That concern arose well before the trial itself began. After the magistrate denied a defense motion to close the preliminary hearing and seal the reporter's transcript thereof, the defense sought a writ of mandate in the El Dorado County Superior Court. Judge Finney directed issuance of a peremptory writ of mandate granting the relief sought by the defense. He found a substantial likelihood that the defendant's right to a fair trial would be prejudiced if closure were not ordered and found that alternatives to closure would not protect his rights. In so doing the judge observed that there had been numerous reports about the case on radio and television, as well as in major newspapers and the local newspapers that were relied on by the community as credible news sources. The South Lake Tahoe area from which a jury panel would be summoned had a population under 40,000 people. That, in addition to the fact that the victims were local and sympathetic, the defendant had no substantial ties to the community, and the nature of the anticipated evidence created a substantial likelihood and probably a "virtual certainty" that a fair and unbiased jury could not be picked in the community unless the court acted to protect the defendant's right to a fair trial in the vicinage.

Notwithstanding the concern appellant expressed at this stage of the proceedings, and his subsequent motion to close all hearings on suppression

motions[9] he did not seek, and consistently opposed, changing the location of the trial to Placerville. Counsel explained that, notwithstanding the "poisoned" community at South Lake Tahoe, they believed that Placerville was a very conservative community and, all things considered, they thought it might be more advantageous to try the case in South Lake Tahoe.

The trial venue was first discussed on January 7, 1988, when the prosecutor suggested that the court have defense counsel place on the record the reason no request for change of venue to another county or to move the trial "over the hill" to Placerville was made. The prosecutor was concerned that there might later be a claim of error or of incompetent counsel if this were not done and suggested that he need not be present and the record could be sealed to avoid revelation of defense tactics. Defense counsel stated that the matter could be discussed in chambers.[10]

---

[9]In ordering the hearing on appellant's section 1538.5 motion to suppress evidence closed, the judge stated: "I am absolutely convinced that if the Court doesn't close the hearing for much of the testimony that I anticipate in the suppression hearing, that Mr. Coddington's right to be tried in his own vicinage is a hollow right, and that the Court . . . would have to grant a motion for change of venue in this case."

[10]Counsel subsequently confirmed their decision with a formal statement of their strategic reasons: "For the seven-year period immediately prior to the commission of the subject crimes, Mr. Coddington's sole source of support was his earnings as a professional gambler. [¶] During that period, Mr. Coddington gambled in casinos on a daily basis, winning and actually losing many thousands of dollars. [¶] Mr. Coddington resided in South Lake Tahoe, California, during the one-and-a-half-year period immediately prior to the subject incident. [¶] During this period, Mr. Coddington indicates that he lost as much as an [sic] $160,000 in casinos at Stateline, Nevada.

"By virtue of this compulsion to gamble, Mr. Coddington lost the aforesaid cash. Lost his house in Las Vegas, and became the focus of an intensive investigation by the Internal Revenue Service for tax evasion. [¶] The defense contends that Mr. Coddington's obsession with gambling played a significant role in triggering mental breakdown which ultimately raised to certain criminal acts which are alleged herein. [¶] The defense has retained the services of Dr. Robert Custer from Bethesda. The doctor is an internationally recognized expert on the issue of compulsive gambling. Dr. Custer can offer testimony regarding the psychological pathology associated with the disease of compulsive gambling. [¶] Mr. Coddington's case in particular, it's believed that the long-term, day-to-day exposure to the casino environment, had a very profound effect on Mr. Coddington's 'mental state.' Counsel for the Defense, Steve Tapson, and Richard Meyer have each tried cases before juries in South Lake Tahoe and Placerville. [¶] Steve Tapson served as Public Defender for El Dorado county from 1972 to 1984. Mr. Tapson managed the Public Defender's Offices in both Placerville and South Lake Tahoe. Mr. Tapson has tried two murder cases before juries in South Lake Tahoe since 1985. [¶] Mr. Meyer is in private practice - was in private practice in Placerville from 1978 to 1983. Since 1984, has been employed by the Public Defender's office in South Lake Tahoe.

"Based on the significant exposure that defense counsel has [sic] had to the communities of South Lake Tahoe and Placerville, the defense believes that for strategic reasons, Mr. Coddington's best interest in this case is to be tried in South Lake Tahoe. [¶] By virtue to their close proximity to Stateline, residents of South Lake Tahoe have a familiarity with the

The District Attorney of El Dorado County then expressed concern in a letter to defense counsel dated February 16, 1988, with a copy to Judge Finney, that the case was scheduled for trial at the South Lake Tahoe session. He noted that there had been extensive publicity in the South Lake Tahoe area and that many witnesses were from that community. It would be difficult for jurors to avoid contact with the witnesses or other improper influence. The district attorney offered to confer with defense counsel. On March 4, 1988, Judge Fogerty, apparently the administrative presiding judge in Placerville, ordered the case transferred to the Placerville session of the court for further proceedings. Notwithstanding that order Judge Finney continued to conduct pretrial proceedings in South Lake Tahoe. On March 11, 1988, Judge Finney continued the trial date to a later Placerville session. Defense counsel objected to the transfer and the parties were permitted to submit briefs on the transfer question. The district attorney, by letter citing *People v. Jones* (1973) 9 Cal.3d 546 [108 Cal.Rptr. 345, 510 P.2d 705], expressed concern that, unless the defendant consented, the transfer would violate the defendant's right to a jury of the vicinage since juries drawn to serve in the Placerville session excluded residents of the South Lake Tahoe area. The district attorney noted, however, that *Jones* suggested that if a jury is drawn from the entire county the vicinage requirement is satisfied. Judge Fogerty then advised counsel for defendant that he did not believe the defendant could receive a fair trial in South Lake Tahoe because of the extensive publicity, that he was ordering a countywide venire for jury selection, and that he had ordered that all pretrial proceedings be heard before Judge Finney at the South Lake Tahoe session of the court.

Appellant opposed the transfer by motion for reconsideration of the March 4 transfer order. He argued that the transfer denied him equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution as he was the only criminal defendant alleged to have committed a crime in South Lake Tahoe to be forced to undergo trial in Placerville with a jury drawn from the entire county since the South Lake Tahoe session began in 1977. He also claimed denial of his right to be tried by a jury drawn from and comprising a representative cross-section of the community. Because many South Lake Tahoe residents had been exposed to the extensive

casino environment that is not shared by members of any other community in El Dorado County. [¶] Residents of South Lake Tahoe, if they don't gamble themselves, often have friends or relatives who come to South Lake Tahoe to gamble. [¶] Moreover, significant numbers of South Lake Tahoe residents either work in casinos, either have friends or relatives who have worked in casinos. [¶] Defense counsel have observed that a significant number of people selected for jury service in past cases in South Lake Tahoe at one time or another have been employed by the casinos. [¶] The defense believes that residents of South Lake Tahoe are uniquely suited to understand and appreciate the stresses associated with supporting one as a professional gambler and living day-to-day in the casino environment.

"For these reasons, the defense would ask this case for strategic reasons remain in South Lake Tahoe."

publicity, they would face obstacles to jury service not shared by residents of other parts of the county. They would also face the hardship of daily travel of at least 130 miles over the Sierra Nevada Mountains for three months in order to serve in Placerville, all of which would result in a jury panel that would be inordinately underrepresentative of the South Lake Tahoe community, denying defendant the right to be tried by a jury comprising a cross-section of the community.

At this point the district attorney opposed the motion for reconsideration, observing that Code of Civil Procedure former section 206c (Stats. 1977, ch. 229, § 1, p. 1026, now Code Civ. Proc., § 199), permitted countywide trial jury venires. He argued that the countywide venire satisfied constitutional vicinage and district concerns and that *O'Hare v. Superior Court* (1987) 43 Cal.3d 86 [233 Cal.Rptr. 332, 729 P.2d 766], and *People v. Jones, supra,* 9 Cal.3d 546, were dispositive. On April 14, 1988, the court indicated that defense counsel had explained in chambers that the defense wished to proceed to the jury selection process to determine if a fair trial could be had in South Lake Tahoe.

Judge Finney denied reconsideration of the transfer order and directed the jury commissioner to prepare a panel of 300 prospective jurors randomly selected from the entire county.[11] Judge Fogerty offered to try the case or to have someone cover his court if Judge Finney elected to try it. The trial was held in Placerville with Judge Finney presiding.

Appellant moved to quash the jury venire when only 30 of the 300 prospective jurors in the first two panels were from the Lake Valley Judicial District that encompasses the Lake Tahoe area. An evidentiary hearing on the issue of random selection was held on June 27, 1988.[12] Appellant offered evidence that there were 72,000 names on the source list from which jury venires were selected, of which 19,000 persons were Tahoe area residents. In selecting potential jurors for this trial, 6,000 persons were excluded because their names had appeared on other venires during the past year. Of those excluded persons, 3,000 were from the Tahoe area and were excluded even though they were not ineligible to serve. Of the 2,061 persons selected in the

---

[11]To comply with that order the jury commissioner requested that 2,000 prospective jurors be randomly selected countywide and sent jury questionnaires. The pool was selected from a list drawn from the Department of Motor Vehicles, voter registration, and tax assessor records. To accomplish a countywide selection process, the records were reviewed and every 30th name was picked by data processing personnel, resulting in a pool of 2,300 prospective jurors. The larger pool from which the selection was made probably excluded persons who had been selected earlier in the year for a Lake Tahoe pool, however.

[12]The parties had stipulated that jury voir dire should commence even before this hearing could be held.

computer run, 502 had Tahoe area ZIP Codes, and 1,559 had ZIP Codes from the Western Slope. Responses to questionnaires sent to those persons totaled 339 from the Tahoe area and 1,235 from the Western Slope. After reviewing the questionnaires as they came in and eliminating the persons who were ineligible to serve, the jury commissioner placed them in a stack as they came in and used the first 300, in three groups of 90 and one of 30, to create four panels for this trial.[13] Of the 90 persons in the first panel, 5 were from the Tahoe area. Of the 90 persons in the second panel, 21 were from the Tahoe area. The third panel of 90 included 12 persons from the Tahoe area; the 30-member fourth panel had no one from the Tahoe area.

Appellant also offered testimony by an expert in mathematics and statistics that one would expect that a random sample of the entire county would produce 80 persons from the Tahoe area, based on 19,000 potential jurors in the Tahoe area and 52,700 others, or 26.7 percent from the Tahoe area. Excluding the 3,000 names from each area that had been dropped, a random selection should produce 74 prospective jurors from the Tahoe area. Even considering only those from the Tahoe area who responded to the jury questionnaire, one would expect 64.6 panelists from the Lake Tahoe area in a random selection. After considering that a higher number of Tahoe area persons was excused by the jury commissioner than Western Slope persons, the witness concluded that there was one chance in 800 that the selection process was random. The witness acknowledged that the disparity might be attributable to the manner in which the names were selected from the questionnaires as they were received, those from the Placerville area being received earlier, and might be affected by the percentage of Tahoe area persons excused by the jury commissioner because they were ineligible to serve as jurors or had another excuse.[14] From a mathematical viewpoint, because persons from the Tahoe area do not respond as quickly as those on the Western Slope, the expert did not consider the method by which jurors were selected for this trial to be an appropriate means by which to achieve randomness.

Appellant argued that the evidence established that the venire did not include a representative cross-section of the Tahoe area population. He acknowledged being unable to demonstrate that the disproportionate number

---

[13]This was a departure from the practice when venires for individual courts in the county were selected. For those venires a juror tag was made for each questionnaire, the tags were placed in a drum and mixed, after which the jury commissioner took out the required number of tags. In selecting the venire for appellant's trial the jury commissioner did not consider the residence of a prospective juror in her review of the jury questionnaires.

[14]Apparently, the jury commissioner had been instructed by the court that she should not excuse any person from the Tahoe area because of travel hardship. Tahoe-area jurors who worked in construction were excused or deferred during the summer months, however, because their work was seasonal, a factor that would affect pure randomness.

of hardship excuses granted persons from that area was improper. Ultimately, the only defect in the selection procedure identified was use of the first 300 questionnaires returned from the 2,000-plus source list to which they had been mailed as the venire. That, counsel argued, was not a random sample. Judge Finney was not persuaded. He noted that the questionnaires were returned by individuals acting independently, whenever the individuals decided to fill them in and mail them, and they had been stacked as they came in. That, he reasoned was "probably as random as you can get." The judge also concluded that appellant's real complaint was not about randomness, but lack of representation from the vicinage. Defense counsel insisted that the motion to quash was based on both grounds.

The court rejected this challenge to the venire pretrial and again posttrial when offered as one basis for a motion for new trial.[15]

---

[15]Before denying the motion to quash the venire, Judge Finney had offered to have an additional 80 or more prospective jurors selected from the Tahoe area in order to cure what appellant argued was an underrepresentation from that area. The prosecutor, while not conceding any defect in the jury selection procedures used thus far, agreed. Appellant's attorneys reserved their decision on accepting the offer pending the court's ruling.

The court explained the denial of the pretrial motions: "The motion is denied, or the challenge to the jury venire is denied on the issue of randomness. The Court believes that there is no demonstrative failure by the jury commissioner to randomly select jurors, save and except for the exclusion of the 3,000 or so jurors that were excluded from both the Lake Tahoe Basin area and the Western Slope area.

"The Court finds that that was done in the normal course of jury selection process to avoid duplicity of service by those jurors, and that is an appropriate function of the jury commissioner.

"The Court further finds that no cognizable class has been excluded, nor that there is any other representation of cognizable class on the jury.

"And, further the Court finds that a cross section of the County or the community is represented in this jury selection process.

"Further, the Court makes a finding that the method used was similar to that used to select all other juries, both civil and criminal in the County.

"The Court further finds that the statutory mandates have been substantially complied with, and the Court further finds that no systematic exclusion of any class or any area of the County has taken place by the jury commissioner or by her method of selection of jurors.

"The Court further believes that the testimony of the doctor on mathematical probabilities does not demonstrate that there's been any discrimination or exclusion by the way the jury selection process has taken place.

"There's been no drawing of the Court's attention to any facet of the jury selection process, except the exclusion of the 3,000 jurors from both areas, that would indicate that anything but a random selection has been used except, arguably, for the way that the jury commissioner took the names off the pile of returned questionnaires.

"The Court believes that the jury commissioner was credible in her testimony when she says that as they came in she put them in a stack, and it would seem to me that would constitute a random assemblage of the documents.

"And, lastly, I guess I should comment that it seems to me—and I don't mean to demean the doctor, or his profession or his discipline, but it seems to me that the very word 'random' means that you can have results precisely as we got them in this jury selection process.

■ The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, grants a criminal defendant the right to trial "by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." When the Legislature has specified a county as a judicial district, a jury drawn from an entire county satisfies the vicinage right that is thereby guaranteed. (*Hernandez v. Municipal Court* (1989) 49 Cal.3d 713, 717 [263 Cal.Rptr. 513, 781 P.2d 547].)

As we explained in *Hernandez*: "Vicinage and cross-section representation are guaranteed by the Sixth and Fourteenth Amendments. Although sometimes erroneously used interchangeably, vicinage and cross-section representation are discrete principles of criminal jury trials. The right to cross-section representation is a demographic requirement, which assures a criminal defendant a trial by a jury selected without systematic or intentional exclusion of cognizable economic, social, religious, racial, political and geographical groups. [Citations.] It is designed to protect the right to be tried by an impartial jury. [Citations.] [¶] The vicinage right is a geographic requirement. It is the right of a criminal defendant to be tried by a jury drawn from the area in which the crime occurred. [Citation.] It is unrelated to the ideal of impartiality [citation] and has nothing to do with the defendant's place of residence. Although the vicinage right is assertable by a defendant in a criminal trial, in the present day criminal justice system the vicinage requirement also protects the right of the offended community to pass judgment in criminal matters." (*Hernandez v. Municipal Court, supra*, 49 Cal.3d at p. 716, fn. 1.)

■ There is no merit in appellant's contention that the judicial district in which these offenses were committed was the supervisorial district from which the jury venire was drawn for the South Lake Tahoe session of the

"Now, if we get into probabilities, and I'm no mathematician, it seems to me that if you're going to talk about probabilities, that you cannot take a single event, i.e., this jury selection process, and apply the discipline of statistics or probabilities to it and say, therefore, we've demonstrated that there is a lack of randomness.

"If we had 15 jury selection processes of a countywide venire, and they were consistent in their representation in the range that's alleged in this case, then I would think that the probabilities would have more meaning to the Court.

"For the reasons stated, the Court denies the Defendant's challenge.

". . . The Court further finds that the Defendant is being tried in his vicinage, that the jury selection process has included people from his vicinage, and that a vicinage is a right of both the People and both of the Defendant, and not exclusively the Defendant."

Appellant subsequently declined the court's offer to supplement the venire with additional prospective jurors from the Tahoe area on the ground that to do so would be inconsistent with the claim that jury selection had not been random. Counsel then stated that all they had asked for was "a countywide venire selected at random which does not arbitrarily and unnecessarily exclude anyone from the area from where the crime was committed."

superior court. The Legislature may determine the size of the area from which a jury may be drawn by establishing judicial districts. At the time of appellant's offenses in 1987, as now, El Dorado County had only one judicial district—the entire county. The Legislature had not authorized division of the county into smaller districts, and based on population, such division was impermissible. (Gov. Code, §§ 69640-69650.)[16] Thus, for vicinage purposes, the entire county was the district previously ascertained by law within the meaning of the Sixth Amendment. The designation of a South Lake Tahoe session, or sitting of the court, could not change that controlling law. Although Government Code section 69751.5 authorizes the establishment of superior court "sessions" in cities more than 30 miles from the county courthouse if the city has a population exceeding 7,000 persons, designating a session of the superior court does not change the district for purposes of vicinage. In fact, the only reference to "district" in the superior court rule that established the South Lake Tahoe session was in a provision making the boundaries for the session identical to the boundaries of the municipal court district then in effect. (Super. Ct. El Dorado County, Local Rules, former rule No. 1, pt. 3; see now *id.*, rule 2.00.09 [South Lake Tahoe session to hear actions arising in South Lake Tahoe Area, as defined].)[17] Appellant was accorded a jury drawn from the vicinage in which his crimes were committed. Neither the Sixth Amendment nor the California statutory scheme for jury selection was violated by the countywide draw.

We also reject appellant's claims that he was not tried by a jury selected from a venire representing a fair cross-section of the community and that the jury selection process was not random. He argues that only 12.3 percent of the 300-person venire was from the South Lake Tahoe area and notes the testimony of his expert who opined that the disparity showed that the selection process was not random. He does not make any argument based on those asserted facts, however, but ultimately claims that trial before the "wrong jury," a jury that had no residents of the South Lake Tahoe area, was "structural error" that requires per se reversal without a demonstration of prejudice. The evidence did not support these claims and no basis for reversal appears in the jury selection process. The jury was drawn from a panel selected randomly from the entire county. There was no systematic or intentional exclusion of jurors from the South Lake Tahoe area.

We need not decide here whether the court erred in moving the trial to Placerville over the objection of defendant or whether the concerns of the

[16]Government Code section 69644 provides that a superior court district must have a population of 250,000. In 1988 the population of El Dorado County was 114,000. (Cal. Statistical Abstract (1994) table B-3, p. 13.)

[17]Appellant's request that the court take judicial notice of the superior court rule and of a 1987 map of supervisorial districts lodged with the court is granted.

prosecutor and judge that defendant might not receive a fair trial in South Lake Tahoe constituted good cause for the transfer within the meaning of the local rules of the El Dorado County Superior Court.[18] Defendant was tried in the district specified by the Legislature. The possible violation of a local rule is not a basis for reversal.

Contrary to appellant's belief, the due process considerations upon which a criminal defendant's right to a hearing on the defendant's motion for a change of venue are founded (see Cal. Rules of Court, rule 841; *People v. Cooper* (1991) 53 Cal.3d 771, 804 [281 Cal.Rptr. 90, 809 P.2d 865]) have no applicability to assignments within judicial districts which may be made for administrative purposes or other good cause. Even assuming such a right, appellant was granted a full hearing on his motion for reconsideration of Judge Fogerty's order.

We also reject defendant's claim that the transfer order denied him equal protection and resulted in cruel and unusual punishment. No imposition of punishment attends an order changing the location of a trial. It is true, as defendant argues, that under section 1033, subdivision (a), the trial of a defendant who objects may not be moved to another county. It does not follow, however, that a defendant who objects to trial within the district in which the charged offense occurred but in another city is denied equal protection as against a defendant objecting to transfer to another county. Defendants do not have the right to trial in a particular court within the district. The assignment of cases for trial is among the administrative responsibilities of the court. (See Gov. Code, § 69508; Cal. Rules of Court, rule 205.)

## 2. *Denial of motion to suppress evidence.*

As the above summary of evidence suggests, the agents who broke into appellant's trailer had neither an arrest nor a search warrant. **(3)** Because a warrantless entry is presumptively unreasonable within the meaning of the Fourth Amendment (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748-749 [104 S.Ct. 2091, 2096-2097, 80 L.Ed.2d 732]; *Payton v. New York* (1980) 445 U.S. 573, 586 [100 S.Ct. 1371, 1380, 63 L.Ed.2d 639]), the People bear the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. (*People v. Williams* (1988) 45 Cal.3d 1268, 1298 [248 Cal.Rptr. 834, 756 P.2d 221].) At the evidentiary hearing, in their memoranda of points and authorities filed thereafter, and at the

---

[18]Those rules permit transfer of any proceeding from the South Lake Tahoe session for "good cause" on motion of a party or the court. (See now Super. Ct. El Dorado County, Local Rules, rule 2.00.09.E.)

subsequent argument of appellant's motion to exclude evidence taken from the trailer and the statements he made to the arresting officers, the People sought to establish that probable cause existed for the agents to believe that the victims were in the trailer, that exigent circumstances justified the entry because there was also probable cause to believe the girls' lives were in danger, and that the agents had not manufactured that exigency.[19]

Appellant did not, and does not, dispute the existence of probable cause at the time of the break-in. At the January 8, 1988, argument of the suppression motion, appellant's counsel conceded that probable cause to believe the lives of the girls were in danger had been established at the moment of the break-in. He argued only that there was no probable cause to believe the girls were in the trailer and in danger apart from his own statement to FBI Agent Baker when Baker called the trailer while Agent Barcklay was knocking on the door and asking to speak to appellant. He argued that this statement—that the girls were in the trailer—was the product of Agent Barcklay's unlawful demand for admittance to the trailer.

There was conflicting evidence at the hearing as to what Barcklay said to appellant. Barcklay testified that he asked only to speak to appellant. Agent Alexander, who overheard Barcklay, testified that Barcklay said "FBI, open the door." The trial court did not resolve the conflict, ruling instead that probable cause and exigent circumstances existed apart from anything appellant said to Baker while Barcklay was at the door.

In this court, appellant argues first that because a warrant could have been obtained before the agents approached the trailer, failure to obtain the warrant rendered the entry and search unlawful. He also argues, as he did below, that his statement to Agent Baker was in response to Barcklay's unlawful assertion of authority and therefore may not be relied on to justify entry into the trailer.

a. *Ability to obtain warrant.*

Appellant argues that the exigent circumstances exception to the warrant requirement may be invoked only in circumstances in which law enforcement agents have insufficient time to obtain a warrant prior to the entry. He

---

[19]Appellant disclaimed any intent to rely on a theory that the FBI agents created the exigency on which the People relied. When the court stated that the evidence could establish that the agents were not manufacturing exigent circumstances, appellant's counsel said that he had no idea why the prosecutor referred to that and denied suggesting that. "We are not suggesting that. The exigency is created by four people missing and presuming their lives are in danger. The question of probable cause is to believe that they are in this mobile home where they broke in."

concedes that he did not argue his first theory below. Therefore, the trial court made no findings on the question. Nonetheless, since appellant claims that his trial attorney rendered constitutionally ineffective assistance by failing to make this argument below, we address and reject the claim. Because the claim lacks merit, appellant cannot satisfy either prong of the constitutional test of ineffective assistance. He cannot establish that counsels' performance was deficient for failing to seek exclusion of the evidence on this ground or demonstrate that he was prejudiced by counsels' failure to do so. (See *Strickland v. Washington* (1984) 466 U.S. 668, 693-694 [104 S.Ct. 2052, 2067-2068, 80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

Following argument on the motion to suppress evidence the court ruled that, quite apart from anything appellant said on the telephone, probable cause to believe that the girls were in the mobilehome and exigent circumstances justifying a warrantless entry existed. Appellant had disputed only probable cause to believe the missing persons were in the mobilehome.

We agree that probable cause to believe the victims were in the mobilehome existed prior to the time two FBI agents went to the door. Evidence offered at the evidentiary hearing on the motion to suppress evidence showed that prior to 9:00 p.m. on Monday, May 18, Knowles, the FBI agent in charge of the combined law enforcement effort to locate the four missing persons, who were believed to have been kidnapped, knew that a person resembling appellant had interviewed several young girls at various modeling agencies in the Reno area and had arranged to meet two of those girls and their chaperones in the South Lake Tahoe area on the day the four disappeared. The chaperone's car had been found abandoned not far from the location of the mobilehome. The FBI had learned the identity of appellant as the person who occupied the trailer, knew that witness Tveten had identified appellant as owning a car which used a TVETEN auto dealership license. Another witness had placed a car with what she recalled as a "TVTEEN" license at a modeling studio where the suspect had interviewed teenage models. Tveten told the investigating officers that appellant possessed firearms and said that a composite sketch of the suspect based on descriptions given by other teenage models and model agency employees resembled appellant. The officers also knew that appellant had said he was building a soundproof room in the mobilehome. FBI and local law enforcement personnel who had the mobilehome under surveillance saw appellant drive away from the trailer and attempt to avoid surveillance on his return. During that trip appellant drove in a manner that led them to believe he was attempting to avoid being followed. He appeared either to be wearing a wig or had unnaturally colored hair. Moreover at 9:03 p.m., shortly before the

assault on the mobilehome, appellant had called the FBI, stating that a friend told him that the FBI wanted to talk to him about the Reno kidnapping and that appellant's picture was in the post office. The latter was untrue. No photo had been posted in the community.

The developments immediately preceding the decision to break into the trailer included the following: When appellant called the FBI to say he heard they wanted to talk to him, Agent Baker told appellant that Baker was not directly involved in the investigation, took appellant's telephone number and address, and told appellant someone would get in touch with him. Agent Knowles, the agent in charge, then detailed an interview team to go to the trailer to talk to appellant. The telephone call afforded the agents an opportunity to speak to appellant without revealing that they considered him a suspect. Depending on appellant's response, the agents might either seek consent to search or, if it was believed necessary, undertake a "protective sweep," i.e., "a sweep of the premises for the sole purpose of determining whether or not in this case there were any victims in that residence; not for the purpose of obtaining any evidence . . . ."

Barcklay testified that as he knocked on the door of the trailer, the lights in the trailer went out. He remained at the door and when he heard a voice asking who it was, identified himself and the other agent as FBI, and said he wanted to speak to appellant. Agent Alexander testified that Barcklay said "FBI, open the door." Barcklay testified that the person inside said he did not want to talk to them now and wanted to talk by telephone. Barcklay then heard the telephone ring inside the trailer and when the person inside asked what he wanted, Barcklay responded that the FBI was on the phone and he wanted the person to answer the telephone. He also heard a radio transmission from Agent Knowles directing the agents to "hit" the trailer, followed by a similar order from Agent Joyce who was at the scene. Within seconds, Agent Joyce was at the trailer breaking the window.

Knowles, who was at the South Lake Tahoe command post with Agent Baker, had telephoned the trailer at the request of Agent Joyce when the lights went out and had been advised by Baker that appellant said the girls were alive in the trailer, then instructed the agents to assault the trailer.

Special Agent Joyce was the agent in charge at the trailer. It was stipulated that he had the same knowledge of events as Knowles when he went to the site. He mobilized a team of agents to back up the two whom Knowles dispatched to interview appellant, and proceeded to the vicinity of the trailer. As Joyce parked, the two agents assigned to interview the occupant had just been directed by Knowles to do so. Joyce heard the interviewing officers

knocking on the door when he saw the lights in the trailer go out. Concerned about the developing situation, he asked the command post to telephone the occupant of the trailer. Agent Baker did so. When advised by radio that the occupant told Agent Baker that the girls were alive in the trailer, Joyce ordered the agents at the scene to "hit the trailer." Joyce had not heard Knowles' command.

When Agent Joyce observed that the agent at the door of the trailer was having difficulty breaking in, Joyce took his gun, broke a window and went partially into the trailer. He saw appellant running to the back of the trailer, ordered him to halt and lie down, and held appellant at gunpoint until the agents who came through the front door took custody of appellant. Joyce then admitted an agent through the back door and went to a bedroom, where he saw the girls. Two South Lake Tahoe officers discovered the murder victims in another room. At that point those officers took charge, and asked the FBI agents to vacate the trailer, as they were sealing it while a search warrant was obtained. The FBI agents were in the trailer from seven to 10 minutes.[20]

The trial court remarked that there was overwhelming justification for the warrantless entry and commented that the FBI acted in what was really a restrained way. We agree. Probable cause to believe the victims were in the mobilehome and were in danger existed even before Agent Barcklay knocked on the door and appellant told Agent Baker on the telephone that the girls were in the trailer. Moreover, the record does not establish any delay, deliberate or otherwise, on the part of the FBI, the lead investigating agency, in obtaining a warrant. To the contrary, it shows that by the afternoon of May 18, the agents were following routine FBI procedures to obtain a warrant. They had discussed their evidence with a special agent in Sacramento whose job it was to advise field agents whether probable cause existed. Having obtained his opinion, they had taken the next step of presenting their information to the United States Attorney for a formal legal opinion and, anticipating approval, had contacted the United States Magistrate in the South Lake Tahoe area to determine if he would be available that evening. FBI and other law enforcement agents had appellant under surveillance, but no attempt to contact him had been made. While the FBI agent in charge was awaiting a response from the United States Attorney to the probable cause inquiry, appellant called and said he had heard that the FBI wanted to talk with him. Appellant was told he would be contacted and agents were dispatched to interview him. No warrant was needed to go to the

---

[20]No evidence was removed from the trailer at that time. The affidavit in support of the search warrant that was issued subsequently did refer to some of the agents' observations during the sweep, however.

trailer in an effort to interview appellant in response to his own call. Only the subsequent rapidly developing events, events precipitated by appellant himself, necessitated action prior to obtaining the warrant. This was not a situation in which the officers deliberately waited for exigent circumstances in order to exploit that exception to the warrant requirement. (See *United States v. Dowell* (7th Cir. 1984) 724 F.2d 599, 602.)

None of the authorities relied on by appellant, for the proposition that the exigent circumstances exception to the warrant requirement does not apply when law enforcement agents have time to seek a telephonic warrant before entry support his claim that a warrant was necessary here. None involved entry to rescue kidnap victims whose lives reasonably were believed to be in danger. ■ When there is a compelling need for official action and no time to secure a warrant, exigent circumstances excusing compliance with the warrant requirement exist. (*Mason v. Godinez* (7th Cir. 1995) 47 F.3d 852, 856; *U.S. v. Arch* (7th Cir. 1993) 7 F.3d 1300, 1304.) A reasonable belief of an imminent threat to life or welfare of a person within the home, probable cause to believe that a person reliably reported missing is within, or a reasonable belief that a person within is in need of aid, are well recognized as exigent circumstances that justify a warrantless entry. (See *Welsh v. Wisconsin, supra*, 466 U.S. 740, 747-753 [104 S.Ct. 2091, 2096-2099]; *Fletcher v. Town of Clinton* (1st Cir. 1999) 196 F.3d 41, 48; *People v. Wharton* (1991) 53 Cal.3d 522, 577-578 [280 Cal.Rptr. 631, 809 P.2d 290]; *People v. Lucero* (1988) 44 Cal.3d 1006, 1017-1018 [245 Cal.Rptr. 185, 750 P.2d 1342]; *People v. Duncan* (1986) 42 Cal.3d 91, 97 [227 Cal.Rptr. 654, 720 P.2d 2]; *People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People v. Wilkins* (1993) 14 Cal.App.4th 761 [17 Cal.Rptr.2d 743]; see also 4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Exclusion of Illegally Obtained Evidence, § 2377, p. 2804, and cases cited.) The warrantless entry in those circumstances is not "unreasonable" in the contemplation of the Fourth Amendment. In circumstances such as those in this case, immediate action was necessary. The agents were not obliged to delay rescue of the victims until a warrant, telephonic or otherwise, could be obtained.

By contrast, in *U.S. v. Patino* (7th Cir. 1987) 830 F.2d 1413, on which appellant relies, warrantless entry was made into the home of an armed robbery suspect to arrest her and a companion also suspected of participating in a series of robberies. Several officers were available to ensure the suspects did not escape while a warrant was being obtained, and the suspects were not aware they had been located. *Patino* is clearly distinguishable, as no victim was being held in the home. In *U.S. v. Ducchi* (8th Cir. 1990) 906 F.2d 1278, warrantless entry was made into the home of a suspect who had earlier

picked up and taken to the home a package of cocaine. Again there was no reason to believe that a victim was being held in the home.

Therefore, even assuming that probable cause existed at some earlier time, there was no violation of the Fourth Amendment. Not only was there no deliberate delay in obtaining a warrant, but no warrant was needed for the attempt to interview appellant following his call to the FBI. Inasmuch as the agents were in a place where they had a right to be—at defendant's door to seek an interview—when subsequent events made them believe that immediate entry without completing the warrant process was necessary, the failure to have obtained a warrant at that time did not violate any of appellant's Fourth Amendment-based rights. No Fourth Amendment privacy interests are invaded when an officer seeks a consensual interview with a suspect. Exigent circumstances arising when the agents did so here justified the entry. This was not a situation in which there was deliberate delay in obtaining a warrant or a warrantless entry that the officers attempted to justify on grounds of convenience. (Cf. *Trupiano v. United States* (1948) 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663]; *Johnson v. United States* (1948) 333 U.S. 10 [68 S.Ct. 367, 92 L.Ed. 436].)

 b. *Response to unlawful assertion of authority.*

Appellant argues here, as he did below, that his statement that the girls were in the trailer may not be considered in determining probable cause to believe the girls were in the trailer because that statement was the product of Agent Barcklay's unlawful demand for entry.

As noted above, the trial court found it unnecessary to decide whether Barcklay demanded entry or simply asked to speak to appellant because, the court ruled, probable cause to believe the missing persons were in the trailer existed apart from appellant's statement. We agree with that ruling. The evidence was sufficient to support that court's finding that even before Agent Barcklay said anything to appellant, probable cause existed to believe appellant kidnapped the missing persons and was holding them in the trailer, and that their lives were in danger. It is not necessary to consider appellant's statement that the girls were in the trailer to conclude that the exigent circumstances exception to the warrant requirement justified the entry.

The trial court did not err in denying appellant's motion to suppress evidence.

 3. *Exclusion of evidence of mental illness.*

In advance of the guilt phase trial session at which appellant planned to offer psychiatric testimony, the court and counsel discussed the scope of the

mental state evidence that would be admitted. ■ Appellant conceded that no evidence of "diminished capacity" was admissible, but sought a ruling that the expert would be permitted to testify regarding "diminished actuality." The court ruled that the defense could offer any relevant evidence on mental defect or disease. However, no questions could be asked of the expert by either appellant or the People about whether or how such defect or disease would affect the defendant's mental state or actuality, or if it would impair his ability to form an intent, deliberate, or premeditate, unless the psychiatrist would testify, out of the presence of the jury, that he believed that appellant did not premeditate and deliberate the killings. The court extended that ruling to preclude any hypothetical questions regarding the effect of mental defect or illness on a person's ability to deliberate or premeditate. Appellant then offered no evidence of mental illness at the guilt phase. He now claims that the court erred.

The ruling was an overly restrictive reading of the statutory limitations on admission of evidence of mental illness. ■ Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. (*People v. Smithey* (1999) 20 Cal.4th 936, 960-961 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Sections 28[21] and 29[22] permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental

---

[21]Section 28: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

"(b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.

"(c) This section shall not be applicable to an insanity hearing pursuant to Section 1026 or 1429.5.

"(d) Nothing [in] this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

[22]Section 29: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing.

 We reject, however, appellant's claim that exclusion of expert testimony on the ultimate question of fact as to whether appellant did form those mental states denied him the right to present a defense and thereby deprived him of rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. All authority is to the contrary. (See, e.g., *People v. Nunn* (1996) 50 Cal.App.4th 1357 [58 Cal.Rptr.2d 294]; *People v. Young* (1987) 189 Cal.App.3d 891, 905 [234 Cal.Rptr. 819]; *People v. McCowan* (1986) 182 Cal.App.3d 1, 12-15 [227 Cal.Rptr. 23]; *People v. Whitler* (1985) 171 Cal.App.3d 337 [214 Cal.Rptr. 610].) Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present.

Although we agree that the court erred in ruling that the experts could not testify unless they believed defendant did not premeditate and deliberate the murders, that error is not a basis for reversal of the judgment. The record does not confirm appellant's implied claim that his failure to offer expert testimony regarding mental illness or defect was attributable to the trial court's restriction of expert testimony. At the hearing, defense counsel conceded that section 29 precludes expert opinion on whether a defendant had the capacity to entertain or actually had a particular mental state when the crime was committed and submitted the matter only on the issue of whether hypothetical questions could be asked of the experts. The court ruled that expert opinion on the ultimate issue could not be introduced by means of asking the expert a hypothetical question such as what a person who had a bipolar disorder or was a paranoid schizophrenic could or could not do. The expert could not tie the disease to appellant's conduct in that manner. That discussion and a subsequent discussion of what evidence the prosecution would be permitted to offer to impeach defense evidence of mental illness clearly assumed that the defense would be offering psychiatric testimony.

Thus, appellant was free to offer evidence that he suffered from a mental disease or defect as well as evidence about that disease or defect. Had the evidence he introduced at the sanity phase about his mental illness offered a basis from which the jury could infer that he did not premeditate or deliberate the murders, that evidence could have been introduced at the guilt

phase. Inasmuch as he failed to offer any such evidence at the guilt phase and the record does not reflect that this failure was due to the court's ruling, the issue is not properly preserved or presented. (*People v. Samayoa* (1997) 15 Cal.4th 795, 837 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Even assuming the court erred in precluding hypothetical questions, however, the error was not prejudicial. None of the experts, either court-appointed or defense-retained, all of whom testified that appellant was mentally ill, suggested that his illness precluded or would affect the ability to premeditate and deliberate. At least to the extent that it was relevant to the plan to seize the girls and their chaperones, the guilt phase evidence demonstrated extensive premeditation and deliberation. There was also sufficient evidence that the murders were premeditated and deliberate.

### 4. *Presumption-of-sanity instruction.*

■ The court instructed prospective jurors that during the guilt phase of the trial the defendant was to be conclusively presumed to be sane at the time of the crime. Although that instruction correctly states the law (see § 1026; *People v. Haskett* (1990) 52 Cal.3d 210, 232 [276 Cal.Rptr. 80, 801 P.2d 323]), appellant contends that this was error which prejudicially undermined his guilt phase defense of lack of premeditation of the murders. He concedes that the jury was instructed that if the defendant did not premeditate because of mental illness or defect, he was not guilty of first degree murder, but claims, nonetheless, that the jury would conclude that the presumption-of-sanity instruction meant that the evidence of his odd behavior prior to the killings could not be considered. A defendant who believes that an instruction requires clarification must request it. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Appellant neither objected to the instruction nor sought modification.

We are satisfied that appellant suffered no prejudice here in any case. As defendant observes, we noted in *People v. Burton* (1971) 6 Cal.3d 375, 390 [99 Cal.Rptr. 1, 491 P.2d 793] that the instruction given there[23] could mislead the jury when evidence of mental illness was offered at the guilt phase. The *Burton* instruction was very different from that of which appellant complains here. Moreover, the prosecutor and defense counsel argued the presence or absence of mental disease during guilt phase closing argument, with defendant reminding the jury that whether appellant was mentally

---

[23] " 'The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. *All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity. . . . [¶] For the purposes of the issues now at trial you must presume that the defendant was sane at the time of his alleged conduct . . . .* ' " (*People v. Burton, supra,* 6 Cal.3d at p. 390, fn. 7, italics added.)

ill was for the jury to decide. The guilt phase instructions given shortly thereafter expressly advised the jury that premeditation and deliberation were elements of first degree murder and that evidence that the defendant suffered from a mental illness or defect could be considered in determining if those mental states were present.[24]

There was no possibility of confusion arising from the instruction of which appellant complains here.

 5. *Failure to strike or exclude reference to alleged statement of Allen Hacker.*

Appellant moved in limine prior to the prosecutor's opening statement to exclude mention of his conversation with David and Allen Hacker regarding methods of killing, including the use of nylon ties, described in a booklet allegedly published by the CIA. He argued that the statements had been made in jest many years before the murders. The court denied the motion, commenting that the use of FLEX-CUFs was a unique method of killing and thus the defendant's knowledge of the method was relevant. The prosecutor then told the jury that Mr. Hacker would tell the jury that defendant was "obsessed" with that means of killing.[25] Neither David nor Allen Hacker so testified. Both recalled the incident and confirmed that appellant had read aloud the description of killing with plastic ties, but each denied that appellant had shown a particular interest in that form of killing.

David Hacker testified that in 1983 appellant read to him and his brother Allen from a booklet about assassinations that described various methods of killing people. David Hacker recalled that appellant told them about two of those methods. One, "Keep a Cool Head," involved throwing liquid oxygen or liquid hydrogen in a person's face. The other was the use of a clear "baggie" nylon tie by walking behind the victim, getting the tie started, pulling it tight, and walking away. Appellant's affect or mood when describing that type of killing did not differ from his mood when he read about

---

[24]The court instructed: "It is for the jury to determine whether or not there is any evidence that the defendant suffered from a mental disease or defect at the time of the alleged offenses as charged in Counts I and II of the information. Should the jury determine that there is such evidence or an inference of such evidence, you may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental states which are elements of the crimes charged in Counts I and II of the information, to wit, murder. . . . Your conclusions as to whether or not there is any evidence that defendant suffered from a mental disease or defect may be used in determining whether or not the defendant had the mental states of malice aforethought and an intent to kill, and whether or not he premeditated or deliberated in connection with the offenses charged in Counts I and II of the information."

[25]The defense conceded that the statement was made in good faith by the prosecutor who was relying on the interview report of an FBI special agent who had interviewed both Hacker brothers.

other methods of killing. There was laughter about "Keep a Cool Head" which was "hilarious, ridiculous." David Hacker was not really paying attention to how appellant was laughing when the use of nylon ties was described.

During his testimony Allen Hacker testified that appellant agreed that the methods of killing were outrageous and unrealistic. Allen Hacker also testified that appellant expressed no particular interest in nylon ties in subsequent contacts. On cross-examination, Allen Hacker denied telling FBI Agent McKevitt that appellant often read The Anarchist Cookbook and seemed particularly interested in killing women.

After the court denied a defense motion to strike the testimony Allen Hacker gave on cross-examination, and over a defense objection, Agent McKevitt, called on rebuttal by the People, testified that Allen Hacker had stated to her that appellant seemed especially interested in various methods of killing people, particularly women.[26] The court also denied a defense motion to strike that testimony, ruling that the testimony was proper impeachment.

Before admitting McKevitt's testimony, the court held a hearing on the admissibility of that testimony. Daniel Birtwell, the chief investigator for the El Dorado County District Attorney's Office, testified that he spoke to both David and Allen Hacker. In November or December 1987 he telephoned David Hacker to find out how to contact Allen. In the course of the conversation, Birtwell brought up some of the topics covered in David Hacker's statement to Agent McKevitt. David Hacker did not state anything that departed from the FBI report.

Birtwell's personal interview of Allen Hacker in San Jose on January 12, 1988, was taped. Allen Hacker told him that he and appellant were in a Las Vegas gun store where they saw the book regarding methods of killing. Hacker referred to one of the methods as using a "ziplock." He did not use the term FLEX-CUF.

The court ruled that McKevitt's testimony would be admitted. It was relevant and the voir dire and hearing had not demonstrated that she was a liar. The court also ruled that the defense would not be permitted to call Birtwell or to introduce the entire taped interview of Birtwell on a defense theory that Allen Hacker's statements to Birtwell were prior consistent

---

[26]The theory underlying the motion to strike and objection was that, having failed to elicit testimony from either of the Hackers that appellant was obsessed with the use of nylon ties to kill, the prosecutor asked Allen Hacker if he told FBI Agent McKevitt that in order to set up a "straw man" to be impeached by McKevitt's testimony if Allen Hacker denied making such a statement.

statements that were admissible under Evidence Code section 791 to rehabilitate Allen Hacker. The defense was unable to identify any part of the tape on which the subject of appellant's interest in killing was addressed. The statement was not made prior to Hacker's statement to McKevitt and there was no implication of recent fabrication by Hacker that would justify admission of the tape of the Birtwell interview.

Appellant now claims that allowing the jury to hear the prosecution's claim in his opening statement, that a Mr. Hacker would testify that appellant was interested in various methods of killing women, rendered the trial fundamentally unfair. Since the testimony of David Hacker did not support the prosecutor's claim, the jury might assume that Allen Hacker was the person to whom the prosecutor referred. Appellant therefore called Allen Hacker, making it clear to the jury that the reason Allen Hacker was being called was to dispel the false impression given by the prosecutor in the opening statement. Had he not been forced to do so, McKevitt's rebuttal testimony would not have come in.

Appellant's argument in support of his claim that the trial was rendered fundamentally unfair as a result of this is simply that it led to the erroneous admission of McKevitt's testimony. McKevitt's testimony, he argues, was hearsay that did not directly contradict Allen Hacker.

■ We first reject the claim that the prosecutor engaged in misconduct in his opening statement by characterizing appellant's interest in using a plastic tie as a method of killing as obsessive. Nothing in the record dispels the inference that the prosecutor anticipated that his witness would testify that appellant had expressed interest in that subject. His opening statement simply overstated the extent of that interest as described by subsequent testimony. It was not a statement that denied appellant a fair trial, diverted the jury from its proper role, or invited an irrational, subjective response. (*People v. Visciotti* (1992) 2 Cal.4th 1, 83 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

We also reject the argument that failure to strike that assertion led to a fundamentally unfair trial and the erroneous admission of evidence. We cannot say that the admission of McKevitt's testimony to impeach Allen Hacker was such an arbitrary, capricious, or patently absurd exercise of discretion that it constituted an abuse of the discretion vested in a trial court to admit impeachment evidence. ■ A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Abuse may be found if the trial court exercised its discretion in an arbitrary,

capricious, or patently absurd manner, but reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 [82 Cal.Rptr.2d 413, 971 P.2d 618]; *People v. Jones* (1998) 17 Cal.4th 279, 304 [70 Cal.Rptr.2d 793, 949 P.2d 890].)

Even were we to assume that the admission of McKevitt's testimony was an abuse of discretion, the error was harmless. The evidence that appellant was prepared to kill if necessary to carry out his plan to falsely imprison and sexually abuse young girls was overwhelming. The uncontradicted evidence that he was aware that plastic ties could be used to strangle was relevant both to his intent when he tightened the ties around the necks of Martin and Walsh and, since he had ordered the ties ahead of time, to whether he premeditated the killings. That evidence was admissible regardless of what appellant argues was its prejudicial impact. It was not made inadmissible by Evidence Code section 352. ■ " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' (*People* v. *Yu* (1983) 143 Cal.App.3d 358, 377 [191 Cal.Rptr. 859].)" (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

Regardless of any obsession or lack thereof, with the particular method of killing, neither the prosecutor's statement nor McKevitt's testimony resulted in prejudice to appellant.

 6. *Prosecutorial failure to disclose potentially favorable material evidence.*

Before McKevitt's rebuttal testimony, during the hearing on the admissibility of her testimony, district attorney investigator Hawkins testified that he spoke with David Hacker in Las Vegas when he served Hacker with an out-of-state subpoena. He showed David Hacker a copy of David Hacker's statement to McKevitt, asked him to review it, asked if there were any inaccuracies, and was told by Hacker that it was his statement. Hacker pointed out some inaccuracies that Hawkins did not consider significant. Hawkins told Hacker they could be taken up at a later time.

Appellant's counsel asserted, during argument over the admissibility of McKevitt's testimony, that David Hacker told counsel on the previous night that he, David Hacker, had told the prosecutor after the prosecutor's opening statement that some of the statements attributed to David Hacker in the FBI report were inaccurate.

Appellant now contends that the failure of the prosecution to disclose that David Hacker told the prosecutor, before McKevitt testified, that McKevitt's typed report of her interview with David Hacker was inaccurate in some respects violated the state's obligation to disclose all evidence, including impeachment evidence, that reasonably appears to be favorable to the defense. (*United States v. Bagley* (1985) 473 U.S. 667 [105 S.Ct. 3375, 87 L.Ed.2d 481]; *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]; *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 378 [285 Cal.Rptr. 231, 815 P.2d 304]; *People v. Morris* (1988) 46 Cal.3d 1, 30 [249 Cal.Rptr. 119, 756 P.2d 843].) Appellant claims specifically that the prosecutor failed to disclose that David Hacker had denied telling McKevitt that appellant was obsessed with killing, and especially women. Appellant argues that, inasmuch as the People intended to place Hacker's statement to McKevitt into evidence, the People were obligated to reveal the impeaching evidence.

First, the record does not support appellant's claim that David Hacker told investigator Hawkins that he did not tell McKevitt that appellant was obsessed with killing. Appellant implicitly concedes as much, asserting: "Because the record is undisputed, that, in the only conversation they had, the one thing David told [the prosecutor] was that he had not made the obsession statement attributed to him by McKevitt, it is only reasonable to conclude the latter was one of the inaccuracies David told Hawkins about, too."

Moreover, no evidence supports appellant's assertion that "the record is undisputed that" before he testified David Hacker told the prosecutor personally that he did not make the obsession statement. Appellant offers no citation to the record for that assumption and we have found nothing to support the claim. The only apparent basis for this claim is defense counsel's statement during argument that he had spoken with David Hacker after Hacker's testimony at which time Hacker told him that Hacker told investigator Hawkins that there were inaccuracies in McKevitt's report and that he had told the prosecutor immediately before he testified that he had not told McKevitt that appellant was obsessed with the different methods of killing people, especially strangulation by using FLEX-CUFs described in the booklet. The prosecutor did not acknowledge the truth of this assertion, which is supported only by double hearsay assertions, not evidence.

Assuming arguendo that counsel's argument created an undisputed record, however, no impropriety appeared. ▪▪▪ Evidence is favorable and must be disclosed if it will either help the defendant or hurt the prosecution. In assessing a claim made on appeal that the prosecution failed to reveal

material evidence, favorable evidence is considered material only if it is reasonably probable that disclosure would have affected the result. (*United States v. Bagley, supra,* 473 U.S. at p. 676 [105 S.Ct. at pp. 3380-3381]; *In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].) That test is not met here. David Hacker did not testify that appellant had such an obsession. His denial that he had made such a statement could not have been used to impeach him. Neither David nor Allen Hacker disputed the accuracy of their statements that appellant was aware of the ziplock method of killing. Appellant thus fails to establish that evidence that David Hacker denied telling McKevitt that appellant was "obsessed" was material, favorable evidence that the prosecution was obligated to disclose.

Moreover, even assuming the statement should have been disclosed, the failure to do so did not harm appellant, since defense counsel were aware of the denial at the time McKevitt testified but made no effort to re-call David Hacker to use the statement to impeach McKevitt. Additionally, the only relevance of the denial was to refute the prosecutor's assertion in his opening statement that Mr. Hacker would testify that appellant was obsessed with that method of killing. The jury was instructed that the arguments of counsel were not evidence.

Thus, appellant not only fails to satisfy us that evidence of the denial could have been used to his advantage other than in an attempt to impeach McKevitt only insofar as she testified that David Hacker told her appellant was "obsessed" with using nylon ties for strangulation, but he was aware of the statement and could have called David Hacker as his witness.

For these reasons we also reject appellant's claim that in failing to "fully present" this claim—by arguing that Hawkins was an agent of the prosecution and thus whatever transpired between Hawkins and David Hacker was attributable to the prosecutor—counsel rendered constitutionally ineffective representation.

7. *Admission of Candice Smith testimony.*

 Appellant objected to admission of Smith's testimony that he telephoned her, using the name Parrott, and asked her to appear in a commercial, on the ground that the prosecution would be unable to prove that the caller was appellant. The court deemed the objection to be one made under Evidence Code section 352, and ruled that the evidence was more probative than prejudicial. Appellant now argues that the circumstantial evidence that appellant was the caller was not a sufficient foundation for admission of the evidence and contends that the evidence lacked probative value.

The prosecution bore the burden of establishing that appellant was the caller. (*People v. Collins* (1975) 44 Cal.App.3d 617, 628 [118 Cal.Rptr. 864].) "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] . . . [¶] (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself." (Evid. Code, § 403, subd. (a)(4).) That burden was met. The People established that appellant had expressed an interest in Smith and knew she had a daughter; that he had played at Smith's table; that he was familiar with the Avalon Modeling Agency; and that he claimed to be calling from Atlanta, Georgia, the place he told the Barbizon agency his "Parrott" or "Barrett" firm was located. Although circumstantial, that evidence was a sufficient basis for concluding that appellant was the person who called Smith. The court did not abuse its discretion in admitting it. (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1167.)

Assuming that appellant's argument on the foundation objection was sufficient to raise the latter claim, it lacks merit. Smith's testimony was relevant to the preplanning activity in which appellant engaged as he sought to lure women and young girls to his trailer.

8. *Instructional error.*

a. *Murder instructions.*

The trial court instructed the jury on first degree murder, second degree murder, and voluntary manslaughter. The defense withdrew a request for an involuntary manslaughter instruction. ▮▮▮ Appellant now contends that the trial court erred in instructing on second degree murder by describing only intentional but unpremeditated second degree murder. Appellant argues that the trial court also should have instructed, sua sponte, on an implied malice theory of second degree murder as a lesser included offense of first degree murder, since the evidence would have supported a conclusion that the murders were not intentional. He asserts that, had the jury been instructed on implied malice, verdicts of second degree murder might have been returned. Under the instructions given, the jury had no choice but to convict of an intentional killing or acquit.

We agree that the trial court erred. ▮▮▮ A court must "instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162

[77 Cal.Rptr.2d 870, 960 P.2d 1094].) ▮▮▮ Appellant contends that the evidence permitted an inference that the murders were not committed with premeditation but were committed in a panic when the victims put up unanticipated resistance and made noise. Murder was defined as "the unlawful killing of a human being with malice aforethought or the unlawful killing of a human being which occurs during the commission or attempt to commit a felony inherently dangerous to human life." The court instructed that the necessary mental states for first degree murder were premeditation, deliberation, and malice aforethought, and that in second degree murder "the necessary mental state is malice aforethought." In further defining second degree murder, however, the court instructed only: "Murder of the second degree is also the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." The court did not instruct the jury that second degree murder included unintentional killing with malice, and did not define implied malice.

Based on the evidence at trial a properly instructed jury could have returned second degree murder verdicts if the jury found that appellant acted in a panic and pulled the FLEX-CUFs tight only to overcome the victims' resistance and stop the noise. That he did not intend to kill when he did this was supported by evidence from which the jury could have found that someone cut the tie on Martin's neck before the police arrived. Since neither of the girls did so, the jury could have inferred that he cut the tie to assist Martin before she died.

The People respond to this claim of error that instructions on lesser included offenses are not required if there is no evidence that the offense was less than that charged. (*People v. Hawkins* (1995) 10 Cal.4th 920, 953-954 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].) They argue on that basis that there was no obligation to instruct on any theory of second degree murder other than intentional killing because the evidence that appellant tightened the FLEX-CUFs when the victims resisted demonstrates that appellant acted with actual or presumptive knowledge that serious bodily injury was likely to occur. (*People v. Colantuono* (1994) 7 Cal.4th 206, 219 [26 Cal.Rptr.2d 908, 865 P.2d 704]; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 [13 Cal.Rptr.2d 864, 840 P.2d 969].) That mental state permits an inference of implied malice, however, and does not support a conclusion that no instruction on second degree murder on a theory of implied malice was necessary.

▮▮▮ The court's duty to instruct sua sponte extends to general principles of law relevant to the issues raised by the evidence and necessary for the

jury's understanding of the case. ▇▇ Malice, an element of second degree murder, may be express, as when a defendant intends to kill, or implied. Malice may be implied from conduct that reflects an intent to do an act that is dangerous to human life. (§ 188; *People v. Swain* (1996) 12 Cal.4th 593, 602-603 [49 Cal.Rptr.2d 390, 909 P.2d 994].) ▇▇ There was evidence here from which the jury could have inferred that appellant acted without intent to kill even though his conduct posed a high risk of death, but the instructions given defined only the express malice theory of second degree murder.[27]

We are satisfied, however, that the omission of complete instructions on the implied malice form of second degree murder was harmless error. There is no probability that the error affected the verdict. (Cal. Const., art. VI, § 13; *People v. Breverman, supra*, 19 Cal.4th at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The evidence of intent to kill was overwhelming and, under properly given instructions, the jury found that the killings were intentional, premeditated, and deliberate. (*People v. Jackson* (1989) 49 Cal.3d 1170, 1199 [264 Cal.Rptr. 852, 783 P.2d 211]; *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) The jury was not, as appellant argues, forced by the instructions given into returning a verdict of first degree murder even if it did not believe the killings were intentional and premeditated. The court made it clear that intent and malice were not synonymous, when it advised the jury that mental illness could be considered in determining if the defendant "had the mental states of malice aforethought *and an* intent to kill." Read in context, it seems clear that the court intended and the jury would have understood that the court was not limiting second degree murder to intentional killings, but was admonishing the jury that even if it concluded the killings were intentional, they were only second degree murder if not premeditated and deliberate. The instruction of which appellant now complains was followed immediately by another reasonable doubt instruction directing the jury to give the defendant the benefit of any doubt as to whether the murder was first or second degree.

The court also instructed that if the evidence as to any specific mental state was susceptible of two reasonable interpretations, the jury should accept the interpretation that pointed to the absence of that mental state and that if the jury concluded there was evidence of a mental disease or defect, that evidence could be considered in determining if appellant actually had

---

[27]Contrary to appellant's suggestion, the evidence did not establish that the tie was cut before police arrived or before Martin died. The evidence was that the police had opened the bags in which the bodies were found to ascertain if the victims were alive, and that the tie on Martin's neck already had been cut at the time the evidence technician later viewed the body. The evidence permitted an inference that the police who opened the bag cut the tie.

the mental states of malice aforethought, intent to kill, premeditation, and deliberation.

### b. *False statements.*

The court instructed the jury in the language of CALJIC No. 2.03 that if it found "that before this trial the defendant made willfully false or deliberately misleading statements concerning the charges upon which he is now being tried, you may consider such statements as a circumstance tending to prove the consciousness of guilt, but it is not sufficient of itself to prove guilt. The weight to be given to such circumstance and its significance, if any, are matters for your determination." Appellant contends that this instruction permitted the jury to infer that he made more than one false statement when, in fact, his denial that he had sexually molested the two girls was the only such statement he made pretrial. He also complains that the instruction was not relevant to the only contested issue in the case—whether the murders were premeditated and deliberate.

As the People observe, appellant made several pretrial statements about the offenses with which he was charged, during his telephone conversation with the FBI agent, while he was being arrested, and during custodial interrogation. The jury could well have concluded that his explanation for the crimes and his claim that he was "sick" and needed hospitalization were false. We think it highly unlikely in any event that the jury would parse this instruction in the manner suggested by appellant and find significance in the use of the plural "statements," or understand the instruction as permitting an inference that denial of sexual molestation of two victims reflected consciousness of guilt of murder of two other victims. ■ We credit jurors with intelligence and common sense (see *People v. Venegas* (1998) 18 Cal.4th 47, 80 [74 Cal.Rptr.2d 262, 954 P.2d 525]) and do not assume that these virtues will abandon them when presented with a court's instructions. (See also *People v. Arias* (1996) 13 Cal.4th 92, 142 [51 Cal.Rptr.2d 770, 913 P.2d 980] [reasonable jury would understand instruction as meaning consciousness of some wrongdoing, not of every element of offense]; *People v. Cain* (1995) 10 Cal.4th 1, 33-34 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

### c. *Special circumstances instruction.*

The court instructed the jury that to find true the multiple-murder special-circumstances allegation it must find "That the Defendant in this case has been convicted of more than one offense of murder in the first or second degree." Appellant contends that the court erred in failing to instruct that at

least one of the murders had to be first degree murder and that the defendant had the specific intent to kill each victim.[28]

The short answer to this claim is that any error in failing to include those elements was harmless. The jury had convicted appellant of two counts of first degree murder on a theory of intentional, premeditated, and deliberate murder. There is no possibility that, had those elements been set out in the special circumstances instruction, a different verdict would have been returned. Indeed, defense counsel declined the opportunity to argue the special circumstance issue, stating, "[T]he matter seems rather self-evident. We'd just submit the matter."

### 9. *Prosecutorial misconduct.*

An objection to instances of prosecutorial misconduct is necessary to preserve the claim for appeal. ■■■ "A defendant who does not object and seek an admonition to disregard improper statements or argument by the prosecutor is deemed to have waived any error unless the harm caused could not have been corrected by appropriate instructions. [Citations.] Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations] defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry." (*People v. Visciotti, supra*, 2 Cal.4th at p. 79; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 428 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Samayoa, supra*, 15 Cal.4th at p. 854; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

Appellant scatters claims of prosecutorial misconduct throughout his brief, often failing to identify the claim as such and simply asserting that an argument or statement was improper or stating that the prosecutor "was permitted" to do the thing complained of.

### a. *Opening statement.*

In his opening statement the prosecutor referred to appellant's diary and statements appellant made therein and on pieces of paper found in his

---

[28]These offenses were committed while *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], so construing section 190.2, subdivision (a)(3), were in effect. Although both were subsequently overruled (see *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]), the intent to kill requirement applies to killings committed during the "window period" after *Carlos* and before *Anderson*. (*People v. Johnson* (1993) 6 Cal.4th 1, 44 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

mobilehome as evidence that would be presented to the jury. That evidence was presented. Appellant argues now that the prosecutor "was permitted" to suggest in his opening statement that these writings showed that appellant "embraced evil" and believed killing was moral. If this is a claim of prosecutorial misconduct, we reject it. There was no objection and the opening statement properly alerted the jurors to the relevance of appellant's writings to the People's theory of the case—that appellant had his own view of morality and the charged crimes had their inception in this skewed view long before they actually occurred. "The function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning." (*People v. Dennis* (1998) 17 Cal.4th 468, 518 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

The entries that appellant asserts were improperly isolated and called to the attention of the jury included appellant's statements: "Evil must exist to prevent boredom," and "If you are given a choice whether or not to kill, but can choose who or when or how or to die or live, it's not murder. [¶] Death is a given in some situations." Another entry to which the prosecutor referred, dated October 15, 1984, stated: "Young chicks smell, taste, feel better, even if not quite as built," and one dated March 4, 1985, said: "Need to find out if young chicks are what I need and, if so, when do I go for it." He also referred to a list of words and phrases that included "Torture Book" and "act out fantasies like last days alive." A diagram of a room within a room appeared on the same page as the former. There was no impropriety in isolating these statements to illustrate the People's theory that appellant had contemplated seizing young girls for sexual gratification and was not troubled by the possible need to kill to achieve his aim. If their context suggested some less sinister meaning, it was open to appellant to argue that in response and to demonstrate that to the jury when the evidence actually came in. That there was no evidence of the time the phrases were written, no theme for all the words, and appellant often scribbled random words on scraps of paper, does not affect the admissibility of those exhibits; it goes only to the weight of the evidence. The prosecutor was free to refer to the evidence to be presented and to explain his theory of its relevance.

Appellant also claims that inviting the jury to draw inferences based only on speculation denied him due process, arguing that the testimony of sanity phase witness Dr. Satten that the statement "[e]vil must exist to prevent boredom" was a conclusion appellant reached when he tried to reconcile philosophically the co-existence of God and evil demonstrated that such speculation would have been inaccurate. Again we disagree. It was not unreasonable to assert that appellant's writings reflected his philosophy and

his state of mind when he committed the crimes with which he was charged, his statements to the psychiatrists who examined him notwithstanding. Here and elsewhere, when appellant claims that the conclusions the prosecutor sought to draw from appellant's writings were unreasonable speculation, appellant assumes that his statements to the psychiatrists who examined him must be accepted as true. As reflected impliedly in the jury verdict and expressly in the court's statement denying appellant's automatic motion to modify the penalty (§ 190.4), neither believed appellant was truthful.

■ We also reject appellant's argument made here and elsewhere with regard to various items of evidence, that the evidence had no relevance to the only issue in the case, whether the murders were premeditated. By his plea of not guilty, appellant put in issue the existence of every element of every offense charged. The People had the right, and the obligation, if they were to avoid a directed verdict of acquittal (§ 1118.1), to offer evidence in their case-in-chief to establish all of those elements. (*People v. Williams* (1988) 44 Cal.3d 883, 907, fn. 7 [245 Cal.Rptr. 336, 751 P.2d 395]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 757-758 [230 Cal.Rptr. 667, 726 P.2d 113].) Defense counsel's opening statement, in which counsel conceded that appellant had killed the two women and stated that only the degree of murder was in issue, was not evidence that relieved the People of their burden.

b. *Guilt phase.*

We reject appellant's claim that the prosecutor engaged in misconduct while examining Szeremeta regarding the incident to which appellant referred when he called Szeremeta to tell him he had "something going . . . like the guy in Philadelphia." That person had kidnapped and confined retarded girls in his basement. Before Szeremeta was questioned, defense counsel objected to testimony that might go beyond kidnapping the girls. The court agreed the evidence should be limited, as did the prosecutor. Szeremeta did not confine his answers as anticipated, however, and had to be cautioned not to speak about certain other things discussed in the telephone conversation and had to be admonished to give "yes" or "no" replies. Appellant assigns as misconduct the phrasing of the prosecutor's questions, claiming prejudice on the theory that the admonitions to the witness conveyed the impression that something was being withheld from the jury.

We perceive neither misconduct—the witness had been prepared, the questions were proper, the rambling answers were the problem—nor prejudice. The jury was instructed that it should not speculate about matters as to which objections had been sustained, and the Philadelphia matter was too tangential to have given rise to speculation in any event.

c. *Closing argument.*

(1) *Writings.*

Appellant contends that the prosecutor improperly based part of his closing argument on unfounded speculation that other writings of appellant reflected preplanning of the scheme to take the girls and commit the murders. Those writings consisted of various words handwritten on the reverse of baccarat game cards. The words on the first one to which the prosecutor referred were: "chop or keep," "won't eat through??" "Negatio," "prints," "burns," "rot," and "shallow." Arrows connected some of the words. The prosecutor argued: "When you think about disposing of a body, when you think about some way the police will never be able to identify or find a body, do the words 'negative prints,' 'chop or keep,' 'won't eat through,' 'burn,' 'rot,' 'shallow' or 'deep,' when you think about disposing of a body, do those words on this document, [exhibit No.] 154, have a meaning? Do they suggest to you, using those all important ingredients of your common sense, your logic, and your experience, do those words suggest to you that Herbert Coddington gave thought before the crimes and at the same time as he was writing out the scripts of the voices, how do I get rid of the bodies?"

On another card, appellant had written: "PABA, minerals, shoes, PO, bag, case, tarp, win-earn, test - sup, rig, car, 5X, church, wo!!, mail, reg - car." The prosecutor argued: "[T]his is the document that has the word 'tarp,' and you look at the word 'tarp' and you look at the other words that are on that list, and you try to determine what is the meaning, and above the word 'tarp' you see the word 'bag' and the word 'case.' And in the context of putting the bodies into a bag in a case and the word 'tarp,' does it have a meaning to you? . . . [I]s it meaningful in what was going through that man's mind sometime before the crime was committed."

No contemporaneous objection was made, but after this argument, defense counsel complained that nothing in the two exhibits showed when they were prepared and they were not evidence of a plan made before the killings. The court ruled that the prosecutor could argue that it was reasonable to infer that the words were written prior to the killings, and instructed the jury that the prosecutor misspoke when he said the words were written before the killings. The court then stated: "That can be argued as a fair inference, but I don't believe the record would indicate as a fact . . . one way or the other when it was written."

Appellant argues that it was not a fair inference that the words were written prior to the killings and the improper argument and erroneous ruling

invited pure speculation, which denied him due process. The court's admonition, he claims, not only failed to cure the misconduct, but made it worse. We disagree. The evidence supported a conclusion that appellant possessed the cards prior to the murders, there being nothing to suggest that he had visited a casino during his brief absence from the mobilehome after the girls had been confined there. It was as or more likely that he made the notations, which included words apparently unrelated to the crimes, before they were committed. The trial court was correct. The inference was reasonable.

 "A reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " (*People v. Morris, supra,* 46 Cal.3d 1, 21.) Defendant's possession of the baccarat cards, the notations on them, and the circumstances in which they were found were all evidence from which it was reasonable to infer that the notations were made prior to the murders.

(2) *Reference to fact not in evidence.*

Appellant also complains that the prosecutor referred in rebuttal closing argument to testimony by the autopsy surgeon, a forensic pathologist, that had not been given before the jury. The prosecutor had argued that the wounds on the murder victims' necks could not have been postmortem injuries caused by the scissors used to remove the ligatures, but were caused by the fingernails of the women as they tried to remove the ligatures. He then asked the jury to recall the testimony of the pathologist that it is possible to distinguish between wounds caused before and those caused after death. After doing so the prosecutor stated that the witness had testified that in his opinion the neck wounds were caused by fingernails and were not consistent with scissors. Defense counsel objected that the doctor had not testified that the marks were not caused by scissors.

Neither the court nor the prosecutor could recall whether that testimony had been given before the jury and the court did not admonish the jury to disregard the argument or otherwise correct the prosecutor. The prosecutor did remind the jury immediately after the bench conference that if they had any concern whether something had been said or not said, or whether counsel was right, the jury had a right to ask to have the expert testimony reread.

 "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant." (*People v. Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802

P.2d 330].) It is misconduct for a prosecutor to go beyond the evidence before the jury in argument. (*Id.* at p. 794.) Appellant fails to persuade us that he suffered prejudice from the statement or the court's failure to correct it. He argues that the defense theory was that the wounds were caused by scissors,[29] and claims that the evidence supported that theory since the victims could not have caused the scratches while their arms were bound behind their backs. Alecia and Monica had testified that the women were bound before the ligatures were placed around their necks. Appellant asserts that the victims' hands were still tied behind their back when the bodies were discovered.

Appellant fails to acknowledge, however, that neither victim was still bound with the FLEX-CUFs described by the girls when found. Each was tied with rope or cord, Walsh's hands were tied in front, and her right index fingernail had been torn off recently. Both victims suffered more injury to the left side of the neck, which, the pathologist explained, could have been caused by the victims using their rights hands to try to release the ligatures and breathe. "[I]in each case the left side was the area which corresponded to the scratches from fingernails and also the trauma to the neck in a struggle to get the ligature free." Moreover, to reach a conclusion that defendant might have cut the FLEX-CUF before Martin died, one would have to assume that the remnant remained in place throughout the process of trussing the body and placing it in the plastic bag in which it was discovered with the severed FLEX-CUF still in place. Thus, we are not persuaded that appellant suffered any prejudice as a result of the prosecutor's erroneous statement.

### d. *Reference to vaginal injuries.*

Before the pathologist testified, defense counsel asked the court to ban prosecutorial inquiry about trauma to the vaginal area of the murder victims' bodies, explaining that the prosecutor might use the evidence to suggest that appellant had sexually assaulted the victims. The court refused to exclude any evidence of trauma to the bodies, but stated that reference to assault of a sexual nature would be prohibited. After further discussion, however, the court proposed that the testimony be heard, after which the court would be in a better position to determine whether or not reasonable people could infer that there were sexual overtones.

The pathologist testified that Martin had a recent wound in the vaginal area, "a very tiny but definite tear of the skin of the mucosa . . . just outside of the hymeneal ring, and it had a very little bit of hemorrhage." Asked

---

[29]We infer that this theory was that appellant had attempted to cut off the FLEX-CUFs when he realized that the women were strangling. No other evidence supported that theory.

whether the injury was consistent with being struck by a blunt object, the witnesses replied: "I think a blunt straddling-type force could cause that type of injury." Walsh had a bruise across the vaginal area, external to the hymeneal ring, in the same basic place.

Appellant now complains that at each stage of the trial the prosecutor mischaracterized and unduly emphasized vaginal injuries found on the murder victims, thereby suggesting to the jury that the women had been sexually assaulted. These references, he argues, violated the spirit of the court's order that the prosecutor not make any inflammatory or speculative suggestion or innuendo that such assaults occurred. He overlooks the court's subsequent ruling that any decision on the appropriate use of, or reference to, those injuries would await receipt of the actual testimony. Thus, the statements to which appellant refers were not a violation of the earlier tentative ruling.

The only guilt phase statement identified by appellant as improper was the prosecutor's reference in closing argument to both injuries as "vaginal tears" and focussing on those injuries when arguing that the pattern of injuries suffered by the victims was not accidental. No objection was made to this argument, however, and the autopsy surgeon had testified that the pattern of injuries on the two murder victims was remarkably similar and the odds that this was accidentally random were very, very slim. In the hundred or even thousands of beatings he had examined in postmortem situations, the injuries were much more random. The "incredibly similar" distribution of injuries on these two bodies could not be coincidental. The prosecutor's argument was, therefore, based on properly admitted evidence. If there was emphasis on the vaginal injuries, it was warranted by the unusual coincidence of blunt force injuries to this part of both bodies.

10. *Cumulative prejudice.*

Having concluded that several of appellant's claims were waived, many did not establish error, and those that did could not possibly have caused prejudice, we reject appellant's claim that cumulative prejudice from numerous errors of an inflammatory nature mandate reversal.

B. *Sanity Phase Issues.*

1. *Irresistible impulse instruction.*

The court instructed the jury: "If a person knows and understands the nature or quality of his act or that it was wrong, then it is not a defense that

he committed the act with which he is charged under an uncontrollable or irresistible impulse."[30]

Appellant claims this was error, arguing that the instruction could cause a reasonable juror to believe that his defense, that he acted on what he believed were commands from God, involved irresistible impulse. He had objected to an irresistible impulse instruction on that basis during an earlier discussion of sanity phase instructions. The court ruled that an instruction on irresistible impulse would be given, explaining that there was evidence that appellant had not always obeyed the signs he believed were from God, and there was no evidence that he could not refuse.

We do not agree that the court erred. While the court's reason for giving the instruction does not support it, the instruction correctly stated the law insofar as irresistible impulse might be offered as a defense at the sanity phase and the instruction was responsive to the evidence.[31] Irresistible impulse does not demonstrate that the defendant is unable to understand the nature and quality of an act or that he does not know that the act is wrong. Section 28, subdivision (c) does not, as appellant argues, forbid "any" instruction on irresistible impulse, even an instruction that irresistible impulse is not an insanity defense. The instruction limited the purpose for which the psychiatric evidence that appellant believed he was acting under signs or commands from God could be used, but it did not, as appellant argues, suggest that appellant's insanity defense was an irresistible impulse defense.

██ With the restoration of the M'Naghten test of legal insanity, irresistible impulse no longer affords the basis for an insanity defense. It does not follow that, when psychiatric evidence suggests that a defendant acted under an irresistible impulse, the court may not instruct the jury that irresistible impulse is not legal insanity. The other instructions on insanity and the arguments of counsel made it clear to the jury that the psychiatric evidence should be considered in deciding whether appellant's mental illness resulted in failure to know that his acts were wrong, the only disputed issue.

---

[30]Appellant does not complain of the error in stating the test using "or" rather than "and." The error was not prejudicial, in any case. There was no dispute that appellant knew the nature and quality of his act — that he was killing Martin and Walsh, and knew that the killings were unlawful. It was made clear to the jury that the issue at the sanity phase was whether appellant knew that his acts were wrong.

[31]Here there was evidence, and appellant recalled the evidence during closing argument, that appellant had "surrendered himself" to what be believed were signs from God. He also argued that, if the jury believed appellant was following signs he believed were from God, the jury had to find that he was not guilty by reason of insanity. These arguments could have been understood as assertions that appellant was acting under an irresistible impulse.

Moreover, if he believed that this instruction might mislead the jury, appellant could have, but did not, request a clarifying instruction tailored to the evidence and its relevance to his theory of insanity. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].) The claim has been waived. (*People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683].)[32]

Appellant also argues, somewhat inconsistently, that the court erred because irresistible impulse may have a legitimate role in an insanity defense. Section 28, subdivision (c) does, as appellant notes, provide that the ban on use of diminished capacity, diminished responsibility, or irresistible impulse contained in subdivision (b) of that section does not apply in an insanity hearing held pursuant to section 1026 or 1429.5. To the extent that section 28, subdivision (c) might have been read to authorize consideration of irresistible impulse at the trial on a plea of not guilty by reason of insanity, however, it was impliedly repealed pro tanto by section 25, subdivision (b), which reinstated the M'Naghten test of insanity. Nothing in the instruction given would have precluded consideration of evidence of irresistible impulse to the extent that the evidence suggested that appellant did not know his acts were wrong.

### 2. *Violation of attorney-client and work product privileges.*

In preparation for the sanity phase of the trial, appellant was examined by seven psychiatrists retained by the defense. Only Drs. Mills, Rosenthal, and Satten were called to testify. The names of the other experts were not revealed to the prosecutor,[33] who learned them through jail sign-in sheets and social contacts. In anticipation that the prosecution would seek to elicit evidence that those experts had also examined appellant, appellant sought an in limine ruling that reference to those examinations be excluded on grounds that admission of evidence that other psychiatrists had seen appellant and the content of their interviews would violate the attorney-client and work product privileges. The prosecutor acknowledged that he might seek to argue to the jury that the defense had consulted several experts before finding ones who would testify that appellant was legally insane and seek to establish that

---

[32]Inasmuch as we conclude that the jury would not have been misled by the instruction, appellant suffered no prejudice, and thus this omission does not support an incompetent counsel claim.

[33]At the close of the sanity phase the parties stipulated that Drs. Custer, Mates, French, and Dougherty had visited appellant in jail.

an individual who took psychological tests repeatedly could become sufficiently familiar with them to tailor responses favorably.

The court ruled that the fact that additional psychiatric reports existed was not shielded as work product, and that during cross-examination of the testifying experts, those experts could be asked if they were aware that other studies and tests had been done. The actual reports were within the work product privilege. Defense counsel then agreed with the court that admission of evidence that other examinations had been made might raise an Evidence Code section 352 problem and the court ruled that eliciting evidence that the defense had been "shopping around" for psychiatric experts was more prejudicial than probative and could not be admitted unless for some legitimate purpose other than simply showing that additional psychiatrists had examined appellant.

During cross-examination of Drs. Mills, Rosenthal, and Satten the prosecutor was permitted, over objection based on the work product and attorney-client privileges, to ask whether they were aware that Drs. Custer, Mates, and French had evaluated appellant. He was also permitted, over objection, to list the credentials of Dr. Mates.

In closing argument during the sanity phase the prosecutor emphasized that the defense experts who did testify were engaged many months after the crimes were committed and had no knowledge of the findings of the psychiatrists, engaged by the defense, who had examined appellant earlier and closer to the time of the events.[34]

Appellant claims that this violated both the attorney-client and work product privileges, constituted impermissible comment on the exercise of a

---

[34]Arguing that the presentation of expert evidence did not compel the jurors to leave behind their common sense and logic in assessing whether the experts were persuasive, the prosecutor said: "I'm talking about the fact that this crime happened back on May 16 and May 17 of 1987. It was not until January, seven months later, that the Defendant entered the plea of not guilty by reason of insanity. And in that interim of some seven months, four mental health professionals, other than the ones that you heard, on behalf of the defense examined Mr. Coddington." Suggesting that a surgeon would not proceed without considering reports and opinions of others who had examined the patient, he argued that psychiatrists have the same obligation and that "[Y]ou, as jurors, must ask yourself what is going on here when there have been four prior mental health professionals and we have no knowledge of what their findings were, and the doctors that finally did the workup have no knowledge of what their findings were. . . . And bear in mind . . . the really critical gut issue is what was going on in that man's mind 15 months ago. [¶] And so when you come in the picture and you're trying to figure out what happened 15 months ago, is it not important to get the results and to talk to the people that saw Mr. Coddington as close to the crime as is possible rather than to go into this with a reckless abandon as to what those people's findings were?"

privilege (Evid. Code, § 913),[35] and denied him due process and the right to counsel guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

■ We agree that the prosecutor's use of this information was improper. While there was no violation of the attorney-client privilege, the prosecutor's cross-examination of the defense experts and his argument did violate the work product privilege. Any error in permitting the questions and argument was harmless, however.

■ The attorney-client privilege is "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." (Evid. Code, § 954.) That privilege encompasses confidential communications between a client and experts retained by the defense. (Evid. Code, § 952; *People v. Lines* (1975) 13 Cal.3d 500, 509-510 [119 Cal.Rptr. 225, 531 P.2d 793].) Neither evidence that appellant had been examined by experts other than those who testified nor evidence that the testifying experts were aware or not aware of the opinions of the nontestifying experts disclosed a confidential communication between defense counsel and appellant or appellant and any psychiatrist. Therefore, the decision of the defense to call only three of the experts who had examined appellant did not constitute the exercise of the attorney-client privilege and comment was not precluded by Evidence Code section 913.

The work product privilege, now codified in Code of Civil Procedure section 2018 and applicable in criminal as well as civil proceedings (*People v. Collie* (1981) 30 Cal.3d 43, 59 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]), absolutely bars the use of statutory discovery procedures to obtain "[a]ny writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories" (Code Civ. Proc., § 2018, subd. (c)), and bars discovery of any other aspect of an attorney's work product, unless denial of discovery would unfairly prejudice a party. (*Id.,* subd. (b).)

---

[35]Evidence Code section 913: "(a) If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding.

"(b) The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

In light of the interrelationship between Evidence Code sections 952, 954, and 913, we deem counsel's objection on attorney-client privilege ground as one encompassing violation of Evidence Code section 913.

This privilege reflects "the policy of the state to: (1) preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of the case; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018, subd. (a).)

 The prosecutor's cross-examination and his invitation to the jury to infer that defendant had been examined by other experts who had not been called to testify contravened that policy. Work product encompasses the investigation of defendant's mental state to assess both the favorable and the unfavorable aspects of the case. It also encompasses counsel's impressions and conclusions regarding witnesses who would be favorable and those who would not be so. (*Nacht & Lewis Architects, Inc. v. Superior Court* (1996) 47 Cal.App.4th 214, 217 [54 Cal.Rptr.2d 575].) It follows that the party's decision that an expert who has been consulted should not be called to testify is within the privilege. (*County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, 656-658 [271 Cal.Rptr. 698].)

The prosecutor did not seek or learn the identities of the nontestifying experts through discovery. Regardless of how the information is obtained, however, if a party were permitted to use information about pretrial investigation that reveals opposing counsel's thought processes and reasons for tactical decisions, thorough investigation would be discouraged. By inviting the jury to infer that the other experts were not called because their testimony would not be favorable, the prosecutor also took advantage of defense counsel's efforts and industry. Appellant failed to object to that aspect of the argument, however, and his questions to the defense experts who did testify elicited only answers that knowledge of the nontestifying experts' opinions would not have had any bearing on their own diagnoses. For that reason, and because defendant's mental state was thoroughly explored by the five experts who did testify, and those experts disagreed only as to the severity of his mental illness, any error in permitting the cross-examination was clearly harmless.

3. *Prosecutorial misconduct.*

 a. *Reference to vaginal injuries.*

Just as he did with regard to the prosecutor's reference in the guilt phase closing argument to the vaginal injuries inflicted on the murder victims, appellant urges the prosecutor's sanity phase reference to the vaginal injuries as misconduct. This claim is based on the prosecutor's examination of Dr.

Mills, a defense psychiatrist, who was asked if he was aware that each victim had what was described as a hymeneal tear, although Walsh had suffered bruising, not a tear. Defense counsel objected that the injuries were not hymeneal as they were outside the hymen, that only one was a tear, and that the prosecutor was attempting to create a false impression. The court ruled that the prosecutor was going too far afield and directed that he go somewhere else. The prosecutor did so.

 It is not improper, of course, to ask an expert whether the expert has considered matters in evidence that may be relevant to the weight to be given to the expert's opinion. Except as to statutory limitations on inquiry about learned treatises, "an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to . . . (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) Although the autopsy surgeon had testified that the injuries were caused by blunt force trauma, not by a sexual assault, his testimony did not rule out the possibility that inflicting injury to the victims' genitalia was sexually motivated. We cannot say that this evidence could not be relevant to the psychiatric diagnosis.

b. *M'Naghten test.*

 Without identifying the claim as one of prosecutorial misconduct, appellant claims that the prosecution pursued a blatantly unlawful and unconstitutional tack during the sanity phase, as a result of which the jury was effectively told it could not find appellant not guilty by reason of insanity because his conception of God was pantheistic rather than "Judeo-Christian." As a consequence, appellant asserts, the jury was precluded from finding him legally insane, notwithstanding his psychotic delusions. The prosecution's conduct in questioning witnesses and in argument, he claims, was contrary to the California M'Naghten test as incorporated into section 25, subdivision (b), and violated his religious rights under the First, Fifth, and Fourteenth Amendments. He asserts that had the jury believed his defense—that at the time of the killings he was delusionally psychotic; had a delusion that God had commanded or authorized him to kidnap and kill; and as a result he believed his conduct was morally justifiable—the jury would have to find him not guilty by reason of insanity. The claim lacks merit.

First, appellant did not object to the questions asked of witnesses on cross-examination of which he now complains or to any aspect of the prosecutor's sanity phase argument. He cannot avoid this threshold requirement by failing to identify this claim as one of prosecutorial misconduct. The issue has been waived.

Further, the jury was properly instructed in accordance with section 25, subdivision (b), and *People v. Skinner, supra,* 39 Cal.3d 765. The court instructed:

"Mental illness and mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity. A person may be mentally ill or mentally abnormal and yet not be legally insane.

"A person is legally insane when, by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the offense. The word 'wrong' as used in this instruction is not limited to legal wrong, but properly encompasses moral wrong as well. Thus, the defendant who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful."

Appellant did not object to this statement of the law when the sanity phase instructions were discussed. The jury was properly admonished that the arguments of counsel are not evidence.

Appellant bore the burden of proving his insanity. (§§ 25, 1026; *People v. Tilbury* (1991) 54 Cal.3d 56, 63 [284 Cal.Rptr. 288, 813 P.2d 1318].) He was given the opportunity to do so and to argue his theory. The experts and both sides agreed that appellant knew the nature and quality of his acts and knew that they were unlawful. The only question was whether he also knew that they were morally wrong.

■ The morality contemplated by section 25, subdivision (b) is, as the prosecutor argued here, not simply the individual's belief in what conduct is or is not good. While it need not reflect the principles of a recognized religion and does not demand belief in a God or other supreme being, it does require a sincerely held belief grounded in generally accepted ethical or moral principles derived from an external source. "[M]oral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the accused." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1274 [252 Cal.Rptr. 913].)

Religious beliefs are often the source of generally accepted moral standards, but a defendant need not show that he or she believed that Judeo-Christian standards of morality justified the criminal conduct. An insane delusion that the conduct was morally correct under some other set of moral precepts would satisfy this prong of the M'Naghten test of legal insanity.

However, "[t]he fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity." (*People v. Rittger* (1960) 54 Cal.2d 720, 734 [7 Cal.Rptr. 901, 355 P.2d 645].) As we explained in *Rittger*, this aspect of the M'Naghten test, adapted from the rule of *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722, is necessary "if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards." (*People v. Rittger, supra,* 54 Cal.2d at p. 734.)

 Defense counsel conceded in argument that appellant had a concept of God that might differ, and had rejected established religion and had his own moral system, but emphasized that whatever it was called, if the jury believed the evidence, it established appellant was following what he believed were commands from that source. If the jury believed that appellant was following what he believed to be signs from God, or from a higher entity, "God, nature, whatever you call it, and therefore did not believe that it was morally wrong," the jury had to find him not guilty by reason of insanity.

Nothing the prosecutor asked or argued was improper, inconsistent with this understanding of the meaning of "wrong" in section 25, subdivision (b), or denied appellant any constitutional due process or religious rights. If anything, appellant received the benefit of his counsel's overly expansive understanding of the concept of morality found in the M'Naghten test, which did not limit that concept to external, generally accepted standards of morality.

The only bases for appellant's claim of impropriety in this regard are the prosecutor's argument and questions the prosecutor put to the expert witnesses who had testified that the defendant was legally insane, questions based on evidence that appellant had rejected the Judeo-Christian concept of God, had examined other religions, and ultimately evolved his own concept of God as a force running through the universe. Nothing in the prosecutor's questions or his subsequent argument precluded the jury from finding appellant legally insane under the court's instruction or under the test he now argues was the sole appropriate objective means by which to measure his sanity.[36] The prosecutor's argument was an attack on the defense psychiatric experts' conclusion that appellant was legally insane, and their reliance on

---

[36]Appellant posits the following as the test: 1. Did appellant believe he was getting signals from some superior or supernatural force? 2. If so, did appellant believe the superior force was a command or was authorizing him to kill and kidnap? If so, did appellant believe it was right to obey despite the fact that kidnapping and killing were against the law? If so, did

statements made to them by appellant, whom the prosecutor characterized as a cheat and a liar. This was not an assertion that the law did not permit a finding of legal insanity on the theory that, because a universal force condoned his actions, appellant did not know his conduct was morally wrong.

The prosecutor charged appellant with manipulating the word "God" to deceive the jury into believing he was mentally ill. He recognized that moral systems may differ, but argued that morality had an external source and was not simply an individual decision as to what is or is not moral. He argued that a moral system has principles or ethics, as opposed to an individual's decision that something was good or bad, and further argued that appellant did what he wanted and then applied the word God in his own moral system to say that his conduct was all right. He accused appellant of creating his own sense of ethics and values and religion, and argued that appellant's religion was not something external to him. It simply reflected his own views. The defense, he argued, had the burden of showing that appellant "really had a moral system, a moral system other than his own, other than simply taking the word God and impressing it on his own lust and desires." The prosecutor did not argue that if appellant actually believed that God or some other external force condoned or commanded his actions appellant was not legally insane.

Defense counsel's closing argument reflected that understanding of the prosecutor's argument.

For these reasons we also reject appellant's claim that the failure of defense counsel to object to either the questions put on cross-examination or the prosecutor's closing argument, to request additional instructions, or to offer authority for an instruction that was offered but refused,[37] constituted ineffective representation.

---

appellant believe that other people, if they knew what he knew and believed what he believed likewise would have believed the kidnappings and killings to be justifiable? If so, were the latter thought processes and conclusions a product of mental disease or defect?

[37] Defense counsel asked that the court instruct: "The fact that a person may not ascribe to the teaching of any traditionally recognized religious groups does not, in and of itself, establish that the person has rejected legitimate (socially acceptable) concepts of morality. The law recognizes that people have wide ranging concepts concerning the existence of God or other concepts concerning the existence of God or other supernatural phenomena from which a moral system may be derived. The fact that a person's concept of God may not coincide with traditional concepts of that deity does not, in and of itself, preclude a determination that a person believes in a system of morality derived from supernatural phenomena."

Appellant offered no evidence that his belief that God was sending messages through traffic lights and numbers approving his plans was related in any way to a system of morality

### c. *Inquiry about psychiatric examination.*

During his cross-examination of Dr. Satten, a defense witness, the prosecutor asked the witness who had asked Drs. Bittle and Kaldor to see appellant, to which the witness replied that he did not know and "it was either the Court or yourself, the prosecuting attorney." The prosecutor followed up by asking the doctor if he thought a prosecutor had the right to have a defendant examined; the doctor responded that he believed this was possible in some circumstances. The prosecutor then asked if the witness had cases for that proposition. Defense counsel objected on relevancy grounds, but the court ruled that the question was appropriate since the witness had been offered as a forensic expert in psychiatry. The witness said that this was possible only with the consent of the defense. When the prosecutor then asked if "these gentlemen" (defense counsel) had agreed it could have taken place, and the witness responded that he thought the court had appointed the doctors, defense counsel again objected to the inappropriate line of inquiry and renewed his earlier objection on the ground that the witness had been asked for a legal opinion.

The court ordered the jury to disregard the answer that the examination could take place if defense counsel agreed. The judge expressed doubt that allowing the jury to know that the prosecutor may not have a defendant examined was inappropriate, and ruled that asking if there were any cases asked for "historical fact," not a legal opinion.

 Appellant contends that the prosecutor's comment, that the People had no right to have the defendant examined and the insinuation that appellant had refused to consent, denied due process. To the extent that this is a claim that the prosecutor's line of questions was misconduct, we agree. What the witness thought about who ordered the examinations by Drs. Bittle and Kaldor was irrelevant, as was the witness's understanding of the law. His expertise was in the field of psychiatry. As a forensic expert, he dealt with psychiatric questions that arise in judicial and administrative proceedings, but that did not qualify him as an expert who may offer an opinion on the law. While the prosecutor did not directly state that he had no right to have the examination performed, the questions and the answers he elicited conveyed that impression and thereby conveyed an erroneous impression of the law. When a defense of insanity has been offered, the defendant waives the Fifth and Sixth Amendment rights to the extent necessary to permit the prosecution to obtain an examination of the defendant's condition. The defendant may preserve his rights by refusing to cooperate, but comment on

---

derived from any generally accepted ethical or moral principles. Inasmuch as he had rejected the Judeo-Christian concept of God and the moral system associated therewith, it was incumbent on appellant to do more than claim that he believed God approved his actions.

that refusal is permissible. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Thus, the prosecutor could have requested that the defendant submit to an examination.

To the extent that this is a claim that the court erred in admitting irrelevant evidence, we also agree.

We do not agree that either the questions or the testimony elicited from Dr. Satten caused any prejudice to the defense, however. Even assuming the jury believed that the prosecution did not have the right to seek an examination of defendant, there is no basis for assuming that they believed that additional evidence about appellant's mental condition would have been more effective in impeaching the defense experts than was the testimony of Drs. Bittle and Kaldor, who were called as prosecution witnesses. And, if the jury believed that the prosecution did have such a right if appellant agreed, but that he had refused to submit to examination, the fact that he had submitted to examination by the two psychiatrists appointed by the court would dispel any inference that the refusal was because appellant had something to hide. The jury was aware that appellant had been examined by the five psychiatrists who testified and had given generally consistent information to each. Thus, there is no likelihood that the jury would assume that appellant feared that one selected by the prosecution might elicit different, damaging information.

### d. *Reference to courtroom demeanor.*

■ Appellant complains that the prosecutor questioned Dr. Mills regarding appellant's asserted "ebullience" during conversations with the witness while the jury was not present. He complains that the questions were designed to suggest to the jury that he was putting on an act when the jury was present, and to invite the inference that appellant was a deceitful person. This, he claims, constituted prosecutorial comment that infringed his Fifth Amendment right not to testify, denied due process by introducing irrelevant evidence, and violated his Sixth Amendment right to confrontation and cross-examination by offering the prosecutor's observations.

To the extent that this is a claim of prosecutorial misconduct or of the erroneous admission of evidence, it was waived by appellant's failure to object. It lacks merit in any event. The prosecutor's questions were not comments or evidence. The jury was instructed that the statements of counsel are not evidence and that the jurors should never assume an insinuation suggested by a question was true. It is not improper to call the jury's

credibility of a witness. (*People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629].) This was not an improper invitation to the jury to infer criminal conduct from appellant's behavior. A major theme of the prosecution in the sanity phase was that appellant had the ability to and had in fact manipulated the experts who examined him. It is not improper to suggest to a jury through evidence and comment based thereon that a defendant is a "con man." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756].)

In fact, Dr. Mills responded to the question by saying he was not sure he would characterize appellant as being ebullient, engaging and eager to talk in the jury's absence.

 e. *Argument that appellant was a liar.*

Appellant claims that the prosecutor improperly asked the experts if he was a liar, referred to past acts of deception, and argued that he was a liar and deceiver. This, he claims, was (1) an improper attempt to offer inadmissible evidence of character to prove conduct on a specific occasion in violation of Evidence Code section 1101, subdivision (a), (2) inflammatory argument that he had a character trait for dishonesty and deception from which the jury could infer that he was dishonest when being examined by the psychiatrists, and (3) more prejudicial than probative. (Evid. Code, § 352.)

Again, appellant waived these claims by failing to object and, again, the failure to do so does not reflect incompetence of trial counsel. Objections would have been meritless. The prosecutor's reference to appellant as a "liar" was not improper. It was a reasonable inference based on the evidence. (*People v. Earp* (1999) 20 Cal.4th 826, 862-863 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

We reject appellant's theory that inquiry into appellant's honesty during the psychiatric examinations was improper because neither the court-appointed experts nor the defense experts believed appellant had lied to them. (Evid. Code, § 721.) When, as here, the psychiatric experts' opinions as to a defendant's legal sanity are based in substantial part on statements made to them by the defendant, inquiry into the basis for the experts' belief that the defendant was honest and their knowledge of past deceitful conduct is permissible. For the same reason, had the prosecutor's questions elicited evidence that the experts were not aware of appellant's past deceitful conduct, that evidence would not have been more prejudicial than probative.

It is true, as appellant argues, that all of the experts agreed that appellant was mentally ill. They differed only in their opinion of the extent of that illness and whether it resulted in legal insanity at the time of the crimes. Nonetheless, the People's theory was that appellant had lied to all of the experts when he claimed to have committed the crimes in the belief that God or a higher power either commanded or approved of his conduct. It was not improper to ask those experts if they were aware of the many instances of deceitful conduct shown by the evidence, since a failure on their part to consider the past deceitful conduct might make the defense experts' opinions less persuasive.

### f. Implication that appellant had interest in torture.

Pursuing a theory that appellant's behavior was not a product of a delusional belief that God approved his conduct, but instead reflected sexual sadism, the prosecutor asked Dr. Rosenthal, a defense expert, whether appellant's violence might indicate that DSM-III-R diagnosis. When he asked whether the witness knew if appellant had an interest in torture, defense counsel objected on relevance grounds that the questions were approaching a book on torture that had been found in appellant's mobile-home, but had been excluded when offered as evidence. The court ruled that the prosecutor could ask if the witness was familiar with the book and was aware that appellant possessed it.

The witness testified that he did not recall that and did not think he was aware of that. Defense counsel objected to a follow-up question, asking if the witness would change his diagnosis if he had been aware of that. The judge did not allow the question, stating that had he thought about it earlier he might have, but since he had ruled that the prosecutor could not pursue the topic if the doctor answered "no" to the first question, that ended the matter.

Appellant now complains that it was error to allow the questions which implied that the prosecutor had a source of information of which the jurors were unaware. The prosecutor thereby injected irrelevant evidence and resurrected the "speculative, propensity-based, and inflammatory suggestions" about torture he had raised in the guilt phase.

To the extent that this is a claim of prosecutorial misconduct, it was waived by the failure to object on this ground. Moreover, as we conclude below, the questions were not improper.

The judge did not err. He did not allow any question other than whether Dr. Rosenthal was aware that a book on torture had been found during a

search of appellant's residence. Moreover, the questions were not improper. The inquiry was within the scope of cross-examination permitted by Evidence Code section 721. The theory that appellant was a sexual sadist was not simply speculation. Appellant's writings, his conduct, and the statements he made to the psychiatrists regarding his interest in seizing and confining young girls to become sex slaves all supported the inquiry. Whether the expert was aware that appellant possessed a book on torture and, if so, whether he took it into account in reaching his diagnosis and rejecting a diagnosis of sexual sadism, was a proper inquiry. (*People v. Osband* (1996) 13 Cal.4th 622, 712 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

4. *Judicial comment.*

Appellant contends that the trial judge improperly vouched for the credibility of the two psychiatrists called by the prosecution. As noted above, both had been appointed by the court.

While cross-examining Dr. Mills, a defense expert, the prosecutor asked if the witness was aware that the court-appointed psychiatrists had reached a different conclusion as to appellant's sanity, and then referred to those experts as "seemingly impartial people that are not hired by the prosecution or the defense. These are people that the Court retained as impartial kinds of people to make an analysis." Dr. Mills objected to the implication that because he had been retained by the defense he was not impartial, to which the prosecutor responded: "But understand sir, that Dr. Bittle and Dr. Kaldor have no allegiance to the parties in any sense other than being retained by the court." After the prosecutor also asked why psychiatrists retained by the court which had examined their credentials would have a different opinion, defense counsel objected to the reference to "allegiance" as inappropriate and to the assertion that the court had examined the credentials as inaccurate.

The judge then said, in the presence of the jury, that he disagreed. "First of all, I think it's within fair comment the allegiance aspect of it. The doctors explained that he's not for sale, but certainly you know as well as I know that there are certain people this court wouldn't employ, and that Dr. Kaldor and Dr. Bittle are well known to the Court and to counsel, and that through a process of talking and exploring various names we arrived at Bittle and Kaldor. You were part of that process, as was the District Attorney, as was the Court. I know these people's credentials, I've had them testify as experts before, and I think [the prosecutor's] characterization is a correct one."

When Dr. Kaldor was later called as a prosecution witness, the prosecutor elicited testimony that Dr. Kaldor became involved in the case when he

received a telephone call from the judge asking if he would be a court-appointed doctor. Defense counsel again objected that the testimony was misleading as it suggested that Dr. Kaldor was the personal choice of the judge. The judge declined a defense request that he give a "disclaimer" that Dr. Kaldor was not his personal choice. He did advise the jury, however, that while the county did not maintain a list of experts, the court had in mind psychiatrists who were available and in whom they had confidence "and in this process I think Dr. Kaldor's name was one of five or six we explored. . . . [T]here were five or six that we thought to be appropriate, and Dr. Kaldor and Dr. Bittle were two names that both sides stipulated would be acceptable."

There is a reasonable likelihood that a juror might infer from those exchanges the court had vouched for the witness's credibility and thereby invited the jury to give special credence to Dr. Kaldor's testimony. The fact that an expert witness has been appointed by the court may be revealed to the jury (Evid. Code, § 722), but vouching, which constitutes an attempt to personally vouch for a witness's credibility, is improper. (*People v. Stansbury, supra,* 4 Cal.4th at p. 1059.)

The judge may have intended only to explain that Dr. Kaldor was appointed pursuant to the regular practice of the court, that the court knows the qualifications of experts considered for appointment pursuant to that practice, and that both sides agreed to this appointment. That would have been proper since the jury understands and expects that the party who retains an expert is familiar with the credentials of the expert. (See *People v. Fauber* (1992) 2 Cal.4th 792, 822 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Like a judicial grant of immunity (see *People v. Freeman* (1994) 8 Cal.4th 450, 489 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]), court appointment of an expert does not itself constitute vouching and would not be seen as such by a jury. In the context in which the court made these remarks, however, the jury may have understood the explanation to mean that the judge personally vouched for the credibility of Dr. Kaldor and Dr. Bittle.

Nonetheless, any error in this regard was not prejudicial. The jurors were instructed that they were the sole judges of the believability of a witness and the weight to be given to the testimony of witnesses. Nothing in the court's explanation of the appointment of the two court-appointed psychiatrists implied that credibility of defendant's experts was in question, and, as noted before, all of the experts agreed that appellant was mentally ill. Only their assessment of the impact of that illness on his awareness that his conduct was morally wrong differed.

To the extent that appellant may be arguing that the questions put to Dr. Mills by the prosecutor regarding his retention by the defense were improper, the claim lacks merit. As we observed in *People v. Johnston* (1957)

48 Cal.2d 78, 87 [307 P.2d 921], it is inevitable that in the course of direct or cross-examination the jury will learn if an expert witness has been retained by a party. That information is relevant to possible bias and may be considered by the jury in weighing the testimony of the expert.

### 5. *Reference to prior violent act.*

Appellant contends that "permitting the jury to hear" that he had committed a prior violent act denied due process. His reference is to questions put to the psychiatrists asking what they had asked appellant about and whether he had admitted to them prior acts of violence. Assertedly, the inquiry was relevant to matters the experts considered in reaching their diagnosis and to appellant's credibility, as he had not told one of the experts about an incident near Puerto Rico in which, in what appellant claimed was self-defense, appellant had killed a man. As a claim of prosecutorial misconduct the claim lacks merit.

Appellant concedes that the court had ruled that questions about the Puerto Rico incident itself would be unduly prejudicial and limited that aspect of the examination to asking whether appellant had told the expert about prior acts of violence. He also concedes that the court did so after the defense found unsatisfactory a proposal by the prosecutor to simply ask if appellant had failed to state significant matters of his history and whether that affected the diagnosis, a question the court approved if the witnesses were admonished that they should not refer to the prior killing. Defense counsel objected that permitting the question would bring out the fact that appellant had been involved in another act of violence, that evidence of such an act would be inadmissible, and would be prejudicial. The prosecutor countered that whether the expert had inquired into the subject was relevant to the adequacy of the psychiatric examination. Ultimately, the court ruled that the line of inquiry was permissible in the sanity phase to test the legitimacy of the psychiatrists' opinions on the defendant's sanity.[38]

Moreover, before the experts were examined, the court permitted counsel to question Dr. Mills out of the presence of the jury to ensure that the evidence would be relevant and sufficiently probative. In that examination Dr. Mills testified that he assumed, but his notes did not confirm, that he had inquired about prior acts of violence when he interviewed appellant. Therefore, he had asked appellant about such an incident on the day before he

---

[38]Although the parties agreed that previously sealed portions of the transcript were to be included in the regular reporter's transcript, these pages are part of a volume that reached this court as a sealed transcript. Inasmuch as appellant cites and relies on them, we are satisfied that he no longer considers them confidential.

testified, appellant had described the Puerto Rico incident which appellant said was an act of self-defense, and the information did not affect Dr. Mills's opinion. Had he had more time, however, he would have pursued the matter further, as information about any past significant acts of violence was potentially relevant.

Following that examination of the witness, the judge stated that he could not conclude whether appellant had told Dr. Mills about the incident, and counsel would be permitted to inquire into whether appellant had told the experts about the Puerto Rico incident and another incident in which appellant had put his hands around the throat of Kelly Cluff.

When the experts were questioned before the jury, Dr. Mills testified that he believed he had asked appellant about prior acts of violence and appellant had, "in effect" told him "no." That type of information would be important in making an evaluation, but whether a person was violent may have nothing to do with whether the individual had a delusional disorder. When the prosecutor asked Dr. Rosenthal if appellant had described a violent act, the witness testified that appellant had told him about a violent act precipitated by the need for self-defense. Appellant had also told him that he had put his hands around the throats of girlfriends and frightened them. Dr. Rosenthal did not believe that conduct and an interest in torture suggested that sexual sadism would be an appropriate diagnosis. Dr. Satten did not ask about, but had considered, appellant's past violent acts, acts he understood were linked to gambling and would not have a bearing or link to the instant crimes. He learned of the acts from defense counsel. Dr. Kaldor, who had not been told about the violence when he first inquired, believed it was significant that appellant had not told him about the violent act in the first interview, but in the second interview admitted he had not told Dr. Kaldor the whole story and did make some disclosure. Dr. Bittle testified that it was important to him to know whether appellant had a history of participation in violent acts, had specifically asked appellant about that, and considered it significant that appellant had not related the same incident to him that he had described to Dr. Kaldor.

If this is a claim that the court erred in admitting evidence, the claim also lacks merit. ▇▇ "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled." (*People v. Cudjo* (1983) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].) As is apparent, the court gave careful consideration to the potentially prejudicial impact of the line of questioning

proposed by the prosecution and ultimately concluded that, as limited under the court's order, that impact was outweighed by the probative value of the evidence.

Moreover, the evidence was clearly relevant, both to whether appellant had been truthful with the examining psychiatrists and to whether their diagnoses should be accepted by the jury. The questions were within the scope of cross-examination permitted by Evidence Code section 721.

A trial court exercises a grant of broad discretion in assessing whether the probative value of evidence outweighs its potential for prejudice. (*People v. Rodrigues, supra,* 8 Cal.4th 1060, 1124.) As we noted above, an appellate court will not find an abuse of discretion in a ruling on admission or exclusion of evidence except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner. (*Ibid.*) The trial court did not abuse its discretion here in permitting the inquiry or admitting the evidence. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

6. *Improper impeachment.*

In another attack on the prosecution's effort to impeach the defense psychiatrists, appellant contends that the court improperly allowed use of unreliable casino records for impeachment.

The defense psychiatrists, who believed appellant's explanation for his conduct, also believed his claim to have lost considerable amounts of money when, as a result of his mental illness, appellant abandoned his rational gambling based on mathematical probability and instead engaged in magical thinking at the gaming tables. Dr. Mills believed this reflected a deterioration of appellant's mental health that had become a psychosis by the time of the crimes. Dr. Rosenthal agreed. In response, the prosecution sought to introduce certain casino records to demonstrate that appellant had won money during the time he claimed to have been following signs from God in his wagering.

In cross-examination of Dr. Mills, a defense expert, the prosecutor relied on a "drop figure history" of appellant's wagering supplied by a Stateline casino, asking if the experts were aware that the casino estimated that appellant had wagered $656,000 in the six-month period between November and May before the crimes, and whether that sounded like a person without knowledge of what they were doing. Dr. Mills testified that he had been unaware of that figure. Defendant objected when Dr. Rosenthal was asked if

he knew how much the casino estimated appellant "dropped" in a six-month period. The witness responded "no" before the objection was made. The objection was that the jury would not understand the meaning of "drop" and would be misled into thinking it meant "lose," whereas the casino figure estimated only how much a player used to buy into a game (by dropping the money into a box below the table) each time he went to a gambling table and thus, unless the player lost part or all of the sum, the drop for each succeeding table would reflect the same money as a new drop.[39] In fact the figure did not reflect either how much was lost or how much was put at risk. After a very confusing discussion, out of the presence of the jury, as to what the prosecutor had attempted to demonstrate when cross-examining Dr. Mills, the prosecutor agreed to ask a different question, defense counsel moved to strike Dr. Mills's testimony for lack of a sufficient foundation, and the court directed counsel to identify a discrete part of the testimony at which time the court would consider the motion. Only then did defense counsel fully identify their concern that if the jury misunderstood the drop figures they would not realize that appellant had lost a significant sum, 70 percent of his total income, even though he was very sophisticated in understanding the mathematical probabilities associated with gambling. Counsel did not identify the specific part of the transcript they wanted struck beyond saying "any and all testimony regarding these drops and the amounts of these drops," and asked for a curative instruction. All parties apparently agreed that the questions had been asked in good faith. The court offered to entertain a stipulation, to entertain the motion to strike evidence if the defense identified what they wanted struck, or to permit the prosecution to make an offer of proof that his questions were appropriate.

Finally, Dr. Rosenthal testified that he had no idea how much money appellant had to gamble with when he entered a casino.

The People then made an offer of proof conceding that the drop figure was not fair and accurate, but appellant's wins and losses, calculated on a different basis, showed that appellant was actually winning money during the period he told the psychiatrists he relied on signs and lost a large sum. The evidence was to come in through the testimony of the cashier cage manager at the casino whose records had been relied on, and both parties agreed that she would be questioned on voir dire before being called before the jury.

Barbara Kucala then testified that casinos keep "win/walk" records that estimate how much a player has won or lost at a given game over a period of

---

[39]Apparently the casinos attempt to make such estimates if a player seems to be a heavy bettor in order to identify "high rollers" to whom the casinos extend special amenities (rooms, food, beverage, air fare reimbursements, etc.). There were then six major casinos at the South Shore of Lake Tahoe (Bill's, Harrah's, Harvey's, Sahara, Lakeside Inn, and Caesar's Tahoe).

time. They do so for a small player only if the player has become familiar, but do so from the beginning if the player gambles more than the average amount. The figure would be turned in by a pit supervisor at the end of the time the person played at a particular table. A second win/walk figure would be turned in if the player then went to a different table. The figures, which are estimates, are then entered into the computer by the pit clerk. The casino had available the "trip screen" win/walk record of appellant, who used the name Gary Sarno when gambling there. Kucala also explained why the then discontinued cash drop history, which had been taken from a system used in Atlantic City, reflected only the amount a player approached a gaming table with and had also been used to track gamblers was not a fair and accurate representation of the amount won and lost. The win/walk record was a better representation of the transactions of the gambler. Maintenance of that record was required by the Internal Revenue Service. Those records reflected that from November 1986 through May 1987, Gary Sarno won $16,000.

Defense counsel argued that the evidence was unreliable, was irrelevant because it would not impeach Dr. Mills, who had not testified that appellant could not act in a rational fashion when gambling, and that the evidence did not establish that appellant had lost a large sum since there was no evidence regarding possible losses at other casinos. An Evidence Code section 352 objection was also made. Defense counsel disclaimed any objection based on the admissibility of computer records as business records. The court ruled that there was a sufficient foundation for admission and that the records were sufficiently reliable since any business record was subject to the type of error in recording a transaction that the defense complained about. The records of the one casino, covering some 550 transactions, were sufficiently relevant to appellant's ability to function on a rational basis to overcome the Evidence Code section 352 objection. If appellant lost money at other casinos, the defense could offer that evidence.

Kucala then testified[40] about the win/walk records, offering substantially the same information about appellant's winnings that had been given on voir dire, but reviewing the amount won and lost reflected on each "trip" (period covered) record individually. Her testimony included the average bet made by appellant during those trips. The testimony also brought out that the records were based on estimates made by a pit supervisor. Her testimony also clarified what a cash drop was and why those records did not accurately reflect wins and losses.

It appears from this record that the psychiatrists' knowledge of appellant's asserted cash drop of over $600,000 during the six months preceding the

---

[40]The court confirmed with counsel that the objections previously made were "running objections" and that the court's ruling would be the same.

crimes had only marginal relevance to assessing his mental competence at the time. The line of inquiry might also have misled the jury if it caused the jury to believe that the experts were unaware that appellant was winning money and not, as the experts believed, losing money by betting in accordance with magical thinking or signs from God. The trial court apparently realized this inasmuch as, at the close of Kucala's testimony, the judge stated that the casino record exhibits would be admitted only if "sanitized" to remove the $656,000 cash drop figure and asked counsel to consider "overnight" whether to strike the prosecutor's questions about that figure and the explanation that it had no meaning or to leave both in.

To the extent that this claim of error is addressed to the prosecutor's inquiry regarding the cash drop records and admission of Dr. Mills's testimony, the claim was waived. Counsel did not raise the matter again. We infer that they were satisfied that Kucala's testimony made it clear to the jury that the drop record to which the prosecutor referred in examining Dr. Mills, and the witness's lack of knowledge of that record, were irrelevant to his diagnosis.

Because Kucala's testimony sufficiently clarified the lack of relevance and the jury was instructed that statements and questions by counsel are not evidence, we are satisfied that, even if there was error in failing to strike Dr. Mills's reply and instruct the jury to disregard the questions, appellant suffered no prejudice as a result.

■ To the extent that the claims are addressed to admission of evidence regarding the win/walk records, it lacks merit. The trial court did not abuse its discretion in concluding that those records were admissible because they were sufficiently reliable to be relevant to the defense claim that during the six months prior to the crimes, appellant was losing money by relying on "magical thinking" or messages to guide his gambling. The win/walk records were relevant since they established that, in one casino at least, appellant won money during that period. That evidence could cast doubt on the defense experts' diagnosis of legal insanity, a diagnosis that was based in part on the experts' assumption that appellant told them the truth when he claimed to be acting in the belief that he should follow signals from an outside force in his gambling and that, as a result, he had lost a considerable sum of money.

7. *Admission of irrelevant evidence.*

Appellant contends that the trial court erred in admitting pages of what appellant claimed was "Black Tams," a science fiction novel he was writing.

The manuscript pages were found in his residence. Some pages, found in a notebook, bore the following entry:

"ELO-Rainin'

as he stood watching the girls 69 each other, he

DEAD + Powerful

Didn't even care. The music made him think of flying and killing.

He choked the life out of her, just for the hell of it."

The court had excluded the evidence at the guilt phase when the prosecutor sought to offer it as evidence of premeditation. Before cross-examining Dr. Mills, the prosecutor advised the court and defense counsel that he would ask the witness whether, if those statements were a recordation of that kind of sexual activity and violence, the entry would have a bearing on the expert's diagnosis, if they were a message from God, or if they showed a psychopathology indicating a different diagnosis. Defense counsel objected on grounds of "absolute nonsense" and "sheer poppycock" which we deem to have been an assertion that the evidence was irrelevant. The court overruled the "objection," reasoning that an expert may be asked about anything considered in reaching a diagnosis unless an Evidence Code section 352 objection was sustained. Defense counsel then made such an objection. The court ruled that the prosecutor would be permitted to inquire about the full passage, but not simply about the number 69 and whether it had a sexual connotation.

When asked about the passage, Dr. Mills characterized it as "pseudo-pornographic" and "trash," stating that it did not mean anything in particular in reaching his diagnosis. He believed appellant's claim that the passage was from "Black Tams."

The prosecutor also asked Dr. Rosenthal about the passage. He, too, believed it was part of the science fiction novel. Finally, during closing argument, the prosecutor argued that the defense failed to show how the passage fit into the science fiction novel.

■ Emphasizing only the "69" passage, appellant contends that admission of the evidence was prejudicial error. It was not. The complete passage described both sexual interaction between girls and homicidal conduct by a person indifferent to death. It was not unreasonable to ask the experts whether they had considered this writing (among others) when they assessed appellant's explanation for his behavior and came to a conclusion that he acted under an insane delusion. The evidence was relevant and the use of it in cross-examination of Drs. Mills and Rosenthal was within the scope of cross-examination permitted by Evidence Code section 721.

We reject defendant's additional argument that defense counsel failed to provide constitutionally adequate representation during this exchange. The claim is based on counsel's failure to call to the attention of the court that the closest page in the notebook containing the "69" passage began with reference to "B-T." Had counsel done so, defendant reasons, it would have been apparent to the court that the 69 passage was part of the "Black Tams" manuscript. The claim is speculative both as to the conclusion the court might have drawn from the juxtaposition of the two entries and as to the ruling the court might have made. Moreover, as the experts found no significance in the 69 passage, admission of that evidence was not prejudicial.

8. *Admission of evidence of "violent streak."*

Reprising his guilt phase claim that the writings found in his mobilehome did not warrant an inference that he was evil or violent, appellant argues that the court erred in admitting into evidence at the sanity phase and permitting the prosecutor to question Drs. Mills and Rosenthal about the paper on which appellant had written: "If you aren't given a choice* whether or not to kill but can choose who or when or how or the # to die or live, it's not murder. [¶] Death is a given in some situations." Appellant objected to admission of the document and a blowup thereof on the ground that there was insufficient foundation to establish when the item was written and on the ground that its prejudicial impact outweighed its probative value. (Evid. Code, § 352.) The court overruled the objection, noting that at the guilt phase the evidence had been excluded as too prejudicial, but it could be used in cross-examination of the experts if a sanity phase foundation was laid by asking the witness if he had seen the document and read it, and, if so, if he considered it and if it had an effect on his opinion. The court ruled expressly that in the sanity phase the probative value of the evidence would outweigh its prejudicial impact, explaining: "The jury's heard an abundance of evidence that is not dissimilar to this, and I don't think that this is going to inflame or outrage the jury so that they can't properly weigh the value of the doctor's testimony."

Appellant argues that the statement was irrelevant and incurably vague, leading the jurors to speculate about its meaning and consider it as propensity evidence, all of which he claims violated Evidence Code sections 350, 352, and 1101, subdivision (a), and federal due process. He concedes that he did not object on those grounds, but claims that objection would have been futile given the court's rulings on his prior objections. We agree that an objection on those grounds would have been unavailing, but that is because it would have lacked merit. At the sanity phase, the jury was not being asked

to decide if appellant had committed murder, but whether he was not guilty by reason of insanity. Insofar as appellant's writings might reveal a philosophy which condoned murder, they were relevant to the opinion of the psychiatrists that appellant acted under an insane delusion that God or a higher power, rather than this philosophy, condoned the murders. The evidence was relevant to the weight to be given to the experts' opinion that appellant was insane. Whether appellant's statement was vague went only to the weight the jury might give it in assessing the persuasiveness of the experts' opinion that appellant was insane. There was no error in admitting the evidence.

To the extent that appellant argues here that the prosecutor's use of the evidence constituted misconduct and that counsel was incompetent in failing to seek to exclude the evidence as character or propensity evidence, the claims are rejected. The use of the evidence did not exceed the proper scope of cross-examination of the witnesses (Evid. Code, § 721) and no issues regarding appellant's character and/or propensities were raised by that use. Counsel may not be deemed incompetent for failure to make meritless objections.

9. *Instructions.*

Appellant claims that the failure to instruct at the sanity phase pursuant to CALJIC No. 2.60 that no adverse inference should be drawn from the fact that the defendant does not testify, when that instruction had been given at the guilt phase, could lead the jury to infer that such an inference could be drawn at the sanity phase. We do not share that speculation. We assume that the jury continues to apply instructions given at the guilt phase that are not inconsistent with sanity phase instructions. (*People v. Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Moreover, he did not request that the instruction be repeated, an instruction that he concedes need not be given sua sponte, but is left to counsel's discretion. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1208 [240 Cal.Rptr. 666, 743 P.2d 301].)

Appellant also contends that the court erred in instructing on the consequences of a verdict of not guilty by reason of insanity, thereby violating his right to jury trial and due process.[41] He did not object to the instruction when sanity phase instructions were discussed with counsel. He

---

[41]The court instructed: "If the jury returns a verdict of not guilty by reason of insanity, it does not mean the defendant will be released from custody as it would were he found to be not guilty of the criminal act itself. Instead, he will remain in confinement while the courts determine whether he has fully recovered his sanity. If he is not, he will be placed in a hospital for the mentally disordered or equivalent facility, or in outpatient treatment, depending upon the seriousness of his present mental illness. However, he cannot be removed from

concedes that this court rejected a challenge to this instruction in *People v. Kelly* (1992) 1 Cal.4th 495, 537-538 [3 Cal.Rptr.2d 677, 822 P.2d 385]. There we concluded that the instruction, basically CALJIC No. 4.01, is one given to aid the defendant. Its purpose is to prevent a finding of sanity by a jury concerned that a finding of not guilty by reason of insanity would lead to the release of the defendant from custody. He claims, however, that the United States Supreme Court subsequently held that the instruction is improper in *Shannon v. United States* (1994) 512 U.S. 573 [114 S.Ct. 2419, 129 L.Ed.2d 459] (*Shannon*).

The *Shannon* holding is not as broad as appellant would have it. *Shannon* arose out of a criminal trial in a federal court. There the court held only that an instruction on the consequences of a verdict of not guilty by reason of insanity was not required by the Insanity Defense Reform Act of 1984 (18 U.S.C. §§ 17, 4241-4247) on request of a defendant, and declined to require the instruction pursuant to its supervisory power over procedure in federal courts. (*Shannon, supra,* 512 U.S. at pp. 584, 587 [114 S.Ct. at pp. 2426-2427, 2428].) One reason for declining to do so was that the instruction would draw the attention of the jury to the consequences of its verdict, something a jury should consider only when imposing punishment in a capital case. (*Id.* at p. 586 [114 S.Ct. at pp. 2427-2428].) Nothing in *Shannon* suggests that giving an instruction like that given here violates any constitutional right of a defendant.

### 10. Cumulative prejudice.

 Each of errors identified above—the assertion that the prosecution had no right to seek an independent psychiatric examination of defendant,

that placement unless and until the court determines and finds the defendant's sanity has been fully restored, in accordance with the law of California, or until the defendant has been confined for a period equal to the maximum period of imprisonment which could have been imposed had he been found guilty rather than not guilty by reason of insanity.

"So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant insane at the time of the crimes. You are now instructed, however, that what happens to the defendant under these laws is not to be considered by you in determining whether the defendant was sane or not at the time he committed the crimes. [¶] You may not speculate as to if, or when, the defendant would be found fully sane again. It is not your function to decide whether the defendant is now sane. So far as you are concerned, you are to decide only whether the defendant was sane at the time he committed his crimes.

"If upon consideration of the evidence you believe defendant was insane at the time he committed his crimes, you must assume that those officials charged with the operation of our mental health system will perform their duty in a correct and responsible manner, and they will not release this defendant unless he can be safely returned into society. It would be a violation of your duty as jurors if you were to find the defendant sane at the time he committed his offenses because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities."

the court's vouching, and the improper cross-examination of the defense experts—may have had some impact on the jury's assessment of the credibility of those experts. We are satisfied, nonetheless, that the errors at the sanity phase of the trial were not prejudicial, individually or cumulatively. The impact, if any, would have been minimal. It is true, as the dissent observes, that all of the experts believed appellant was mentally ill. However, their opinions on the severity of his illness differed as did their diagnoses. While the three defense experts testified that appellant was legally insane and incapable of knowing moral right from moral wrong, none testified that when appellant formulated his plan to seize the girls and acted on that plan he did not know, or was incapable of knowing, that his conduct fell outside the norms of society's generally accepted standards of morality. It is not enough in a case like this, where the appellant had a unique concept of morality, to say simply, as does the dissent, that a person is incapable of recognizing that conduct is morally wrong if he or she believes God has commanded that conduct.

Dr. Mills based his diagnosis of delusional or paranoid disorder on appellant's belief that appellant must obey messages from God, but appellant, not God, formulated the plan to seize the girls and their chaperones. That plan was not a command from God and none of the defense experts indicated that appellant believed he received such messages during the time he held the girls in his trailer and killed the chaperones. The only basis for a conclusion that appellant did not understand his conduct was morally wrong was his statement to one expert that the lights were green on the way to the trailer and thus God did not disapprove of his plan.

Dr. Rosenthal did not make a firm diagnosis of schizophrenia, but believed that appellant suffered a psychotic episode and was delusional. He too accepted that appellant believed he was receiving messages from God, but again there was no indication in his testimony that appellant believed God had commanded him to take the girls and kill the chaperones.

Dr. Satten concluded that appellant had a mixed personality disorder with obsessive-compulsive components, and briefly had a psychotic disorder. He also concluded that appellant did not understand what he was doing was morally wrong, but he did not testify that appellant's mental illness made him incapable of understanding that his conduct was immoral under generally accepted standards.

Thus, even absent the errors, and assuming the credibility of these experts was unquestioned, the result would not have differed. The information supplied to the defense experts by appellant suggested only that appellant,

not some outside force, formulated the plan to take the girls and later to kill the chaperones. God neither commanded those acts nor told him to stop. None of the information appellant gave to the experts related in any way to his ability to understand or his actual understanding that his acts were not acceptable under any generally accepted moral or ethical standards of behavior. Moreover, appellant's attorney conceded that appellant's idiosyncratic concept of God and morality—that which gave him pleasure was good—was not an accepted concept of morality. In addition there was extensive evidence of appellant's preplanning of the events, his use of disguises, and his deliberate conduct in interviewing and selecting the victims of his sexual molestations, as to which he did not claim any messages of approval from God.

We do not agree therefore with appellant or the dissent that there is a reasonable probability (*People v. Watson, supra,* 46 Cal.2d 818, 837) that the cumulative impact of the errors affected the sanity verdict.

C. *Penalty Phase Issues.*

1. *Exercise of peremptory challenges.*

The prosecutor exercised 14 peremptory challenges in jury selection. Nine were directed to jurors appellant asserts had expressed reluctance to vote for death—Prospective Jurors G., H., T., C., R., J., O., H., and L. As a result, appellant argues, no juror who had any reservations about capital punishment remained on the jury. This, he asserts, denied him his federal and state constitutional rights to due process, heightened reliability of the penalty verdict, and a neutral, representative, penalty phase jury.

Appellant concedes that this court has rejected his claim insofar as it relates to the exercise of peremptory challenges. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1202 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Crittenden, supra,* 9 Cal.4th 83, 153; *People v. Turner, supra,* 37 Cal.3d 302, 315.) He urges the court to reconsider the issue, arguing that use of a peremptory challenge is just as damaging to a defendant's rights as erroneous excusal of a scrupled juror for cause. Appellant relies on a statement made by the United States Supreme Court in *Gray v. Mississippi* (1987) 481 U.S. 648, 658-659 [107 S.Ct. 2045, 2051-2052, 95 L.Ed.2d 622], which he selectively edits: "To permit the exclusion for cause of . . . prospective jurors based on their views of the death penalty . . . . 'stack[s] the deck against the [defendant]. To execute [such a] death sentence would deprive him of his life without due process of law.' "

In fact, however, the court preceded that statement, which actually refers to the exclusion of "other prospective jurors" (*Gray v. Mississippi, supra,* 481 U.S. at p. 658 [107 S.Ct. at p. 2051]), with express recognition that the state has an "interest in removing those jurors who would 'frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.' " (*Ibid.*)

We decline the invitation to reconsider our view that the prosecutor may use peremptory challenges to excuse death penalty skeptics. A prosecutor may have many reasons for believing that a prospective juror will not fairly consider an argument that death is an appropriate penalty. The juror's views about the death penalty, although not clear enough to warrant exclusion for cause, may be among those reasons. Moreover, we do not share appellant's assumption that jurors who are not death penalty skeptics will not return a reliable verdict. The voir dire conducted in this case does not suggest that any juror selected would not conscientiously consider all of the evidence and whether life without possibility of parole was an appropriate penalty.

Finally, appellant failed to object on this ground and exercised only 17 of the 26 peremptory challenges available to him. He had it within his power to alter the composition of the jury of which he now complains.

### 2. *Absence of defendant during closing arguments.*

A criminal defendant charged with a felony has a due process right under the Fifth and Fourteenth Amendments to the United States Constitution, as well as a right to confrontation under the Sixth Amendment, to be present at all critical stages of the trial. (*People v. Frye* (1998) 18 Cal.4th 894, 1010 [77 Cal.Rptr.2d 25, 959 P.2d 183].) A competent defendant may waive that right, however. (*Ibid.*) Neither the constitutional right to confrontation nor the right to due process precludes waiver of a defendant's right to be present at a critical stage of a capital trial. (*People v. Bolin, supra,* 18 Cal.4th at p. 325.) Section 977 permits a felony defendant, with leave of court, to waive his or her presence at all stages of the trial other than arraignment, plea, presentation of evidence, and sentencing. Section 977 requires, however, that the defendant personally execute, in open court, a written waiver of the right to be present.

Prior to closing arguments at the penalty phase of the trial, defense counsel advised the court that appellant was very agitated and chose not to be present for the prosecutor's closing argument. After advising that this would be to appellant's detriment, the judge permitted counsel and appellant to confer in the court's chambers. After that conference counsel advised the

court that appellant said that mentally he could not sit and listen to the prosecutor. Counsel invited the court to attempt to dissuade appellant, and the court addressed appellant directly about appellant's past exemplary behavior, that his absence could suggest to the jury that appellant concurred in what the prosecutor was saying, the anticipated nature of the argument, and that appellant would have to determine if he could listen to that argument without losing control. The court also suggested that it might be detrimental if appellant were absent only during the prosecution argument. Appellant and his counsel again conferred, after which defense counsel advised that, while appellant acknowledged responsibility for the crimes, appellant had been upset by what he perceived to be the prosecutor's mischaracterization of his life during the three months of trial. Counsel had advised appellant that he should remain, but also acknowledged to him that it was his trial. Counsel then stated that it was appellant's preference to be absent during both arguments. Immediately thereafter, before appellant left the courtroom, the parties discussed stipulations, the court asked if appellant wanted to be present, to which appellant replied "sure." The trial court advised the jury that appellant had asked that he not be present during the argument of counsel and the court had honored that request.

Closing argument is not a proceeding at which the personal presence of a felony defendant is required by section 977. However, appellant did not himself express a preference to be absent during closing argument and he did not execute a written waiver.

Appellant now claims that a personal waiver was necessary to ascertain that he had knowingly and voluntarily surrendered his federal and state constitutional right to be present at trial, and complains that his attorneys contributed to the error.

Assuming, but not deciding, that closing argument is subject to the statutory written-waiver requirement (see *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259] [written waiver required only if proceeding affects opportunity to defend]), nothing in this record suggests that appellant suffered any prejudice as a result of his absence during the argument of counsel.

3. *Impact of sanity phase reference to prior violent act.*

Appellant contends that the jury was bound to infer from the sanity phase evidence of which he complained (that he had told Dr. Kaldor he had committed a prior act of violence in self-defense) that he had killed someone in circumstances similar to those in the present case. He claims that, as a

result, he was forced to request an instruction to the jury that it should not consider that evidence. The jury was instructed: "In the sanity phase testimony was offered concerning the defendant's alleged involvement in incidents of violence prior to the events of May, 1987. [¶] You are instructed that such testimony cannot be considered by you in reaching a verdict in the penalty phase."

Appellant asserts that this instruction would not cure the impact of the sanity phase error.

We found no error in permitting the sanity phase inquiry into whether appellant had told Dr. Kaldor about the Puerto Rico incident, and, since he had not done so initially, whether he considered that failure significant. Inasmuch as that evidence was relevant and admissible at the sanity phase, reversal is not required on appellant's theory that the jury might consider the evidence notwithstanding the court's instruction. Inasmuch as appellant requested the instruction, he may not now claim that the instruction heightened the possibility the jury would infer a prior, unexcused, killing. (*People v. Hardy* (1992) 2 Cal.4th 86, 152 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

We do not agree that it is not possible, through instructions, to "unring the bell" heard earlier. Rather, we assume the jury was capable of following the court's instruction here to disregard evidence of any uncharged crime that the People fail to prove beyond a reasonable doubt. (See *People v. Champion* (1995) 9 Cal.4th 879, 949-950 [39 Cal.Rptr.2d 547, 891 P.2d 93].) The court had no obligation to go beyond the instruction requested and given, and to sua sponte give a broader instruction like that now proposed by appellant.[42] Indeed, by further emphasizing the sanity phase evidence, the instruction might have made it more difficult to ignore the evidence.

We do not agree with appellant's additional claim that the jury would ignore the instruction given by the court to disregard the sanity phase evidence of a prior violent act because the court next instructed that the jury could consider all of the evidence introduced at any part of the trial "except

---

[42]Appellant offers as a more appropriate instruction this example: "In the sanity phase, reference was made to a 'violent act' allegedly committed by appellant prior to the offenses for which he is presently on trial. In the sanity phase it did not matter whether such an act actually occurred. I allowed questions on the subject even though there was no independent evidence that any such act ever occurred.

"In the penalty phase, by contrast, it does matter whether such an act actually took place. At this time, therefore, I must tell you that all of the evidence that exists indicates that if any prior violent act occurred it was fully justified. In considering which penalty to impose, consequently, it would be highly improper for you to consider the prior act referred to in the sanity phase in any way that is adverse to the defendant. It has—and should have—absolutely no bearing on the determination you are to make at this time."

as you may *hereafter* be instructed." Reasonable jurors would understand the first, specific, instruction to bar consideration of the prior violent act evidence.

### 4. *Prosecutorial misconduct.*

#### a. *Inflammatory use of "gruesome" photographs.*

Appellant's objections to admission of various photographs of the murder victims depicting Martin's face while wrapped in clear plastic and after the plastic had been removed, and of the body of Walsh with and after removal of the clear plastic that covered her upper torso, were overruled during the guilt phase. When first presented to the court for a preliminary ruling, the court observed that none of the photos other than exhibit Nos. 60 and 61 were particularly gruesome and stated that they were not so inflammatory that a jury would be incensed or bothered. As to the photographs identified as exhibit Nos. 60 and 61, the court said that the People would have to offer "pretty hard evidence and arguments" before he would admit them but "on a scale of one to ten of other homicides . . . they're not of the upper scale either, but they do portray more graphically some of the details." The prosecutor explained that exhibit No. 60 showed the manner in which the victim was trussed, while exhibit No. 61 showed the actual mechanism of death—the intact FLEX-CUF—all of which was probative of malice and premeditation. The court indicated that the probative value would have to be high before he would exercise his discretion under Evidence Code section 352 to admit them.

Exhibit Nos. 60 and 61 were subsequently admitted. At the time admission of exhibits was discussed, defense counsel stated that he had "some concerns" about exhibit No. 60, the photograph of the bound body of Dorothy Walsh. The court admitted that exhibit, stating twice that it was not particularly gory. The objection to exhibit No. 61, which depicted the ligature, was that it was duplicative of two other photos. The court ruled that exhibit No. 61 and one of the other photos would be admitted.

Appellant claims that the admission and use of the photographs, which apparently were shown to the jury again by the prosecutor during closing argument, violated his rights under the Eighth Amendment and the due process clause of the Fifth and Fourteenth Amendments. He argues that they had insufficient relevance to any issue, were cumulative of expert testimony regarding the cause of death, and were unduly gruesome. (*People v. Anderson, supra,* 43 Cal.3d 1104, 1137.) In addition, he claims, the prosecutor

used the photographs to arouse revulsion and anger rather than to elicit from the jury a reasoned moral response. To the extent that this latter claim is one of prosecutorial misconduct it was waived as he failed to object. We deem the objections made were broad enough to encompass his constitutional claims and therefore need not address his claim that if the objections were inadequate counsel rendered ineffective assistance.

 We have examined the photographs and find no error in the admission and use of these exhibits. They are not gruesome and accurately depict aspects of the method of killing that were relevant to issues in the case. Exhibit No. 60 confirms that the victim's hands were no longer bound behind her body with FLEX-CUFs when found, but were tied in front with string or rope. Thus, the scratches on her neck could have been caused by her fingernails as she attempted to loosen the ligature in order to breathe. Exhibit No. 61 depicts, in a way oral testimony could not, how tight the FLEX-CUF was pulled, compressing the victim's neck to an extraordinary degree. Photographs corroborating testimonial evidence are admissible as they assist the jury in understanding and evaluating the testimony. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

The evidence was, as the prosecutor argued, relevant to intent, premeditation and malice. The trial court did not abuse its discretion in admitting these exhibits. (*People v. Medina* (1995) 11 Cal.4th 694, 754-755 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Display of the photographs during penalty phase argument was not misconduct. The jury is permitted to consider any evidence regarding the circumstances of the crime admitted at the guilt phase. (§ 190.2, subd. (a).) The photographs were relevant to the appropriateness of the death penalty. (*People v. Smithey, supra,* 20 Cal.4th at pp. 959-960.) Thus, contrary to appellant's claim, trial counsel's failure to object to that use of the photographs during the penalty phase does not reflect incompetence.

b. *Penalty phase argument.*

Appellant contends that numerous other aspects of the prosecutor's penalty phase argument were improper. He cites as misconduct the prosecutor's arguments that the jurors should not permit sympathy for appellant's parents to influence their penalty determination;[43] that appellant had not expressed

---

[43]Referring to the defense penalty phase witnesses, the prosecutor pointed out that none of them knew appellant as an adult, or knew the person appellant had become at the time of the offenses. He acknowledges that appellant's parents suffered untold misery. He then said: "But

remorse;[44] that appellant should be put to death to prevent him from engaging in various noncriminal activities;[45] and that the murder victims were not

---

nowhere in the factors that His Honor will tell you about, nowhere in this framework (indicating [apparently a listing of aggravating and mitigating factors posted on a tripod]) of analysis is there anywhere where this jury may have sympathy for anyone beyond this railing (indicating). There is not one bit of sympathy that can be applied by this jury for anyone that sits beyond this place in the courtroom, on either side. [¶] And your focus is on Herbert James Coddington, the sinner, and the crimes that Herbert James Coddington committed. [¶] The jury cannot allow sympathy for the parents to intrude upon its verdict. They can only allow sympathy for Herbert, the defendant, as expressed in these factors (indicating) to be balanced and considered as you go through the evidence."

[44]The prosecutor described the killings and apparently displayed to the jurors photographs admitted earlier of the murder victims still trussed and in bags with one FLEX-CUF intact on the neck of the victim. As his final argument, responding to a defense reference to his having shown the photographs, the prosecutor referred again to the photographs, stating: "What did he really do so that you twelve people as jurors have a chance to see it and to know it and to understand it. That's what those six or eight photographs are all about. That's what Mr. Coddington really did." The photographs were not sent into the jury room when the jury went in to deliberate.

During his opening penalty phase argument the prosecutor asked rhetorically: "And what about Herbert James Coddington, the sinner? Is he remorseful, sorry, apologetic for what he has done? And the answer is profoundly 'no.' " Then, noting that appellant's father had testified that his heart went out to the people harmed by appellant, the prosecutor said: "And somewhere those words were in the heart of a fine and honorable gentleman, the father of the Defendant Herbert James Coddington, but Herbert James Coddington, the snake, the jackal, the vulture, professes no words whatsoever in remorse for what he has done."

[45]Stating that he was not a juror, the prosecutor closed his argument saying that there came a time when he put himself in the jurors' shoes and asked himself how he would feel if he had returned a verdict of death. He acknowledged that the jurors' task was not easy and then contrasted return of a death verdict with how he would feel if he had not done so, and there was no execution date, asking: "What if, despite the savage beating that Herbert Coddington gave Dorothy Walsh, as shown in the picture, Herbert Coddington sat in a cell, composing further science fiction? [¶] What if, despite placing a Flex-Cuff [sic] around the neck of Mabs Martin, and pulling it tight in increments, and tightening it down, Herbert Coddington was in prison drafting further accounts of the 'Black Tams'? [¶] What if, despite the fact that Herbert Coddington said to Michael Szeremata: 'It is better than I ever expected,' Herbert Coddington lay on his back reading Playboy Magazine? What if, despite the fact that Herbert Coddington trussed up Mabs Martin and Dorothy Walsh much like turkeys, stuffed them into a trash bag and slept by their side, Herbert Coddington continued to pan [sic] grievances of how he had been cheated by life, by his parents, by the casinos, by the system, and possibly by the warden? What if, despite stripping Mabs Martin and Dorothy Walsh of their rings and jewelry, Herbert James Coddington on a daily basis played board games, Parcheesi, chess, and Monopoly? [¶] What if, despite the conviction of two murders, a rape, two counts of oral copulation, and two counts of rape with a foreign object, Herbert Coddington continued to make entries in his autobiography and continued to keep records of his sexual prowess. [¶] What if, despite the most atrocious, cruel, sadistic, immoral attack on two elderly ladies, Herbert Coddington devised a method to overreach and cheat the casinos, and he published his results under the name of K. Coddington? [¶] Somewhere in the analysis of those analys[es], somewhere in the moral weighing, Herbert Coddington must atone, and the sinner must pay for his sins in the manner that you, as the collective conscience of this State, of this community, determine to be appropriate."

longshoremen, bikers, gang members, truckers, or johns.[46] He also cites as misconduct the prosecutor's assertedly inflammatory and derogatory references to appellant, reference to appellant as a sinner who must atone for his sins, and reference to appellant's age as an aggravating factor notwithstanding a prior agreement that age could not be considered. He complains that reference to "hymeneal tears" was improper and prejudicial at this phase of the trial also.

 No objection was made to any of the argument appellant now claims was improper.[47] The rule, that failure to object or request an admonition to the jury, and thereby to afford the trial court the opportunity to cure the impact of misconduct by admonition to the jury, constitutes a waiver of an appellate claim of prejudicial misconduct, applies to a prosecutor's penalty phase argument. (*People v. Samayoa, supra,* 15 Cal.4th at p. 854.) We have, nonetheless, reviewed the prosecutor's argument and conclude that it did not exceed proper bounds. It was tied to the evidence, related the evidence to the factors upon which the penalty decision should be based, and was not argument that would invite a verdict based on passion or prejudice.

5. *Denying jury view of Life Without Possibility of Parole incarceration.*

During a penalty phase discussion between the court and counsel regarding the anticipated duration of further proceedings, necessitated by concerns

---

[46]Discussing the circumstances of the case, the prosecutor stated: "Did Mr. Herbert James Coddington kill a longshoremen in a waterfront café? Did Mr. Herbert James Coddington kill a biker, clad in steel-toed boots and the colors of a gang?" "Did he kill a 200-pound truck driver as he stepped from the cab of a Kenworth diesel? No. He killed Mabs Martin, age 69, and Dorothy Walsh, age 73, two grandmothers. [¶] . . . Mabs Martin and Dorothy Walsh were two defenseless women who had rounded the vitality of their youth and had entered a stage of life wherein your step slows down a little bit and where quickness and agility are something of a past year. They were no match for Herbert James Coddington whose quest for health and fitness had produced a strong and agile body. And so I submit to you that when you look at the circumstances of the crime of which the defendant was convicted, the murders of Dorothy Walsh and Mabs Martin, they were murders not of a match for Mr. Coddington in any sense but two defenseless women who never bargained for that kind of result." He went on to contrast activities in which a person might be aware that they were entering a place of danger from those in which the two women were killed. Calling the attention of the jury to the age and vulnerability of the murder victims as circumstances of the crime (§ 190.3, factor (a)) is not improper. (*People v. Carpenter* (1997) 15 Cal.4th 312, 412 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

[47]After the prosecutor had concluded his argument, out of the presence of the jury, defense counsel asked to put on the record an objection to argument asking the jurors to place themselves in place of the victims and imagine the horror they went through, and to what was characterized as "inflammatory" reference to the fright, horror, and pain the murder victims felt as they attempted to remove the FLEX-CUFs. The court ruled that the latter was not inflammatory, was within the evidence, and was not emphasized by the prosecutor who simply asked the jury to consider it as one of the factors.

expressed by several jurors and alternates regarding their future commit-ments, the court stated that, if a written motion for a prison visit was to be made, the defense would have "real problems with that with this judge. You've had months to think about that. You've had months to prepare." No request, written or oral, for the jury to view the conditions in which appellant would be confined if sentenced to life without the possibility of parole was made. Appellant characterizes the court's comment as a refusal to entertain a motion. It was not. The court expected, not unreasonably, that if such a motion were to be made counsel should be prepared to explain their delay and to justify any disruption of the trial schedule on which they had attempted to agree.

 Even had there been such a motion, a capital defendant has no right to insist on a jury view of either the execution chamber or the conditions under which a term of life without possibility of parole would be served. Evidence of the conditions of confinement is irrelevant to a capital sentenc-ing scheme and thus, refusing to permit such a view does not deny a capital defendant any constitutional right. (*People v. Osband, supra,* 13 Cal.4th at p. 713; *People v. Lucas* (1995) 12 Cal.4th 415, 499 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

### 6. *Comment on length of deliberation.*

After the close of the penalty phase evidence, the judge held a conference with two jurors and two alternates who had advised the court of personal obligations or concerns that required their attention. He attempted to deter-mine whether the anticipated trial schedule would avoid those problems. Based on information he had received from counsel, the judge stated during that conference that he anticipated that "we can wrap the whole thing up" by the following Wednesday, which was one week ahead. He later repeated that estimate, telling the jurors he thought they could count on "being free of this" on the following Wednesday. Because the court had told the jurors that closing argument would begin on Tuesday, the statement that the jurors would be free on Wednesday implied that jury deliberations would take a day or less.

 Appellant argues that the implication that penalty phase delibera-tion would be short suggested to the jurors that the penalty decision would be easy. If the court's statement conveyed that impression it was improper. Generally, the court may comment on evidence and on the credibility of a witness, "so long as its remarks are accurate, temperate, and 'scrupulously fair' " (*People v. Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741]), but that authority does not extend to offering a view on how the

balance of aggravating and mitigating factors should be weighed in the penalty phase of a capital case. Appellant did not object to the court's comment, however, and thus did not preserve this claim for appeal. (*People v. Wader* (1993) 5 Cal.4th 610, 647 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

In any event, we do not agree with appellant's assertion that the comment would have undue and improper influence on the jury. The court had discussed scheduling with the jury on several occasions, apologizing when an early recess was necessary if witnesses were not available, and had expressed understanding of the jurors' need to cope with outside obligations. The jurors were aware that past estimates had been inaccurate and would understand that this estimate too was being offered only to ease their concerns. At this stage of the trial the jurors, who had already deliberated guilt and sanity, were familiar with the deliberative process and of the overarching importance of that process in determining the appropriate penalty. It is not reasonably probable that the court's estimate had any impact on the deliberative process at the penalty phase of the trial.

7. *Erroneous, inadequate, ambiguous instructions.*

a. *Consideration of all evidence.*

The jury was instructed in the language of former CALJIC No. 8.84 that it should consider all of the evidence received at any phase of the trial "except as hereafter instructed." The jury was also told twice that it "shall consider, take into account, and be guided by" the statutory factors relevant to the penalty decision. (§ 190.3.)

Appellant contends that the first of these instructions permitted the jury to consider all of the evidence received during the earlier stages of the trial regardless of whether evidence was relevant to one of the statutory factors. The second instruction, he claims, was not sufficient to restrict consideration of evidence that was not relevant.

While an instruction that evidence should be considered only if it was relevant to one of the statutory factors would be proper, appellant did not request such an instruction and the court was not required to give one sua sponte. (*People v. Champion, supra,* 9 Cal.4th at p. 947.) Moreover, the evidence introduced at the sanity phase that appellant identifies as irrelevant was in fact relevant to several statutory factors—whether appellant acted under the influence of mental or emotional disturbance, whether defendant believed he had a moral justification or extenuation for his conduct, and whether his capacity to conform his conduct to the law was impaired by

mental disease. (§ 190.3, factors (d), (f), and (h).) Much of the other evidence, specifically that to which the prosecutor referred in closing argument, could be considered in rebuttal to the mitigating evidence presented at the penalty phase.

b.* *Instruction as to section 190.3, factor (b).*

Appellant contends that the jury was likely to misunderstand the instruction, former CALJIC No. 8.84.1, that it consider, "if applicable," "the absence of criminal activity other than those acts for which he has been convicted in this trial, which involved the use or attempted use of force or violence." As worded, appellant argues, the jury would believe that only complete absence of other criminal activity was mitigating, an understanding reinforced by defense counsel who referred to that factor as "absence of criminal activity" and by the prosecutor's argument in which he identified appellant's nonviolent criminal activity as aggravating factors. The prosecutor did not do so. He argued only that the defense penalty phase witnesses who testified about appellant's sterling character as a youth did not know about his conduct as an adult.

We find no "reasonable likelihood" that the jury understood the instruction in the manner now suggested by appellant. (*Boyde v. California* (1990) 494 U.S. 370, 380 [110 S.Ct. 1190, 1198, 108 L.Ed.2d 316]; *People v. Benson, supra*, 52 Cal.3d at p. 801.)

c. *Instruction as to factors (d) and (h) of section 190.3.*

 Factor (d) of section 190.3 permits the jury to consider whether the defendant committed the capital offense while "under the influence of extreme mental or emotional disturbance." Factor (h) of section 190.3 permits the jury to consider whether the defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect." The jury was so instructed.

Appellant contends that evidence of these factors may only be considered mitigating. In *People v. Osband, supra*, 13 Cal.4th at page 709, we reaffirmed our view that a court need not instruct that section 190.3, factor (d) may only be considered in mitigation. We have held, however, that the absence of these, or any, factors may not be considered aggravating. (*People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) Because the jury was not so instructed, appellant argues, jurors who did not believe in an insanity defense or thought a mental illness defense was

a "cop-out" would have considered his reliance on that defense as a factor in aggravation. He did not request a clarifying instruction, however.

The jury was properly instructed to rely on evidence. Appellant's reliance on an insanity or mental illness defense was not itself evidence. We see no possibility that the jury would misunderstand the instruction in the manner suggested by appellant. Nor would a reasonable juror fail to identify evidence of mental illness as mitigating. (*People v. Benson, supra,* 52 Cal.3d 754, 802.) Thus, the failure of defense counsel to request further instructions cannot be deemed incompetent or prejudicial.

In sum, the record does not support appellant's assertion that the jury relied on an invalid aggravating factor.

> d. *Failure to instruct that absence of mitigation is not aggravation.*

We held in *People v. Livaditis* (1992) 2 Cal.4th 759, 784 [9 Cal.Rptr.2d 72, 831 P.2d 297] that the court is not required to instruct that the absence of a mitigating factor is not itself aggravating, stating further: "Although that would be a correct statement of the law [citation], a specific instruction to that effect is not required, at least not unless the court or parties make an improper or contrary suggestion."

Appellant contends that two aspects of the prosecutor's argument obliged the trial court to instruct that the absence of mitigating factors is not aggravating. He claims that the prosecutor suggested to the jury that evidence that appellant did not come from a repressive home was aggravating, and that he argued that appellant's lack of remorse was aggravating. The prosecutor did not argue that coming from a good home is a factor militating in favor of death. Again, appellant relies on argument related only to the defense penalty phase evidence which, the prosecutor argued, rebutted what the jury "somewhere . . . heard" about a repressive and terrible childhood."[48]

The reference to remorse came after a recitation describing the manner in which the victims died, their defenselessness, the prosecutor's theory that the victims died only because they stood between appellant and his sexual lust, at the end of which the prosecutor asked rhetorically: "And what about Herbert James Coddington, the sinner? Is he remorseful, sorry, apologetic for what he has done? And the answer is profoundly 'no.' " ██ There was no argument that absence of remorse is aggravating. The import of the

---

[48]The "somewhere" to which the prosecutor referred was, most probably, in psychiatric testimony that mentioned statements appellant made about his relationship with his parents.

argument was that the highly aggravated, heinous nature and circumstances of the crimes were not tempered by remorse. That was neither misleading nor improper. A prosecutor may comment on lack of remorse if he or she does not suggest that this is an aggravating factor. (*People v. Proctor* (1992) 4 Cal.4th 499, 545 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

### e. *Considering elements of first degree murder aggravating.*

 Appellant next contends that the jury should have been instructed that it could not consider any aspect of the crimes that was part and parcel of the elements of first degree murder as aggravating. He derives authority for this proposition from this court's statement in *People v. Dyer* (1988) 45 Cal.3d 26, 77 [246 Cal.Rptr. 209, 753 P.2d 1], that the following instruction was a useful framework within which a jury could consider the aggravating circumstances set out in section 190.3: " 'An aggravating circumstance is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the offense itself.' "

Appellant's understanding of that instruction, which he complains was not given in this case, is faulty. *Dyer* did not say that the manner in which the elements of first degree murder were established could not be considered aggravating. It said only that additional circumstances attending the commission of the crime could also be considered.

Were appellant's construction of section 190.3, factor (a) accepted, a jury could not consider the method of killing or evidence of extensive planning offered to establish premeditation as aggravating factors. That is not the law. All circumstances of the crime or crimes may be considered. (§ 190.3, factor (a); see, e.g., *People v. Ramos, supra,* 15 Cal.4th at p. 1170 [photographs showing execution-style form of killing, manner of inflicting wounds, also relevant to intent]; *People v. Proctor, supra,* 4 Cal.4th at p. 552 [fact that telephone line cut, and victim raped, beaten, stabbed, and intentionally tortured properly considered under § 190.3, factor (a)].)

### f. *Instruction as to section 190.3, factor (d).*

Appellant argues that one or more jurors might have believed that his mental illness was not mitigating because it was not "extreme." He contends that instructing the jury that it could consider any other circumstance in his "character, background, history or mental condition that the defendant offers" in mitigation (see § 190.3, 1st par.; see also factor (k)) was not sufficient to offset the misleading impact of the instruction following section

190.3, factor (d) that the jury should consider: "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."

Appellant concedes that we have rejected this argument, but notes that in doing so in *People v. Wright* (1990) 52 Cal.3d 367, 443-444 [276 Cal.Rptr. 731, 802 P.2d 221], we said we would presume the jury understood the instructions correctly, barring evidence to the contrary. Although appellant disputes the logic of our conclusion, he offers no such evidence. The record does not, as he claims, demonstrate that the jury failed to give proper weight to the evidence of appellant's mental and emotional difficulties. Nothing in this record or in appellant's argument persuades us that we should reconsider our conclusion that it is not error to give only the standard instructions. (See *People v. Osband, supra,* 13 Cal.4th at p. 709.)

> g. *Failure to instruct that unanimity is not required as to mitigating evidence.*

■ Contrary to appellant's contention, the court was not required to instruct that unanimity is not required before a juror may consider evidence to be mitigating. (*People v. Breaux* (1991) 1 Cal.4th 281, 314-315 [3 Cal.Rptr.2d 81, 821 P.2d 585].) Moreover, he did not request that instruction, and CALJIC No. 8.84.2, the instruction of which he complains, was not misleading.[49] It would not lead the jury to conclude that only facts deemed mitigating or aggravating by all 12 jurors could be considered. The jurors had already been told: "Both the People and the defendant are entitled to the individual opinion of each juror. At this phase of the proceedings you must each exercise your personal moral judgment within the framework of the instructions as I am now giving to you as to whether the appropriate punishment for the defendant is death or life imprisonment without the possibility of parole. [¶] It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors."

This instruction was adequate to inform the jurors that each was to weigh the evidence and arrive at a penalty decision individually.

> h. *Failure to instruct that unanimity is required as to aggravating evidence.*

Appellant contends that if it was not necessary to instruct that jury unanimity was not required as to mitigating factors because CALJIC No.

---

[49]The instruction to which this argument is addressed stated: "In order to make a determination as to the penalty, all 12 jurors must agree."

8.84.2 would not mislead the jurors, it follows that they must be instructed that they must unanimously agree that a factor is aggravating before weighing it against the mitigating evidence. He argues that such unanimity is necessary to ensure the reliability of a death verdict demanded by the Fifth and Eighth Amendments.

Appellant analogizes a finding that a factor is aggravating to the statutory requirement of jury unanimity on enhancing allegations in noncapital cases (e.g., §§ 1158, 1158a), arguing that capital defendants are entitled to even more rigorous protection in the penalty decision.

The jury was instructed, however, that "[t]o return a judgement of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances, that it warrants death instead of life without possibility of parole." This instruction is adequate to ensure reliability in a death verdict as it makes clear to the jurors that each must reach an individual decision that evidence or factors that the individual juror believes are aggravating outweigh those he or she deems mitigating.

> i. *Instruction on failure to testify.*

Appellant contends that, having given an instruction at the guilt phase that no adverse inference should be drawn from the defendant's failure to testify, the court's omission of that instruction at the penalty phase suggested to the jury that at that stage of the trial such an inference is permitted. That implication, he suggests, was reinforced by the prosecutor's comment on his failure to testify during closing argument.

The prosecutor made no such comment, however. The argument identified by appellant is that in which the prosecutor stated that appellant "professes no words whatsoever in remorse for what he has done." That comment was directed to, and the jury would so understand, the numerous occasions on which appellant discussed the crimes with others—from his initial statements to the arresting officers through his interviews with the psychiatrists—in which he did not express remorse.

We reject this claim for the reasons we rejected the same claim when raised by appellant with regard to the sanity phase instructions.

> 8. *Refusal to give instructions on standard of proof, burden of persuasion, unanimous agreement.*

At the close of the penalty phase evidence, appellant made a formal motion for an instruction that the jury may impose the death penalty only if

"persuaded beyond a reasonable doubt and to a moral certainty that the aggravating circumstances are so substantial in comparison with the mitigating circumstances, and that the imposition of the death penalty is justified and appropriate in the circumstances of this case" and that "reasonable doubt is present when you are not firmly and without hesitation convinced that death is the justified and appropriate punishment."

Appellant contends that we should join other states that have concluded a capital jury may not return a death verdict unless the jury finds beyond a reasonable doubt that aggravating factors outweigh mitigating factors and/or that death is the appropriate penalty. He also contends that an instruction must be given to articulate the standard of proof to be applied in the penalty phase.

We have repeatedly declined to require either instruction. Neither is statutorily or constitutionally required. (*People v. Earp, supra*, 20 Cal.3d at p. 899; *People v. Osband, supra*, 13 Cal.4th at pp. 709-710; *People v. Medina, supra*, 11 Cal.4th at p. 782; *People v. Cudjo, supra*, 6 Cal.4th at p. 634.)

9. *Cumulative prejudice.*

Appellant contends that prepenalty phase instances of misconduct and error, as well as those errors and misconduct he claims were made during the penalty phase, together contributed to the death verdict. Inasmuch as we have rejected his claims of error and prejudicial misconduct, this claim also fails.

10. *Denial of automatic motion for reduction of penalty.*

Before ruling on appellant's automatic motion for reduction of the penalty (§ 190.4, subd. (e)) (section 190.4(e)), the trial judge stated that he had read the probation officer's report and recommendation. Appellant contends that, in ruling on the motion, the trial court improperly relied on information contained in a probation officer's report and misconstrued factor (b) of section 190.3[50] as including acts or threats of violence occurring during the commission of the capital offense. The People concede the latter point, but argue that appellant suffered no prejudice as a consequence, and argue that while the judge referred to information in the probation report, that information was inconsequential in the ruling. We agree. While it

---

[50]Section 190.3 provides that "[I]n determining the penalty, the trier of fact shall take into account any of the following factors, if relevant: [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Further reference to specific factors is to those factors found in section 190.3.

appears that the judge did improperly mention information that was not before the jury, we are satisfied that the information had no effect on either his conclusions with regard to the individual aggravating and mitigating circumstances or his ultimate conclusion that the jury's findings were supported by the weight of the evidence and were not contrary to the law and evidence.

Section 190.4(e) provides that whenever a verdict of death has been returned, the defendant is deemed to have applied for modification of the penalty. It further provides that, in ruling on the application, the judge is to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (*Ibid.*) The judge is to state the reasons for his or her findings on the record. Judge Finney did so here. Those findings refute any claim that error in the procedure was prejudicial to appellant. ·

The court must review the probation officer's report prior to imposition of sentence for noncapital offenses if the defendant is eligible for probation. (§ 1203, subd. (b)(3).) Because it may consider only evidence that was before the jury in ruling on an automatic application for reduction of a death verdict (§ 190.4(e); *People v. Welch* (1999) 20 Cal.4th 701, 775. [85 Cal.Rptr.2d 203, 976 P.2d 754]), we have stated that the court should neither read nor consider a probation officer's report before ruling on an application for modification of the death verdict. (*People v. Kipp* (1998) 18 Cal.4th 349, 383 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) Failure to defer reading the report is not invariably prejudicial, however. (*People v. Williams, supra,* 45 Cal.3d at pp. 1329-1330.)

In the course of ruling on motions for a change of venue or to exclude evidence and in dealing with other routine matters, it is inevitable that a judge will become aware of information that is not presented to the jury. ▉ As an aspect of the presumption that judicial duty is properly performed, we presume, nonetheless, in other proceedings that the court knows and applies the correct statutory and case law (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032 [224 Cal.Rptr. 208]) and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may be considered in the judicial decisionmaking process. (Evid. Code, § 664; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913-915 [141 Cal.Rptr. 133, 569 P.2d 727]; *In re Contreras* (1975) 45 Cal.App.3d 549, 555 [119 Cal.Rptr. 757]; *People v. Ozene* (1972) 27 Cal.App.3d 905, 915 [104 Cal.Rptr. 170].) A section 190.4(e) proceeding

is subject to the same presumption regardless of the source of the judge's knowledge.

We presume that a judge is aware that a section 190.4(e) ruling is to be based solely on the evidence before the jury. Not only does the language of section 190.4(e) make that clear, but prior to the January 20, 1989, proceedings at which the section 190.4(e) motion was denied here, we had stated in *People v. Williams, supra,* 45 Cal.3d at page 1329, that a probation report is not relevant to the court's determination of such motions.[51] Absent evidence to the contrary the court will assume that the judge was not influenced by the material that was not before the jury of which he became aware through the probation report or other proceedings. (*People v. Welch, supra,* 20 Cal.4th 701, 775; *People v. Cain, supra,* 10 Cal.4th at p. 81.)

The trial court here did refer to matters in the probation report that were not before the jury—that appellant's trailer "was a virtual arsenal of firearms"; that appellant had purchased a gun to use in these crimes; that appellant had complained about the adequacy of funds for his defense; that defendant had told the probation officer he knew his conduct was wrong but believed it was all right because he was commanded by God to do it; and that such force had been used in tightening the FLEX-CUFs that the cuffs were the size of a wrist.[52] We must therefore examine the record "to determine whether the court may have been improperly influenced by material in the report." (*People v. Kipp, supra,* 18 Cal.4th at p. 383.) We are assisted in this by the trial court's thorough recitation of the reasons for denying the application to modify the death verdict.

Before making his section 190.4(e) ruling, the court made a statement in response to the arguments of counsel. The court incorporated some of those remarks into his explanation for denial of the application to modify the death verdict. Considered together, the court's introductory remarks and explanation make it unmistakably clear that his consideration of material in the probation report did not improperly influence the ruling.

---

[51]We had not yet suggested that "the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict." (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]) or that it was error to read the report before considering the section 190.4(e) application.

[52]Presumably the judge was aware of the number and kind of firearms found in the mobilehome quite apart from the probation report since they were listed on the receipt for property seized pursuant to the warrant he had issued. Additionally, the defense objected to the admission into evidence of one photograph of the interior of appellant's mobilehome that depicted several firearms. The judge reviewed the photo and it was cropped to omit that portion.

The court's knowledge that defendant stated to the probation officer that God was telling him what to do could not have been prejudicial. The court, having heard the expert testimony offered during the sanity phase of the trial, was well aware of appellant's claims in that regard and this information added nothing other than the fact that the statement to the probation officer was consistent with appellant's statements to the psychiatrists. As discussed below, the court did not believe that appellant believed that God was commanding or condoning appellant's actions. We are also satisfied that consideration of the other evidence did not influence the outcome of the section 190.4(e) proceedings.

The reference to appellant's statement about the funds spent for his defense was made in the court's introductory remarks and not referred to again. The judge said only that if there was anything in the probation report that disturbed him it was appellant's comment about the way the trial was handled and whether or not sufficient funds were spent to defend him. The court stated that defense counsel had served appellant well throughout the trial, that they had done a "premiere job," and the judge could not recall any case in the county where funds were spent to the extent they had been an attempt to give appellant every conceivable advantage at trial. Nothing in those remarks or the court's explanation of the denial of the section 190.4(e) motion suggests that the court considered this information relevant to the sentencing decision or was influenced in any way by this aspect of the probation report.

To the contrary. The court's statements indicate that the circumstances of the crime justified the jury verdict and his denial of the application to modify the penalty. In his introductory remarks the judge stated that, while the murders presented one of the least gory murder situations he had seen as a trial judge and attorney, appellant's conduct was "probably the most completely evil course of conduct that I have ever been involved in. There were no extenuating circumstances." The court noted the planning that had occurred over a considerable length of time. Appellant had to have in mind that he would have to get rid of the chaperones and bought the FLEX-CUFs and the gun because he might have to take life in order to have his way with the girls. "In that sense, I think it was one of the most diabolical and evil schemes that I've ever seen in my career."

The judge rejected the evidence of mental illness, stating that he did not believe appellant's story to the psychiatrists, did not believe that appellant thought God was telling him to do certain things, and thought that appellant's claim was a rationalization of what appellant wanted to use to explain his conduct. The court believed appellant was a tremendously egocentric

person who constructed his own religion "and when you create your own God, then you can dictate what that God tells you to do . . . this is nothing else than an individual who knows that that's not God talking to him, that's a rationalization of what he wants to use to explain his conduct." This was consistent with evidence offered at the sanity phase. The court then said: "And so having heard the testimony, I just do not believe that Mr. Coddington was under the impression that God was telling him what to do, and if he wasn't, then I'm correct that this was the most evil of evil schemes, and I firmly believe that it was."

Before addressing the statutory factors in aggravation and mitigation, the judge expressly stated that he was acting pursuant to his statutory obligation as set forth in section 190.4 and was making an independent determination whether the jury's findings were contrary to the law "on the evidence that was presented to the jury."

In his subsequent explanation of his section 190.4(e) ruling, the judge first addressed factor (a)—the circumstances of the crime—referring back to his earlier remarks and describing appellant's conduct in detail. He mentioned the purchase of the gun twice and once cited the probation report as the source of that information.[53] Those references are so minor in comparison to the other events in the court's recital that we are satisfied in the court's conclusion, that the murders were a "callous, calculated, and heinous scheme" in which appellant was willing to kill the women so he could "carry out his own desires," and thus the circumstances of the crime were aggravating circumstances, would not have differed had the court been unaware of the statement in the probation report that appellant bought a gun specifically for use in the scheme to sexually assault young girls. The same is true of the court's mention that appellant had an arsenal of guns. No gun was used in the crimes. The ownership of guns was irrelevant to any factor.

Addressing factor (b)—the presence or absence of criminal activity by the defendant involving the use or attempted use of force—the court did err by considering appellant's use of force during the murder under that factor, which refers only to other instances of violent conduct or threatened violence (*People v. Champion, supra,* 9 Cal.4th at p. 945), and by failing to recognize that the absence of prior criminal activity involving force is

---

[53]The first reference to "purchasing a firearm" was included in a litany of acts reflecting preparations the judge believed indicated that appellant knew lives would be jeopardized if he followed through on his plan to take young girls for sexual gratification. The second was lengthier: "Further, it's worthwhile to note that his mobile home was a virtual arsenal of firearms, and that he had purchased a gun specifically for this crime. I cite the probation report on page 12 for that." Evidence that defendant possessed one handgun had been presented to the jury.

mitigating. However, there is no indication that the court considered appellant's use of force during the murders to be an aggravating circumstance that was additional to factor (a) and "double counted" the aggravating nature of that conduct when concluding that aggravating circumstances outweighed mitigating.

Appellant argues that the error did affect the balance because absent the error, factor (b) would have been considered mitigating—reflecting an absence of prior violence or threats of violence—and would have been weighed as such with factor (c) which the court found was mitigating—the absence of prior felony convictions. We agree that the court erred, but not that this error affected the balance of aggravating and mitigating factors in the court's ruling on the motion for modification of sentence. The court's other remarks make that clear.

Additionally, it was during the court's statement about factor (b) that the court made the italicized reference to information that was not before the jury: "[H]e used such force in strangling the two older women with the Flex-cufs that *Detective O'Brien described the circumference of those Flex-cufs as being approximately the size of a human wrist.* One can hardly imagine a more violent or sadistic act than strangulation." Consideration of this information could not have been prejudicial, however, in the court's conclusion that appellant had engaged in violent criminal acts. The remnants of one of the FLEX-CUFs were in evidence, as was a photo of Walsh with the FLEX-CUF around her neck, and the medical examiner had described the means by which the murder victims were strangled. That appellant had engaged in violent criminal acts was clearly established by the evidence and effectively conceded by appellant at the penalty phase. We see no possibility that the court may have considered appellant's conduct more aggravated because of Sergeant O'Brien's description of the used FLEX-CUF than he did simply on the basis of the evidence at trial regarding the manner in which the victims were killed and the photographs depicting the effect of the FLEX-CUF.

Discussing factor (d)—whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance—the judge stated that in his 20 years of involvement with trial of criminal cases, he had "never seen a more complete exploration and exposition of the issue concerning mental status." He expressed his view that the jury's rejection of appellant's claim that he was insane at the time he committed the crimes was correct. The court acknowledged that appellant had been suffering emotional disturbance occasioned by the excitement of the event, but, the court concluded, this was not the type of emotional

disturbance contemplated by the Legislature. The judge referred to his initial remarks, and again stated that he did not believe the defendant's "claim that he was operating under the commands of his concept of a God." There was no independent evidence other than appellant's own statements to the psychiatrists. Evidence that appellant was "flighty" and "his actions were somewhat bizarre" just before the crimes did not indicate severe emotional or mental distress. He made no mention of voices of God or any mental aberration when he confessed to the police. Unless being self-centered and egocentric constituted a legally cognizable form of insanity or mental duress, the court found no basis for mitigation under this factor. "The Court specifically finds that the evidence including the testimony of the psychiatrists do [*sic*] not demonstrate that the Defendant was insane or acting under such emotional or mental distress as to reduce the punishment from death to life without possibility of parole." The court further found "that the weight of the evidence supports the jury's findings, and that this does not then constitute a mitigating factor."

The court reached the same conclusion as to factors (f) and (h)—whether the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct, or whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the law was impaired as a result of mental disease or defect, or intoxication. There was no evidence of intoxication and the judge again stated that he did not believe that appellant believed that he was acting with moral justification.

Factor (e)—whether the victim was a participant in or consented to the homicidal conduct—was found to be totally absent, as was factor (g)—whether appellant acted under duress or the domination of another person. The judge stated once again that he did not believe appellant's statements about God and the directions of God.

The judge considered appellant's age at the time of the offense (27) to be mitigating under factor (i), and as to factor (j)—whether the defendant was an accomplice or a minor participant—stated that the factor would be mitigating if present, but found it was not present and therefore not mitigating.

The court found no other circumstance that would extenuate the gravity of the crime (factor (k)), stating that he believed the course of conduct was of such an evil nature that there were no extenuating circumstances that would diminish the gravity of the crime. The factor was absent and thus not mitigating.

The court then concluded that the jury findings and verdict were supported by the weight of the evidence, and found after independent review of all the

evidence that the jury's verdicts and findings were not contrary to the law or the evidence.

Appellant argues that, had the court not considered the information in the probation report, it might have given greater importance to the evidence of mental disturbance. He also claims that the court ruled as it did because of the nature of appellant's religious beliefs. As the People note, however, the judge did not simply give less weight to factor (d) as a mitigating factor, he disbelieved the evidence that appellant acted under emotional or mental disturbance. The rejection of the claim was not based on the nature of appellant's religious beliefs. The court simply did not believe appellant's claim that appellant believed that God, any God, condoned or directed appellant's actions.

The court found only two mitigating circumstances: appellant's age at the time of the offense and the absence of prior felony convictions. In light of the court's remarks regarding the heinous, calculated, and evil nature of appellant's conduct, we see no possibility that had the court not considered information in the probation report, or considered the absence of other crimes of violence to be mitigating, those circumstances would have been found to outweigh the aggravating circumstances or be a basis for a verdict less than death. We conclude, therefore, that the errors of which appellant complains were not prejudicial.

In *People v. Lewis, supra,* 50 Cal.3d at pages 266-267, on which appellant relies for his assertion that consideration of this extraneous matter was prejudicial, the information in the probation report which the court considered was about the defendant's juvenile record and his involvement in a prior homicide, information which influenced the court's conclusion that aggravating evidence outweighed mitigating. This is not the case here. Rather, as in *People v. Welch, supra,* 20 Cal.4th at page 775, while the court did make reference to the probation report, we are satisfied that the irrelevant matters therein did not influence the ruling on the motion to modify the death verdict.

D. *Other Issues.*

1. *Shackling.*

Defendant was restrained by leg irons throughout the trial. Counsel had objected, but the judge ruled that in light of the nature of the crimes, the district attorney's instruction that the defendant be treated as a risk while being transported, and the bailiff's request, he would permit the restraint.

Based on a statement made by trial counsel during penalty phase argument, appellant asserts that the jury was aware of the restraint.[54] Because there was no manifest need or compelling reason for the restraint, he argues, his due process and confrontation clause rights were violated.

 Assuming that the restraint was unjustified, the record does not support the claim that the jury was aware of the restraints. Absent evidence that the jury was aware that appellant was restrained any error is harmless. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) We will not assume solely on the basis of a statement by counsel made during penalty phase argument after months of trial and in the absence of any complaint by counsel during trial that the precautions taken to avoid prejudice to appellant were ineffective and that the jury was aware of, or influenced by, the restraint.

When the subject was raised at the beginning of jury selection, the court authorized leg irons, but not handcuffs. He also directed that if handcuffs were used in transporting appellant, he should be brought into the courtroom before the jurors arrived and removed after they left. The bailiff assured the court that the practice had been to use handcuffs during transport and in the elevator but not in court, and that "[w]e make sure he's out of the view of the jurors first before we take him out." There is no indication that this practice was not followed throughout the trial, and counsel made no further complaint or objection to the manner in which the restraints were used.

Moreover, prejudicial error is not established simply on the basis of one or more jurors having seen the defendant in shackles. (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 584.)

### 2. *Ineffective-counsel Claims.*

Appellant offers several bases other than those rejected above in support of his claim that his trial counsel did not afford constitutionally adequate representation.

 To establish constitutionally ineffective assistance of counsel under either the state or federal constitutional right to counsel, appellant must demonstrate (1) that his attorney's performance fell below an objective level of reasonableness, i.e., that counsel's performance was not within an objective level of reasonableness and thus did not meet the standard to be

---

[54]"Now, you've seen Herb Coddington every day come into court here, he's chained up, and for some reason fate, or God, or whatever you want to call it, the people on this side of the Bar in this room have been called upon to determine what happens to him. . . . And we say to you he should be chained up. He should be chained up for the rest of his natural life. He should not be allowed to roam in society ever again."

expected of a reasonably competent attorney, and (2) that he suffered prejudice as a result of that failure. Prejudice is established if there is a reasonable probability that, absent counsel's errors, the result would have been different. (*Lockhart v. Fretwell* (1993) 506 U.S. 364, 371 [113 S.Ct. 838, 843-844, 122 L.Ed.2d 180]; *Strickland v. Washington, supra,* 466 U.S. at pp. 687-688 [104 S.Ct. at pp. 2064-2065]; *People v. Ochoa, supra,* 19 Cal.4th at p. 414.) We have applied these standards in rejecting several of appellant's ineffectiveness of counsel claims.

In addition, however, when the reason for counsel's action or inaction is apparent on the record, the court will determine whether that reason reflects reasonably competent performance by an attorney acting as a conscientious and diligent advocate. If no explanation appears, an ineffective counsel claim will be rejected unless the attorney was asked for and did not offer an explanation, or there can be no satisfactory explanation. (*People v. Osband, supra,* 13 Cal.4th at pp. 700-701.) In other cases the appellant is left to his remedy on habeas corpus where evidence outside the record may shed light on the reason for the attorney's action.

██ In any assessment of trial counsel's conduct of a criminal defense we are mindful of the admonition of the United States Supreme Court that we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland v. Washington, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) The burden is on an appellant who challenges the competence of his or her trial counsel to overcome the presumption that counsel's conduct is within the range of reasonably professional assistance. (*Ibid.; People v. Earp, supra,* 20 Cal.4th at p. 896.)

With these standards in mind, we address the remainder of appellant's ineffective counsel claims and conclude that none has merit.

### a. *Failure to make Fourth Amendment-based objections.*

██ To make a showing of constitutionally inadequate representation by counsel when failure to seek suppression of evidence on a Fourth Amendment ground is asserted as the basis for the ineffective counsel claim, the party must establish that the Fourth Amendment claim had merit and that it is reasonably probable that a different verdict would have been rendered had the evidence been excluded. (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375 [106 S.Ct. 2574, 2582-2583, 91 L.Ed.2d 305]; *Mason v. Godinez, supra,* 47 F.3d at p. 855.) Appellant's claim that counsel should have argued that

the FBI manufactured an emergency in order to avoid getting a warrant lacks merit. The evidence confirms that there was no unjustified delay in seeking a warrant. As of the time the FBI agents broke into appellant's trailer, only three days after the victims had been reported missing, one of the investigating agents had contacted a Sacramento agent who acted as legal adviser, described the available information, and obtained the legal adviser's opinion that probable cause to obtain a warrant existed. The agent had then been instructed, according to FBI procedure, to contact the office of the United States Attorney to obtain a formal legal opinion on probable cause. Instructions had been given to contact the United States Magistrate in the South Lake Tahoe area to see if he would be available to execute a warrant and if application could be made to him. The call to the United States Attorney was not made only because ensuing developments led the FBI agents to conclude that an immediate entry was necessary. The FBI did not precipitate or manufacture those developments.

### b. *Treatment of Allen Hacker's alleged statement.*

Appellant argues that "undoubtedly" trial counsel had a copy of FBI Agent McKevitt's report regarding his interview with Allen Hacker in which, McKevitt testified, Allen Hacker told McKevitt that appellant often read The Anarchist Cookbook and seemed interested in killing women. Therefore, he argues, counsel should have anticipated, before calling Allen Hacker as a defense witness, that the prosecution would offer McKevitt's statement in rebuttal. Counsel should have sought a ruling on the admissibility of McKevitt's testimony before Hacker took the stand.

This argument is no more than an invitation to second-guess trial counsel's tactics. As appears above, their primary defense was an effort to persuade the jury that the murders were not premeditated. They obviously believed that Allen Hacker's testimony was important to dispel any implication to that effect in the prosecutor's opening statement. We will not engage in this type of second-guessing. We cannot say on this record that the tactic chosen was one that competent counsel would not elect. Moreover, in light of the extensive evidence of premeditation, even were we to conclude otherwise it is not reasonably probable that a different verdict would have been reached had Hacker's and McKevitt's testimony not been heard by the jury.

### c. *Failure to object to or cure prosecutorial misconduct.*

We have rejected appellant's misconduct claims above. ▮ To the extent that any of the instances cited as misconduct might be considered so,

however, we note that "mere failure to object to prosecutorial argument . . . rarely establishes incompetence on the part of defense counsel in the absence of some explanation on the record for counsel's action or inaction." (*People v. Samayoa, supra,* 15 Cal.4th at p. 855.)

That is true here.

### d. *Failure to rebut sanity phase evidence of violent nature.*

The same objective standard for assessing the competence of counsel applied at the guilt phase is applied to a claim of ineffective assistance at the subsequent phases of a trial. (*People v. Samayoa, supra,* 15 Cal.4th at p. 855.)

Dr. Mills testified on cross-examination by the prosecutor at the sanity phase that Carol Wiseman, a former girlfriend of appellant's, told him that appellant was sometimes physically intimidating when angry and had frightened her. The claim of incompetent representation is based solely on trial counsel's failure, after the court had ruled they could do so, to bring out that Wiseman had also said with regard to the charged crimes that the person she knew would not have done them and appellant must have been insane if he did them.

The record offers no explanation for counsel's decision not to proceed in that manner, and thus is not a basis for concluding that counsel had no satisfactory reason. In any event, there could have been no prejudice. All of the expert witnesses testified that the incidents with Wiseman or Cluff had no relevance to their diagnoses.

### e. *Allowing defendant to be absent during penalty phase closing argument.*

Again appellant, with the benefit of hindsight, asks the court to second-guess counsel. It was not enough they attempted to dissuade appellant from absenting himself from the penalty phase argument, asked the court to counsel appellant, and conferred with appellant again after the court did so. Counsel should have done more. They should have asked the court to engage appellant in a dialogue, and should have objected that the court was presenting appellant with an unconstitutional and unnecessary choice. The court should have been asked to restrain the prosecutor's inflammatory style and appellant should have been offered the opportunity to remain and request a recess if that became necessary.

The record confirms that the court and counsel did all that could reasonably be expected in this situation. The assumption that appellant had not

been told by counsel that a recess could be requested if he became too upset to control himself is not supported by the record. The prosecutor's style of argument did not exceed permissible bounds and was not subject to the type of prior restraint now suggested by appellant simply to avoid upsetting him.

### f. *Inadequate penalty phase argument.*

■ We have reviewed the penalty phase argument and do not agree with appellant that it fell short of the quality demanded by the Sixth and Eighth Amendments. For the most part his argument here is only that a better or different penalty phase argument could have been made. This is not a basis for finding constitutionally ineffective assistance. (*People v. Mincey* (1992) 2 Cal.4th 408, 471 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Appellant also complains that trial counsel did not make it clear that the absence of prior violent criminal conduct in his past could be considered mitigating even if he had committed nonviolent criminal acts or that mental illness that was not "extreme" could be considered. But counsel did argue that unlike many capital cases, appellant had no prior felony convictions. With respect to mental illness, counsel acknowledged that the jury had found that appellant was not legally insane and argued that the jury could nonetheless say that he was "crazy" when he committed the crimes and urged the jury to remember that all five psychiatrists believed that he suffered a severe and prolonged mental defect absent which the crimes would not have occurred.

Appellant received adequate representation in the penalty phase argument.

### g. *Deletion of mitigating factors from instructions.*

Trial counsel agreed that the court should delete factors (f) and (g) from the instructions describing the aggravating and mitigating factors. Factor (f) directs the jury to consider "[w]hether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct." Factor (g) asks "[w]hether or not the defendant acted under extreme duress or under the substantial domination of another person."

The record does not suggest that counsel could not have had a reasonable tactical reason for that decision. Since the factor is mitigating only if the defendant reasonably believes the conduct is morally justified, counsel may have concluded that reference to that factor would be harmful. Even assuming counsel had no tactical reason for the decision, however, we fail to see how appellant was prejudiced by the omission of these factors from the instructions.

h. *Failure to poll jurors.*

When the jury returned its verdict of death, the court asked counsel whether they wanted the juror polled. Defense counsel responded simply "[N]o." The court asked if the answer was no and counsel responded "No." He did not request that the jury be polled when the earlier verdicts were returned. Appellant contends that this omission and the failure to poll the jurors when they returned guilt, special circumstances, and penalty phase verdicts requires reversal since a defendant has an absolute right, conferred by section 1163, to have the jury polled at the request of either party. Polling, he argues, is necessary to safeguard a defendant's right to a unanimous jury, to ensure that no juror has been coerced, and to ensure that the verdict is not mistaken.

As appellant recognizes, this claim is actually an assertion that counsel's failure to request a jury poll constituted ineffective assistance of counsel. He is unable to establish prejudice, however, as this record does not reflect that any of the dangers polling seeks to avoid actually occurred.

3. *Constitutionality of death penalty statute.*

Appellant contends that the California death penalty statute is constitutionally invalid on numerous grounds: (1) failure to require explicit jury findings on factors in mitigation and aggravation; (2) prosecutorial discretion in charging decisions; (3) lack of comparative (proportionality) review; (4) failure to meaningfully narrow class of offenses rendering defendant's offense death-eligible; and more specifically (5) the multiple-murder special circumstance (§ 190.2, subd. (a)(3)) fails to meaningfully narrow the class of persons eligible for the death penalty. This court has repeatedly rejected the first four challenges to the law (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Earp, supra,* 20 Cal.4th at pp. 904-905; *People v. Smithey, supra,* 20 Cal.4th at p. 1017; *People v. Marshall* (1996) 13 Cal.4th 799, 866 [55 Cal.Rptr.2d 347, 919 P.2d 1280]) and the United States Supreme Court recognized multiple murder as a narrowing factor in *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 [108 S.Ct. 546, 555, 98 L.Ed.2d 568].)

4. *Sentencing error.*

Appellant claims that remand for resentencing on the noncapital counts is required because, while the court stated reasons for imposing the upper term, the court failed to state its reasons for imposing consecutive terms or for sentencing under section 667.6 instead of section 1170.1.

We disagree. The court's statement of reasons was adequate to demonstrate that the court was aware that the choice to sentence under section

667.6 was a sentencing choice separate from the decision to impose consecutive terms. That is all that is required. (*People v. Belmontes* (1983) 34 Cal.3d 335, 348 [193 Cal.Rptr. 882, 667 P.2d 686].)

### III

### DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I dissent.

So far as it imposes punishment, including the sentence of death, on appellant Herbert James Coddington, the judgment in this cause depends on the soundness of the jury's verdict finding him sane. That the superior court committed error, and the prosecutor engaged in misconduct, bearing on the issue of sanity is undoubted. The majority establish the fact. Whether such error and misconduct caused prejudice is the question. The majority give a negative answer. After reviewing the record on appeal, I would give an affirmative one.

Under the law of the State of California, as we have held in decisions including *People v. Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752] (hereafter sometimes *Skinner*), a person is not criminally liable for any conduct in which he participates while he is insane. Insanity operates as an "affirmative defense" belonging to a defendant for use against any "criminal charge" (*People v. Hernandez* (2000) 22 Cal.4th 512, 522 [93 Cal.Rptr.2d 509, 994 P.2d 354], italics omitted), separate and independent from the elements of any underlying crime (see *ibid.*). The defendant who would invoke insanity must plead it (Pen. Code, § 1016; see *id.*, § 1026 et seq.) and then prove it by a preponderance of the evidence (*id.*, § 25, subd. (b)). Insanity is defined in accordance with the test adopted by the House of Lords in *M'Naghten's Case* (1843) 8 Eng.Rep. 718. (*People v. Skinner, supra*, 39 Cal.3d at pp. 768-769, 771-777.) It entails the following: At the time of the commission of the crime or crimes charged, and as a result of mental disease or defect, the defendant was "incapable of knowing or understanding the nature and quality of his . . . act" or "of distinguishing right from wrong . . . ." (Pen. Code, § 25, subd. (b); see generally *People v. Skinner, supra*, 39 Cal.3d at pp. 768-769, 771-777.) To be incapable of distinguishing right from wrong, a person need not be incapable of distinguishing *legal* right from *legal* wrong. (*People v. Skinner, supra*, 39 Cal.3d at

pp. 777-784; see *People v. Stress* (1988) 205 Cal.App.3d 1259, 1272-1274 [252 Cal.Rptr. 913].) He need only be incapable of distinguishing *moral* right from *moral* wrong. (*People v. Skinner, supra,* 39 Cal.3d at pp. 777-784; see *People v. Stress, supra,* 205 Cal.App.3d at pp. 1272-1274.) Moral right and moral wrong refer to right and wrong as defined by positive norms comprising "society's generally accepted standards" of behavior (*People v. Stress, supra,* 205 Cal.App.3d at p. 1274; see *People v. Kelly* (1992) 1 Cal.4th 495, 534-535 [3 Cal.Rptr.2d 677, 822 P.2d 385]), and depend for their enforcement on the "operation of feelings of shame, remorse, and guilt" (Hart, The Concept of Law (1961) p. 84). A person is incapable of recognizing that specified conduct is morally wrong if he believes that he is commanded by God to participate therein. (*People v. Skinner, supra,* 39 Cal.3d at pp. 783-784; see *People v. Stress, supra,* 205 Cal.App.3d at p. 1273.)

The trial of the issue of sanity in this case was one of the most complex and extensive of any that I have ever examined. It was also one of the closest and most vigorously litigated. Quantitative measurement supports qualitative characterization. The reporter's transcript of the oral proceedings on sanity fills almost 1,700 pages—exceeding the reporter's transcript of the oral proceedings on guilt and penalty *combined.*

Coddington called to the stand three psychiatrists who had examined him on his retainer: Mark J. Mills, M.D., Fred Rosenthal, M.D., and Joseph Satten, M.D. They each testified at length and in detail, concluding, inter alia, that he was severely mentally ill.

For their part, the People called to the stand two other psychiatrists who had examined Coddington under the superior court's appointment: Bruce T. Kaldor, M.D., and Robert M. Bittle, M.D. They too each testified at length and in detail, concluding, inter alia, that he was severely mentally ill.

Coddington's psychiatrists each went on to opine that he was insane. They concluded that he was incapable of distinguishing moral right from moral wrong. They did so because they concluded that he believed that he was authorized and indeed commanded by God to act as he did through "signs" that he discerned in traffic lights and in certain numbers.

By contrast, the People's psychiatrists each went on to opine that Coddington was sane. Dr. Kaldor rejected Coddington's belief about the "signs" from God: he deemed Coddington's conception of God and notion of morality to be somehow insufficient. Dr. Bittle also rejected Coddington's belief about the "signs" from God: he deemed Coddington's belief to be a

mere rationalization to justify his conduct at least to himself. He did so in spite of his admission that he "did not . . . have the impression that" Coddington "was lying," but "felt" instead that he "was in general . . . straightforward."

There was much evidence in support of the opinion of Coddington's psychiatrists that he was insane, and in opposition to that of the People's psychiatrists that he was not. Among the undisputed, and indisputable, facts are these: In spite of Coddington's long-term and pathological obsession with sex—for years he kept a daily log of the number of times he masturbated, revealing a high of 38—he did not sexually assault Alecia T. and Monica B. at all on the first and third days of their captivity, and did so only on the second and then only in a relatively limited fashion. He was hardly a simple sexual predator. Further, in spite of his long-term and pathological obsession with violence—which culminated in his murder of Mabs Martin and Dorothy Walsh—he became progressively passive as the girls became progressively aggressive over the course of the incident. He was hardly a simple violent thug.

But there was also much evidence in support of the opinion of the People's psychiatrists that Coddington was sane, and in opposition to that of his own psychiatrists that he was not. Among the undisputed, and indisputable, facts are these: Coddington was extremely intelligent. He often lied to and deceived others in order to serve his own interests. He had a powerful motive to lie to and deceive the psychiatrists who examined him—to avoid a sentence of death. He also had a substantial opportunity to do so successfully—the experience provided him through the process of repeated inquiry allowed him to attempt to tailor his responses away from sanity and toward insanity.

In light of the foregoing, we can say with confidence that the jury's determination of the issue of sanity depended on its assessment of the relative credibility of Coddington's psychiatrists and the People's. We can also say with confidence that the jury's assessment turned on the narrow question whether Coddington was malingering—a question that must be considered close in light of the admission by Dr. Bittle, one of the People's psychiatrists, that he did not believe that Coddington was "lying," but "felt" instead that he "was in general . . . straightforward."

As the majority establish, the superior court erred by vouching for the "impartial[ity]" of the People's psychiatrists, whom it had appointed, over that of psychiatrists who are retained by a "party" and purportedly owe him "allegiance"—including, inferentially, Coddington's. The court's attestation

was erroneous. It was reasonably likely (*People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705]) to have been understood by the jury as an expression, contrary to decisional law (e.g., *People v. Cole* (1952) 113 Cal.App.2d 253, 261 [248 P.2d 141] (per Dooling, J.); *People v. Ramirez* (1952) 113 Cal.App.2d 842, 855 [249 P.2d 307]), of the court's personal knowledge or belief that was beyond the evidence admitted at the sanity trial and hence beyond the jury's ability to consider and weigh. It was also misleading on the facts of this case. So far as the record on appeal gives any indication, the People's psychiatrists were no more "impartial" than Coddington's, either generally or specifically on the narrow and close question of malingering.

As the majority also establish, the superior court erred by allowing the prosecutor to cross-examine Coddington's psychiatrists, and to argue in summation, with regard to certain psychiatrists, of whom they were generally not aware, who had earlier examined Coddington on his retainer but were not called by him to the stand. The court's allowance was erroneous. It violated the work product rule of section 2018 of the Code of Civil Procedure. It was also misleading on the facts of this case. It permitted the prosecutor to lead the jury to believe that the uncalled psychiatrists would have testified that Coddington was sane; that their testimony would have been sound because it would have been based on examinations that were closer in time to the crimes; and that the testimony of Coddington's psychiatrists was unsound because it was based on examinations that were farther in time from the crimes and that were not informed by the results of the earlier ones. The record on appeal contains little concerning what testimony the uncalled psychiatrists would have given. But what little it does contain suggests that they would not have testified that Coddington was sane. For it suggests that they had even not examined him on the issue.

As the majority establish as well, the prosecutor misconducted himself by intentionally eliciting testimony on cross-examination of Dr. Satten, one of Coddington's psychiatrists, to the effect that the People did not have a right to have a defendant pleading insanity examined by a psychiatrist without his consent, and the superior court erred by admitting evidence in the form of such testimony. Evidence concerning any such right was inadmissible because it was irrelevant (Evid. Code, § 350), and it was irrelevant because it had no tendency in reason to prove or disprove any material fact (*id.*, § 210). For a prosecutor intentionally to elicit such evidence is misconduct. (E.g., *People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) For a court to admit such evidence is error. (E.g., *People v. Poggi* (1988) 45 Cal.3d 306, 323 [246 Cal.Rptr. 886, 753 P.2d 1082].) The evidence in question was also misleading on the facts of this case. As the

Court of Appeal held in *People v. Danis* (1973) 31 Cal.App.3d 782, 786-787 [107 Cal.Rptr. 675]—a decision on which the prosecutor expressly relied outside of the presence of the jury—the People did indeed have a right to have a defendant pleading insanity examined by a psychiatrist without his consent.[1] Of course, the defendant might not cooperate. But in that event, his noncooperation could be introduced against him as evidence. (Cf. *People v. McPeters* (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834, 832 P.2d 146] [dealing with a defendant who "tender[ed] his mental condition as an issue in the penalty phase" of a capital trial].) The record on appeal indicates that, although the prosecutor took steps to exercise the right in question, he apparently did not actually do so. *That* he did not follow through seems clear: Had he exercised the right, and had Coddington cooperated, he would have obtained an examination—which he did not. Had he exercised the right, and had Coddington *not* cooperated, he would surely have sought to introduce his noncooperation against him as evidence—which he did not. *Why* he did not follow through also seems clear: Having learned, from their reports, that Drs. Kaldor and Bittle, who had been appointed by the court, had each formed the opinion that Coddington was sane, he could rely upon them and their purported "impartiality," and hence had no need to retain a psychiatrist of his own. He led the jury to believe that he was disabled from subjecting Coddington to a psychiatric examination, but that, if he had not been, he would have been able to call a psychiatrist to testify that Coddington was sane in terms even stronger than those of the "impartial" Drs. Kaldor and Bittle. He did so, however, altogether without basis.

Having surveyed the superior court's errors and the prosecutor's misconduct, we must now address this question: Were they prejudicial? The answer that I would give is: Yes.

Under *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243], there is prejudice when there is a "reasonable probabilit[y]" that error or misconduct contributed to the outcome. There is such a reasonable probability when there is "merely a *reasonable chance*, more than an *abstract possibility*," of an effect of this kind. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894], italics in original; see *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 68 [70 Cal.Rptr.2d 118, 948 P.2d 909].)

After reviewing the record on appeal, I believe that there is at least a reasonable chance that, cumulatively if not individually, the superior court's errors and the prosecutor's misconduct contributed to the jury's verdict finding Coddington sane.

---

[1]See *Estelle v. Smith* (1981) 451 U.S. 454, 465-466 [101 S.Ct. 1866, 1874-1875, 68 L.Ed.2d 359] (citing decisions so holding).

First, the superior court's erroneous vouching for the "impartiality" of the People's psychiatrists over that of Coddington's improperly increased the credibility of the former and decreased that of the latter, both generally and specifically on the narrow and close question of malingering. It also did so unfairly, inasmuch as the record on appeal gives no indication that the People's psychiatrists were more "impartial" than Coddington's in either regard. It is true that the "jurors were instructed that they were the sole judges of the believability of a witness and the weight to be given to [his] testimony . . . ." (Maj. opn., *ante*, at p. 616.) But it is also true that "jurors are eager to find and quick to follow any supposed hint of the judge as to how they should" proceed. (*People v. Cole, supra*, 113 Cal.App.2d at p. 261; accord, *People v. Ramirez, supra*, 113 Cal.App.2d at p. 855.) That is because "[j]urors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*People v. Mahoney* (1927) 201 Cal. 618, 626-627 [258 P. 607].)

Second, the superior court's erroneous allowance of the prosecutor's cross-examination and argument relating to Coddington's uncalled psychiatrists improperly increased the credibility of the People's psychiatrists and decreased that of Coddington's, both generally and specifically on the narrow and close question of malingering. It permitted the prosecutor to magnify the believability of the People's psychiatrists on malingering, by bolstering their testimony with the "nontestimony" of the uncalled psychiatrists that Coddington was sane. At the same time, it permitted the prosecutor to minimize the believability of Coddington's psychiatrists on insanity, by attacking their examinations as later than those of the uncalled psychiatrists and as not informed by their results. And it did so unfairly, since it appears from the record on appeal that the uncalled psychiatrists had not even examined Coddington on the issue of sanity. That the jury heard much from the psychiatrists "who did testify" (maj. opn., *ante*, at p. 606) only highlighted the fact that it heard nothing at all from those who did not.

Third, the prosecutor's misconduct in intentionally eliciting inadmissible evidence on the People's purportedly nonexistent right to a psychiatric examination of a nonconsenting defendant pleading insanity, and the superior court's erroneous admission of such evidence, are similar in effect to the error concerning Coddington's uncalled psychiatrists. That is to say, they improperly increased the credibility of the People's psychiatrists and decreased that of Coddington's, both generally and specifically on the narrow and close question of malingering. Unfairly so, since—as the prosecutor himself knew—the People did indeed have the right in question, but, to judge from the record on appeal, declined to exercise it for reasons of their own. Certainly, they were not disabled from subjecting Coddington to a

psychiatric examination by Coddington himself. That the "jury was aware that" Coddington "had been examined by . . . five psychiatrists who testified" (maj. opn., *ante*, at p. 612)—his three, who the court implied owed him "allegiance" because of his retainer, and the People's two, who the court stated were "impartial" because of its appointment—could hardly have caused the jury to ignore the fact that he had not been examined by a psychiatrist of the People's own choosing.

In view of all that is set out above, I conclude that there is at least a reasonable chance that the superior court's errors and the prosecutor's misconduct, together, contributed to the jury's verdict finding Coddington sane. For I conclude that there is at least a reasonable chance that such errors and misconduct marginally affected the jury's assessment of the relative credibility of Coddington's psychiatrists and the People's on the narrow and close question of malingering, and hence marginally affected the jury's consequent determination, implicit but necessary, that Coddington did not prove by a preponderance of the evidence that he was insane because he did not disprove to that standard that he was not malingering.

I so conclude in spite of the majority's argument to the contrary. That is because they fail to persuade, stumbling at some points on the law, and at others on the facts, as they attempt to minimize the crucial matter of the jury's assessment of the relative credibility of Coddington's psychiatrists and the People's on the narrow and close question of malingering.

As to the facts: Although Coddington made some admissions to his psychiatrists and the People's that God did not command him to *plan* the crimes, he consistently stated that He did indeed command him to *execute* them, through a combination of "go" "signs" that He gave and "stop" "signs" that He did not give. Hence, although he might be criminally liable for the planning—which was not at issue—he would *not* be criminally liable for the execution—which was.

As to the law: It was of no consequence whether or not Coddington's crimes were the product of mental disease or defect. The answer would surely be relevant under the so-called product test of insanity, which the United States Court of Appeals for the District of Columbia laid down in *Durham v. United States* (D.C. Cir. 1954) 214 F.2d 862 [94 App. D.C. 228, 45 A.L.R.2d 1430], and subsequently abandoned in *United States v. Brawner* (D.C. Cir. 1972) 471 F.2d 969 [153 App. D.C. 1] (in bank). The product test, however, has never been the law in this state. It was similarly of no consequence what Coddington's conception of God might have been. What mattered, and still matters, is that a person's "God" is the ultimate, and ultimately authoritative, source of norms comprising standards

of behavior. (See *People v. Skinner, supra,* 39 Cal.3d at pp. 783-784.) Neither was it of consequence what Coddington's notion of morality might have been. Then and now, if a person believes that he is commanded by God to act as he does, whatever his views of morality might be, he is incapable of recognizing that his act is morally wrong. That is the square holding of *Skinner,* which dealt with a defendant who "held" a "belief . . . that the marriage vow 'till death do us part' bestows on a marital partner a God-given right to kill the other partner who has violated or was inclined to violate the marital vows." (*Id.* at p. 770.) In support of its holding, *Skinner* quotes from Justice Cardozo's opinion for Court of Appeals of the State of New York in *People v. Schmidt* (1915) 216 N.Y. 324 [110 N.E. 945]: " 'If . . . there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong' "—specifically, *morally* wrong. (*People v. Skinner, supra,* 39 Cal.3d at p. 784, quoting *People v. Schmidt, supra,* 216 N.Y. at p. 340 [110 N.E. at p. 949].) The majority assert that "[i]t is not enough in a case like this, where the appellant had a unique concept of morality, to say simply . . . that a person is incapable of recognizing that conduct is morally wrong if he or she believes God has commanded that conduct." (Maj. opn., *ante,* at p. 627.) But *Skinner* holds that it is, in fact, enough. It cannot be ignored.

For the reasons stated, I would reverse the judgment as to sanity and penalty, and remand the cause to the superior court for proceedings not inconsistent with the views expressed herein, including retrial of the issue of sanity.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied September 27, 2000, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.